p. 12) The reports thus were not only illegal, but highly prejudicial to Mr. Nichols.

Instead of continuing the sentencing hearing until legal presentence reports were prepared, the court stated it would ignore the presentence reports and that it had in fact not even read them. (Tr. 12/14/90 Sentencing Hearing, 3) However, under T.C.A. §40-35-205(a) (1990), the court is <u>obligated</u> to consider presentence reports, albeit not illegal ones. There was no plea agreement to preclude the necessity of a presentence report. Therefore, the court could not ignore the statutory requirement simply because illegal reports were prepared, and choose to sentence without a report. If it were otherwise, the Legislature would not have required that a presentence report be supplied to the court to be used in sentencing.

**2. THE COURT ERRED IN THE SENTENCING HEARING OF THESE CASES BY REVIEWING HIGHLY PREJUDICIAL VICTIM IMPACT STATEMENTS THAT WERE FORBIDDEN FROM CONSIDERATION.**

At the sentencing hearing, Mr. Nichols objected to the court's review of the highly prejudicial victim impact statements as well as a December 13, 1990 "victim impact" letter which the presentence officer did not file until the day before the sentencing hearing and which he failed to present to Mr. Nichols until the morning of the hearing. (Tr. 12/14/90 Sentencing Hearing, 9; R. 434-446) Pursuant to T.C.A §40-35-208 (1990), these documents were strictly forbidden from consideration by the court because they were not filed and presented to the parties within the requisite 10-day period. The court, nevertheless,

stated that although it had read the victim impact statements and the letter, it would not consider them. (Tr. 12/14/90 Sentencing Hearing, 5)

The sentencing should have been continued as requested by Mr. Nichols. (Tr. 12/14/90 Sentencing Hearing, 5)

### 3. THE COURT ERRED AT THE SENTENCING HEARING OF THESE CASES BY REFUSING TO CONSIDER THE MITIGATING FACTORS PUT FORTH BY MR. NICHOLS.

The sentencing in these cases was improper and illegal because the court did not accept any mitigating factors put forth by Mr. Nichols in sentencing him. (Tr. 12/14/90 Sentencing Hearing, 34) Under Tennessee law, the sentence imposed is to be the least severe measure necessary to achieve the purposes for which it is imposed. T.C.A. §40-35-103 (1990). In these cases, the court categorically denied the existence of any of the mitigating factors put forth by Mr. Nichols. (Tr. 12/14/90 Sentencing Hearing, 33-34) By not considering any mitigating factors in its sentencing, the court subjected Mr. Nichols to a sentencing period greater than that warranted by law. To imprison him for a period greater than that warranted constitutes excessive punishment which is a violation of T.C.A. §40-35-103 (1990), the Eighth Amendment prohibition against cruel and unusual punishment, the Fifth Amendment requirement of due process of law as applied to the states through the Fourteenth Amendment, and Article I, Sections 8 and 16 of the Tennessee Constitution.

### 4. THE TRIAL COURT ERRED AT THE SENTENCING HEARING OF THESE CASES BY ALLOWING THE PROSECUTION TO SEEK

## ENHANCED PUNISHMENT WITHOUT THE REQUISITE NOTICE TO MR. NICHOLS.

The court failed to follow the statutory and procedural limitations required for sentencing notice when the State sought enhanced punishment in these cases. Tenn. R. Crim. P. 12.3(a) provides that the State is prohibited from seeking enhancement of the defendant's punishment unless it files notice of such enhancement with the court and defense counsel ten (10) days (stating that 10 day notice is required where the State seeks enhanced punishment) before trial. (See also T.C.A. §40-35-202(a) (1990). The Supreme Court of Tennessee has held in regard to the necessity of compliance with the above-stated statute: "[n]otice is important not only in preparation for a sentencing hearing, but in evaluating the risks and charting a course of action before trial." State v. Adams, 788 S.W.2d 557, 559 (Tenn. 1990). The defendant need only show prejudice from the late filing, and did in these cases (see below). Id.

In the cases at hand, the court ignored these statutory and procedural limitations, thus effectively destroying Mr. Nichols' constitutional rights. Mr. Nichols moved at the sentencing hearing that he not be sentenced beyond a multiple offender to either a "persistent" or "career" offender because the State did not properly provide the 10-day notification of enhanced punishment. (Tr. 12/14/90 Sentencing Hearing, 26) Moreover, because the State did not provide any notice to him that it sought consecutive sentencing until two days before the sentencing hearing, Mr. Nichols moved that the sentences in these

cases not be consecutive. (Tr. 12/14/90 Sentencing Hearing, 26) The State was in clear violation of the limitations set upon it by T.C.A. §40-35-202(a) (1990) and Tenn. R. Crim. P. 12.3(a) in seeking such enhanced punishment without the requisite notice. The court wrongfully denied Mr. Nichols' motions. (Tr. 12/14/90 Sentencing Hearing, 30)

Because the State refused to provide the statutorily-required notices of enhancement for sentencing in each of the above cases (trials and pleaded cases), Mr. Nichols formulated his strategy for the three trials and the two nonbargained pleas without the information that these pleas and convictions would later be used against him for enhancement in the manner that the State demanded they be used, and to which demand the court agreed. Mr. Nichols promptly moved for a continuance in accordance with Rule 12.3(a). (Tr. 12/14/90 Sentencing Hearing, 26). This prejudice Mr. Nichols suffered as a result of the State's violation of Tenn. R. Crim. P. 12.3(a) warranted a continuation of the sentencing hearing.

Perhaps one of these errors standing alone would not warrant a reversal. Mr. Nichols maintains it would. Nevertheless, each of these errors violated Mr. Nichols' statutory as well as constitutional rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 and 16 of the Tennessee Constitution. Certainly the compound errors require that a new sentencing hearing should be granted as to all these effected cases.

D.  THE TRIAL COURT ERRED IN REFUSING TO SENTENCE MR. NICHOLS IN
    THE ORDER HIS CASES WERE TRIED, AFTER IT HAD, OVER MR.
    NICHOLS' OBJECTION, SCHEDULED HIS TRIALS OUT OF CHRONOLOGI-
    CAL ORDER AT THE PROSECUTOR'S DEMAND IN ORDER TO PROVIDE THE
    STATE WITH THE EVIDENCE OF AN ADDITIONAL AGGRAVATING
    CIRCUMSTANCE FOR THE DEATH PENALTY TRIAL.

**THIS SECTION APPLIES TO THE SENTENCING ON THE ROACH, GORE,**

**TATE, ROSZELL AND PULLEY CASES.**

This issue is one of extreme importance in the death penalty
case appeal (175504). For consistency in the two appeals (this
appeal and the death penalty appeal), the issue must be brought
to this court's attention. It is Mr. Nichols' contention that he
should be resentenced on all of the 14 cases at issue in this
appeal as well as on the death penalty case.

Mr. Nichols' rights under Article I, Section 8 of the
Tennessee Constitution to a trial under "the law of the land,"
and under the Fifth and Fourteenth Amendments of the United
States Constitution to due process of law, were violated when the
court acceded to the prosecutor's demand to try the cases against
him out of chronological order in order to <u>create</u> an additional
aggravating circumstance to support the prosecutor's request for
the death penalty in the Pulley murder case. These rights were
then <u>further</u> violated when the court refused to sentence him in
the order tried.

On April 5, 1989, Mr. Nichols filed a motion with the court
asking that the separate cases against him be tried in
chronological order. (R. 67-69) He had been charged in 14
separate "groups" of cases, each involving a single victim.
Chronologically, Mr. Nichols' only charge of murder related to an

incident which occurred prior to the offenses charged in all of the above cases except the two Pulley cases.

The prosecutor contested this motion. He deliberately set out to try the cases against Mr. Nichols _out of_ chronological order solely in an effort to manufacture an additional aggravating circumstance to support his request for the death penalty. (Tr. 4/10/89 Hearing, 33) The defense motion for chronological trials was denied. (R. 127-129)

On the day of sentencing, December 14, 1990, the prosecutor asked the court to sentence Mr. Nichols in the reverse order from which he had demanded Mr. Nichols be tried. The prosecutor presented a list of the offenses and demanded that Mr. Nichols be sentenced first for the death penalty case and _then_ the other cases. (Tr. 12/14/90 Sentencing Hearing, 15-16) Over the defendant's objection, the court followed this order of sentencing. (Tr. 12/14/90 Sentencing Hearing, 31) The State said plainly at the sentencing hearing that it did not wish to keep Mr. Nichols alive to serve his remaining sentences. (Tr. 12/14/90 Sentencing Hearing, 17)

The prosecutor may not declare it is constitutional and proper to try the defendant in one sequence, and then state that it is constitutional and proper to sentence him in a reverse sequence. When the State argued successfully to this court that the trials of the rapes which occurred subsequent to the murder must be held first, Mr. Nichols was entitled to be sentenced for those rapes first and to serve those sentences first. The State

cannot have it both ways. To have denied Mr. Nichols' motion to be sentenced in the same order he was tried was a violation of his constitutional rights.

As this Court is aware, these cases should be treated with the same deference given to the death penalty itself, since they were used as one of only two aggravating factors for the death penalty against Mr. Nichols. (Tr. 12/14/90 Sentencing Hearing, 17, 31; collective Exhibit 5 hereto from the Pulley murder trial shows how the State used the cases as an aggravating factor.) In a death penalty case, or cases associated with it, the courts must carefully scrutinize all aspects of the cases. As the Supreme Court of the United States has held, "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special 'need for reliability in the determination that death is the appropriate punishment.'" Johnson v. Mississippi, 486 U.S. 578, 108 S.Ct. 1981, 1986 (1988). The decision to impose the death penalty cannot be predicated on mere "caprice." In this case, the caprice of the prosecutor in trying the cases out of chronological order, and then sentencing them not in that order, not in chronological order, but yet in a third order, must be carefully scrutinized by this court, and is exactly the unreliability which Johnson and its progeny forbid in death penalty (or as in these cases, death penalty-related cases).

The actions of the court in sentencing Mr. Nichols in reverse order from his trials merely to allow the prosecution to

further manipulate time and space so that Mr. Nichols would be put to death, violated his rights under the Fifth, Eighth and Fourteenth Amendments of the United States Constitution, and Article I, Section 8 and 16 of the Tennessee Constitution, and he should receive a new sentencing hearing on all the above cases.

E.   THE COURT ERRED WHEN IT REFUSED TO DISMISS THE CASES AGAINST THE DEFENDANT BASED UPON THE COMPOSITION OF THE HAMILTON COUNTY GRAND JURY.

**THE FOLLOWING SECTION APPLIES TO THE GORE AND ROACH CASES ONLY.**

1.   THE 1931 TENNESSEE LEGISLATURE ACT, THE HAMILTON COUNTY BOARD OF JURY COMMISSIONERS ACT OF 1931 (1931 PRIVATE ACTS, CHAPTER 564, AS AMENDED), IS NOT SUPPORTED BY ANY RATIONAL BASIS IN FACT, AND IS, THEREFORE, AN UNCONSTITUTIONAL SPECIAL ACT.

In 1931 the Tennessee Legislature passed a special Act relating to the selection of grand and petit jurors in counties "having a population of not less than one hundred and fifty-nine thousand or more than one hundred and sixty thousand inhabitants, by the Federal Census of 1930, or by any subsequent Federal Census . . . ." 1931 Tenn. Priv. Acts, Ch. 564, § 1.  As a matter of fact, this act, by definition, applied only to Hamilton County at the time it was passed.  The Act, therefore, provides for a board of jury commissioners and the selection of grand and petit jurors in Hamilton County.  As such, and as described below, it is unconstitutional.

Article 11 § 8 of the Constitution of Tennessee provides in pertinent part:

> The Legislature shall have no power to suspend any general law for the benefit of

> any particular individual, nor to pass any
> law for the benefit of individuals
> inconsistent with the general laws of the
> land; nor to pass any law granting to any
> individual or individuals, rights,
> privileges, immunities, or exemptions other
> than such as may be, by the same law extended
> to any member of the community, who may be
> able to bring himself within the provisions
> of such law.

Since at least 1884 Tennessee has had a general law providing for the selection of grand and petit jurors. The Code of Tennessee, Milliken and Vertrees (1884); T.C.A. § 22-2-101.

As set forth in Hall v. State, 124 Tenn. 235, 239-40 137 S.W. 500 (1910), at one time the Tennessee Supreme Court was of the opinion that special acts which by their express terms applied only to counties having a certain designated population according to a particular federal census or any subsequent federal census were not violative of Article 11 § 8 of the Tennessee Constitution since any county could come within the terms of such act by an increase or decrease in population.

In modern jurisprudence, the Tennessee Supreme Court has held that the fact that an act applies to counties within certain population brackets according to a present federal census or any subsequent federal census does not keep such an act from being violative of Article 11 § 8 of the Tennessee Constitution. Knox Comm. Dev. Corp. v. Knox County, 665 S.W.2d 704 (Tenn. 1984). Rather, for such an act to be upheld, there must be some reasonable factual basis shown to justify the discriminatory classification by population bracket. Id. at 705.

At the July 14, 1989 hearing of this cause, just as in the Knox County case cited above, no factual evidence was produced showing that there is a reasonable basis for the Act in question applying only to counties within a certain population bracket.

The population of Hamilton County as determined by the 1980 Census (as revised) was 287,643. Tennessee Statistical Abstract 1989 10 (B. Vickers ed. 1989). Because the current population of Hamilton County is no longer between 159,000-160,000 (as it was when the Act was passed), the 1931 Tennessee Private Act, Ch. 564 does not now apply to Hamilton County. 1931 Tenn. Priv. Act Ch. 564, §1. The juror panels should have been selected in accordance with the general law of Tennessee as set forth at T.C.A. § 22-2-101 (1990) et seq., and the failure to do so renders such grand juries unconstitutional.

For the foregoing reasons, Chapter 564 of the Tennessee Private Acts of 1931 is unconstitutional on its face, and alternatively, if said Act is found not to be facially unconstitutional it would be invalid if applied to Hamilton County which has not had a population of less then 160,000 persons since at least 1940.

Although Mr. Nichols objected to the indictment in these cases (R. 173-79), the motion was denied. (R. 190-93)

The order of the trial court affirming the constitutionality of the Private Act should be reversed and Mr. Nichols should receive a new trial in these cases.

    2.    THE HAMILTON COUNTY JURY COMMISSION IMPROPERLY EXCLUDED LARGE CLASSES AND CATEGORIES OF CITIZENS FROM JURY

SERVICE IN HAMILTON COUNTY AND ALLOWED AN UNSWORN
ASSISTANT TO SELECT NAMES FOR THE MASTER JUROR LIST.

In Rutherford v. State, 409 S.W.2d 535, 536 (Tenn. 1966) the
Tennessee Supreme Court ruled that irregularities in the
selection of a grand jury warrant a new trial where the defendant
objected to the irregularities prior to the jury being sworn.  In
Rutherford, the panel from which the grand jurors and the trial
jurors were chosen were not selected in accordance with the
statutory mandate.  Even though both parties acknowledged the
absence of fraud, the court ruled that had the defendant objected
to the irregularity prior to the swearing of the jury, the
validity of the judgment would have been affected. Id.

In the case at bar, Ms. Reba Brown, one of the three
Hamilton County Jury Commissioners, admitted that the Commission
did not abide by the law in its selection of jurors.[1]

First, she admitted the Commission selected jurors almost
exclusively from the voter registration list.  (Exhibit 6 at 24,
25)  Of a 1980 population of 287,740 only 160,453 people were

---

[1] At the same time that Mr. Nichols' cases were being held,
another Hamilton County case, State of Tennessee v. Boyd, raised
the issue of the unconstitutionality of the Hamilton County jury
act.  The hearing held in the Boyd case was combined with the
Nichols case and the evidentiary hearing became evidence to both of
those cases.  However, defendant believes that the Boyd transcript
was not made a part of the transcript records sent to this court,
and accordingly, applicable portions of that transcript are
attached hereto as collective Exhibit 6.  The trial court ordered
that all portions of the August 24, 1989 evidentiary hearing in the
case of State of Tennessee v. Boyd, Case Nos. 176380, 176404
(Criminal Court of Tennessee at Hamilton County) relevant to Mr.
Nichols' Motion for Constitutional Selection of Jury and Motion of
Defendant to Dismiss Indictments be made a portion to the record.
(R. 261)

registered to vote in Hamilton County in July 1989. (Exhibit 6 at 12, 19) Assuming that the population remained constant from 1980 to 1989, approximately 127,287 residents of Hamilton County, 44% of the population, were automatically excluded (of course the actual numbers would be lower because many residents are below the 18 year minimum age).

Second, registered voters who had not recently voted were automatically excluded. (Exhibit 6 at 25)

Third, all citizens over the age of 75 were automatically excluded. (Exhibit 6 at 50-51, 56, 57)

Fourth, of those potential jurors remaining, the commissioners automatically excluded anyone they identified as an attorney, a physician, a clergyman, a pharmacist, a certified public accountant, a public accountant, a member of a fire company, one engaged in teaching college, school, or other learning institution, one disabled by bodily infirmity or a member of the National Guard in actual military service of the State. (Exhibit 6 at 31, 32, 33)

The Hamilton County Board of Jury Commissioners Act of 1931 did not empower the commissioners with the authority to exclude any of these people. 1931 Tenn. Priv. Acts, Ch. 564, as amended. In Duren v. Missouri, 439 U.S. 357 (1979), the United States Supreme Court held that a defendant is entitled to a fair cross section of jurors in the county in which he is tried. To remove these people violated Mr. Nichols' right to a jury representing a fair cross-section of Hamilton County residents as set forth in

<u>Duren</u>. The disproportionately low number of jurors from the predominately black districts (<u>see</u> Section C of this issue) suggests the commissioners may even have illegally excluded more classes of people than they acknowledge.

Mr. Nichols' right to a constitutional grand jury was further violated because an unsworn assistant to the jury commissioners selected the names for the master jury list. (Exhibit 6 at 28-30)

Mr. Nichols objected to the irregularities in the selection process. (R. 243-250) The motion was denied. (R. 262) To deny Mr. Nichols' motion violated his right to a constitutionally-selected grand jury. Under the authority of the Tennessee Supreme Court as set forth in <u>Rutherford</u>, the indictments are invalid.

Mr. Nichols need not show prejudice as a result of the illegal and unconstitutional actions of the jury commissioners and the unsworn assistant. In <u>Gomez v. United States</u>, 490 U.S. 858, 109 S.Ct. 2237 (1989), a U.S. District Judge assigned the tasks of conducting the voir dire examination and jury selection in a felony case to a magistrate. The U.S. Supreme Court held that the statutes did not empower the magistrate with the authority to conduct the jury selection. <u>Id</u>. at 2246-47. The Court ruled that a harmless error analysis does not apply where an officer exceeds his authority in the jury selection process:

> Among those basic fair trial rights that 'can never be treated as harmless' is a defendant's 'right to an impartial adjudicator, be it judge or jury'
> (quoting <u>Gray v. Mississippi</u>, 481 U.S. 648, 688 (1987)).

In the present cases, because the trial juries were not chosen from Hamilton County, it is obvious that the arguments presently in this issue apply to the Grand Jury (or Juries) which indicted Mr. Nichols in all 14 of these counts, not to the petit juries which tried the cases. It would have been impossible for Mr. Nichols to object to the irregularities in the jury selection process of the Grand Jury prior to that jury being sworn, since he did not know that he would be indicted by the jury prior to the time it was sworn.

For the foregoing reasons, Mr. Nichols was denied his rights guaranteed under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Articles 8, 9, and 16 of the Tennessee Constitution, and he should be granted a new trial.

3. THE SELECTION OF GRAND JURORS AND PROSPECTIVE JURORS PURSUANT TO THE BOARD OF JURY COMMISSIONS ACT OF 1931 HAS BEEN CONDUCTED IN SUCH A MANNER AS TO PRODUCE AN UNREPRESENTATIVE SAMPLE WHICH IS NOT A FAIR CROSS-SECTION OF HAMILTON COUNTY RESIDENTS.

Although Mr. Nichols may not be entitled to a jury which is a perfect mirror of the community, he is entitled to a jury which represents a fair cross-section of Hamilton County residents. (See Duren v. Missouri, 439 U.S. 357, 368 (1979) (holding that a defendant is entitled to be tried by a jury representing a fair cross-section of the community where tried). Although without resources to conduct the detailed statistical studies necessary to prove that the jury panels in Hamilton County do not include such a fair cross-section, Mr. Nichols did obtain the services of

Dr. James H. Macomber, the George M. Clark, Sr. Professor of Business Administration, School of Business Administration, University of Tennessee at Chattanooga.

Dr. Macomber, a statistician, testified at the July 14, 1989 Hearing on this motion that from the limited evidence available to him (lists of the names and places of residences of more than 750 jurors qualified for service in Hamilton County, Tennessee between January and April, 1989), he was only able to test the representative nature of one variable factor -- the zip code of residence of these prospective jurors. (Tr. 7/14/89 Hearing, 12)

Dr. Macomber concluded to an extraordinarily high degree of certainty, that the residential distribution of prospective jurors in Hamilton County is not random. (Tr. 7/14/89 Hearing, 11-12)

Exhibit A to Mr. Nichols' Motion for Interlocutory Appeal on the grand jury issue, supports Dr. Macomber's conclusion that the venire panels are unrepresentative of the community by demonstrating that Hamilton County's act is a "political" act which may be politically applied. (R. 201-202) Unlike the general act, T.C.A. §22-2-101 (1990) et. seq., which does not inject politics into the selection of jury commissioners, Hamilton County's act, by noting that not more than two of the three commissioners can belong to the same political party, both implies that the selection of jurors is somehow related to personal politics, and mandates that knowledge of a person's

political affiliation be known before the appointment to the Board of Commissioners. 1931 Tenn. Priv. Acts, Ch. 564, §1.

As is further demonstrated by the statistics contained in Exhibit B to the interlocutory motion, areas of predominately black population appear to be under-represented on Hamilton County juries, while districts with majority white populations may be over-represented. (R. 203)

Mr. Nichols submits that the present system employed in Hamilton County for the selection of juries deprived him of a grand jury panel representing a broad cross-section of community attitudes and groups. As the United States Supreme Court noted in Ballew v. Georgia, 435 U.S. 223, 233-234 (1978), "the counter-balancing of various biases is critical to the accurate application of the common sense of the community to the facts of any given case."

As can be seen from an examination of the data presented to the trial court and included as Exhibit C to the interlocutory motion, the geographical areas of Hamilton County included in these postal zip code areas differ greatly in terms of education and income. (R. 205-242) Justice Frankfurter, speaking in dissent in Thiel v. Southern Pacific Co., 328 U.S. 217, 227 (1946), noted that juries which represent a broad cross-section of community groups and attitudes assure a "diffused impartiality." Mr. Nichols is entitled to a grand jury which fairly represents all of Hamilton County. If residents of Hixson and Red Bank are over-represented on the grand jury panels of

statistical evidence that the composition of the Hamilton County grand juries are neither random nor representative of Hamilton County residence and as such violate his constitution rights as set forth in <u>Duren</u>, above at page 23.

Defendant submits that the Hamilton County Board of Jury Commissioners Act of 1931 is unconstitutional, as stated previously, and that its application and implementation deprive him of a fair cross-sectional grand jury and of a grand jury free from discriminatory exclusion of racial and other distinctive groups in the community, in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 6, 8 and 9 of the Tennessee Constitution.

F.  THE COURT ERRED WHEN IT REFUSED TO ALLOW MR. NICHOLS TO WITHDRAW THE GUILTY PLEAS IN THE TATE CASES, WHEN EVIDENCE WAS WITHHELD FROM HIM PRIOR TO THOSE PLEAS AND SURFACED ONLY AFTER THE PLEAS WERE ENTERED.

## THIS SECTION APPLIES TO THE TATE CASES ONLY.

Mr. Nichols pleaded guilty to the three Tate cases on October 24, 1989. At that time, Mr. Nichols plead guilty to aggravated rape (175433), first degree burglary (175490) and petit larceny in case number 175442, which had originally been filed as grand larceny.  (R. 319-322)

On the evening of November 29, 1989, Mr. Nichols was informed by the State that the East Ridge Police Department had a taped statement given by the alleged victim in the above cases shortly after the alleged incidents.  The State provided Mr. Nichols with a copy of that tape on November 29, and his counsel

were first able to listen to the tape on that afternoon.  (R. 319-322; Tr. 12/18/89, 5)

The State also did not produce to defense counsel a typewritten statement of the victim, which was in the State's possession on September 13, 1989, more than one month before defendant entered his pleas.  This statement was part of the victim's compensation claim and Mr. Nichols was not allowed to obtain a copy from the Tennessee Claims Commission as the State had done.  (Tr. 12/18/89, 7)

On February 28, 1989, this Court had entered an order requiring the State to make available to Mr. Nichols prior to trial "any evidence, material, or information within the possession . . . of the State, or that by the exercise of reasonable diligence may be obtained by the State, and which is favorable to . . . or which tends to establish a defense . . . or which may assist court-appointed defense counsel in their efforts . . . with regard to any of the . . . charges."  (R. 67-69)  Upon the information provided by the State which responded to this Order, defense counsel entered into discussions with the State concerning disposition of the charges, and these discussion led to the guilty pleas of October 24, 1989.  (R. 319-322; R. 327-334)

The defendant filed a motion to withdraw these guilty pleas on December 4, 1989 (R. 319-322), and supplemented that motion on December 15, 1989. (R. 327-334)  A hearing was held on December 18, 1989, and this Court denied the motion to withdraw the guilty

pleas. (Tr. 12/18/89; R. 340) Mr. Nichols was sentenced in these cases on December 14, 1990.

Counsel was placed in a position of negotiating a plea agreement without benefit of the evidence which the State had been required to provide, and which the State had. This evidence was certainly exculpatory, in that it provided two different descriptions by the victim of what had happened in the assault portion of this case. (Tr. Hearing, 14)

The Tennessee Rules of Criminal Procedure allow a defendant to withdraw a plea of guilty "upon a showing . . . of any fair and just reason" before sentence is imposed. Tenn. R. Crim. P. 32(f) Sentence had not been imposed in these cases, when the motion to withdraw was made. The matter of withdrawal of a plea rests within the discretion of the trial court. State v. Anderson, 645 S.W.2d 251 (Tenn. Crim. App. 1982).

Additionally, Rule 16(d)(2), Tennessee Rules of Criminal Procedure, provides that this Court may enter such Order "as it deems just under the circumstances" if at any time during the course of proceedings it is brought to the attention of the Court that a party has failed to comply with the provisions of Rule 16.

In the police report on this case, and the only account provided to defendant's counsel prior to plea negotiations, the victim states that she knew the gun was loaded with three live rounds, and that the defendant "pulled the trigger." In the typewritten victim's account, the victim admits that defendant opened the cylinder of the gun and commented, "It's not loaded."

She makes no mention of the defendant pulling the trigger on the pistol. In her third account, tape recorded by the East Ridge (Tennessee) police, the victim states again that the defendant opened the cylinder of the gun to examine it, but then placed it to her head and pulled the trigger. (Tr. 12/18/89, 14-15)

The difference between these accounts is important. The defendant could not have, as charged in the indictment "deliberately, premeditatively, maliciously and with malice of forethought assault [the victim] with . . . a pistol, with intent at the time to . . . kill and murder the [victim]" if, as the victim stated twice, once under oath, the defendant had opened the cylinder of the gun, examined it, and, as noted in the sworn typewritten statement, said, "It's not loaded." In the sworn typewritten statement, the victim does not say the defendant pulled the trigger on the gun. (Tr. 12/18/89, 14-15; Exhibit 8 is the indictment on this dismissed charge)

Was defendant prejudiced even though this charge was dismissed? Yes. An individual is <u>always</u> prejudiced when his counsel are compelled to negotiate with the Attorney General under unfair conditions.

The trial court had broad discretion under Rules 32 and 16 of the Tennessee Rules of Criminal Procedure, both to allow a defendant to withdraw his pleas of guilty, and to enter whatever order it would deem just because of the State's failure to comply with the Rules of Criminal Discovery and the Court's order. The Court's failure to do so denied him his rights guaranteed under

the Fifth, Sixth, and Fourteenth Amendments of the United States
Constitution, and Article I Sections 8 and 9 of the Tennessee
Constitution, and the guilty pleas in the Susan Tate cases should
be withdrawn and stricken.

G.   THE TRIAL COURT ERRED WHEN IT ADMITTED INTO EVIDENCE THE
     VIDEOTAPED CONFESSION MADE BY MR. NICHOLS, BOTH BECAUSE THE
     CONFESSION WAS TAKEN AFTER HE WAS REFUSED COUNSEL AND UNDER
     COERCIVE CIRCUMSTANCES.

**THE FOLLOWING SECTION APPLIES TO THE TRIAL OF THE GORE AND
ROACH CASES ONLY.**

Mr. Nichols was taken into custody by officers of the East
Ridge Police Department at his home at approximately 10:30 p.m.
on January 5, 1989.  (Tr. 9/6/89 Hearing, 3-4)  At the police
station he was placed in a room filled with numerous law
enforcement officers from several police jurisdictions.
Questioning was directed by two East Ridge officers, Larry
Holland and Buck Turner, assisted by one officer from Red Bank
and two from the City of Chattanooga.  (Tr. 9/6/89 Hearing, 7-8)

Shortly after some preliminary questions, Mr. Nichols, who
had been represented by counsel during previous criminal
proceedings, unequivocally told Holland and Turner of the East
Ridge Police Department that he did not want to answer any more
questions, and asked that an attorney be called for him.  (Tr.
9/6/89 Hearing, 11)  The questioning should have stopped at that
moment.

Detectives Holland and Turner refused to stop questioning
Mr. Nichols, and refused Mr. Nichols' request that efforts be
made to obtain him an attorney.  Mr. Nichols was told:  "[I]f I

was to have to wait for an attorney . . . they'd have to get search warrants . . . and having to wake the judge up . . . [T]he judge wouldn't like to get woke up in the middle of the night . . . and it'd be easier on me if I just cooperated with 'em." (Tr. 9/6/89 Hearing, 12) The officers continued with their questions.

The officers promised Mr. Nichols they would get him "help" and "treatment" if he would make a statement. (Tr. 9/6/89 Hearing, 12) His requests that questioning stop and an attorney be obtained having been ignored, intimidated by the presence of the officers, and overwhelmed by the promises of help, Mr. Nichols signed a form indicating a waiver of his Fifth Amendment rights and provided statements concerning assaults in the Chattanooga area. This "waiver" was apparently witnessed at 11:23 p.m. by East Ridge Detective Larry Holland. (Tr. 9/6/89 Hearing, 10-14)

Mr. Nichols was questioned throughout the early morning hours of January 6, 1989. During the interrogation at approximately 12:47 a.m. on January 6, 1989, a statement concerning the Gore and Roach cases was taken. (Tr. 9/6/89 Hearing, 73)

Mr. Nichols did not voluntarily waive any of his Constitutional rights. This Court must enter into this inquiry by presuming that Mr. Nichols "did not waive his rights." North Carolina v. Butler, 441 U.S. 369, 373 (1979). A defendant's waiver of his Fifth Amendment rights must be made voluntarily, knowingly, and intelligently. Miranda v. Arizona, 384 U.S. 436

(1966). The <u>Miranda</u> court noted that the state has a "heavy burden" to prove a waiver of these rights. <u>Id</u>. at 475. The absence of a voluntary waiver is shown by "<u>any evidence</u>" that the suspect was intimidated into relinquishing his rights. <u>Id</u>. (emphasis added). Such intimidation is present here. When a suspect has been advised of his rights, the salient inquiry is whether the statement was voluntary. <u>United States v. Brown</u>, 557 F.2d 541, 545 (6th Cir. 1977).

When evaluating the voluntariness of a suspect's statement, the court evaluates "the duration and conditions of detention . . ., the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his power of resistance and self-control." <u>Columbe v. Connecticut</u>, 367 U.S. 568, 602 (1961). In <u>Colorado v. Spring</u>, 479 U.S. 564 (1987) the Court addressed the issue of a knowing and intelligent waiver of <u>Miranda</u> rights.

Coercion may be psychological as well as physical. <u>Miranda</u>, 384 U.S. at 448. Although Mr. Nichols was not physically abused, the end result was the same as in <u>Brown</u> - a coerced statement. The police ignored Mr. Nichols' request for an attorney, and continued to question him in the presence of a crowd of law enforcement officers. Their "advice" to him of rights was meaningless. Not only was his capacity for rational thought impaired so that he could not make a voluntary decision to waive his rights and confess, but also his request for an attorney was ignored.

On August 31, 1989, Mr. Nichols filed a Motion to Suppress any and all statements made by him to law enforcement officers after his arrest on January 5, 1989, with supporting Brief attached. (R. 265-280) Mr. Nichols subsequently argued this Motion in open court. (Hearing of 9/6/89) The Motion was denied. (Hearing of 9/6/89 Tr. at 153)

Based on the above, it was error for the court to admit Mr. Nichols' statement into evidence, and a violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and Article I, Sections 7, 8, 9, and 16 of the Tennessee Constitution, and he is entitled to a new trial on these cases.

H.    THE COURT ERRED IN NOT REDACTING PORTIONS OF THE
      VIDEOTAPED STATEMENT BY MR. NICHOLS.

**THE FOLLOWING SECTION APPLIES TO THE ROACH CASES ONLY.**

Any portion of a confession that indicates that the accused has been guilty of another offense is inadmissible if it can be separated from the portion of the confession in issue. <u>Rounds v. State</u>, 106 S.W.2d 212, 214 (Tenn. 1937). In <u>Rounds</u>, the Supreme Court of Tennessee ruled that the trial court committed error in allowing into evidence portions of the defendant's statements relating to another crime. The court reversed the judgment. <u>Id</u>. at 215.

In <u>State v. Caldwell</u>, 671 S.W.2d 459, 464 (Tenn. 1984), <u>cert. denied</u>, 469 U.S. 873 (1984), the Tennessee Supreme Court held that references to other crimes must be redacted from a

<u>Caldwell</u>, the statements by Mr. Nichols regarding these separate offenses were inadmissible and violated Mr. Nichols' constitutional rights to a fair trial.

The introduction of such highly prejudicial and irrelevant evidence denied Mr. Nichols' rights to a fair trial and due process as set forth under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution as well as Article I, Sections 6 and 8 of the Tennessee Constitution and he should be granted a new trial on that basis.

I.  THE TRIAL COURT ERRED WHEN IT REFUSED TO ALLOW MR. NICHOLS'
    REQUEST FOR A CONTINUANCE AFTER IT WAS DISCOVERED THAT
    CERTAIN EVIDENCE HAD EITHER BEEN LOST OR WITHHELD FROM HIM.

## <u>THE FOLLOWING SECTION APPLIES TO THE ROACH CASES ONLY</u>.

Under Tennessee law, a defendant, upon request, has the right to inspect and copy any documents or tangible objects which are within the possession, custody or control of the State and which are material to the preparation of his defense. Tenn. R. Crim. P. 16(a)(1)(C). Where the State fails to comply with the above law, the court has a variety of remedies available, one of which is to grant a continuance. Tenn. R. Crim. P. 16(d)(2). The sanction a court must apply for non-compliance must fit the circumstances of the individual case. <u>State v. Cadle</u>, 634 S.W.2d 623, 625 (Tenn. Crim. App. 1982).

Approximately one week before the trial in these cases, at a voir dire hearing of a number of police officers from the East Ridge Police Department, Mr. Nichols discovered that there was a taped statement from the victim which he had never received.

(Tr. 1/4/90 Hearing, 64)  At the hearing, Mr. Nichols learned for
the first time that Officer Butch Bryson, one of the
investigating policemen in the above cases, taped a statement
made by the victim soon after he arrived at the scene of the
incident.  (Tr. 1/4/90 Hearing, 64).  This was the first recorded
statement of the victim and was made while the incident was fresh
in her mind.

Mr. Nichols had made specific requests for all exculpatory
evidence almost one year before the January 4, 1990 hearing (R.
61-63), and the court sustained the motion ordering the State to
produce any such evidence, (R. 67-69), yet the State never
produced the above-mentioned tape.  The testimonies of the police
officers were extremely confusing when questioned as to why Mr.
Nichols had not received a copy of the tape in accordance with
his motion for exculpatory evidence (in fact it appears that two
tapes may have been made).  Officer Bryson stated that he gave
the tape to Detective Buck Turner.  (Tr. 1/4/90 Hearing, 65)  At
the hearing, Officer Turner testified that he had seen the tape
and delivered it to the District Attorney's Office.  (Tr. 1/4/90
Hearing, 9)  At trial, Officer Turner then changed his story and
said that he did not deliver the tape to the District Attorney's
Office.  (Roach Tr. 1/10/90 Evidence, 208, 212)  Captain Larry
Holland stated that he did not know what happened to the tape.
(Roach Tr. 1/10/90 Evidence, 12)  The District Attorney's office
denied knowledge of the tape.  (Roach Tr. 1/10/90 Evidence, at
209)

Mr. Nichols asked for a continuance on January 4, 1990.
(Tr. 1/4/90 Hearing, 73)  It was denied.  (Tr. 1/4/90 Hearing,
77)  The defendant renewed his motion for continuance on the
first day of jury selection (Roach Tr. 1/9/90 Jury Selection, 27)
and again on the first day of trial.  (Roach Tr. 1/10/90
Evidence, 26)  But these were also denied.  (Roach Tr. 1/9/90
Jury Selection, 27)  (Roach Tr. 1/10/90 Evidence, 31)

At the voir dire hearing of the officers, Mr. Nichols also
learned for the first time that Mrs. Roach had identified Fred
Coates in a photo lineup as the perpetrator of the charges in the
above cases.  (Tr. 1/4/90 Hearing, 31)  Mr. Coates was arrested
by the East Ridge police, and later released for lack of
evidence.  (Tr. 1/4/90 Hearing, 31)  When Mr. Nichols sought to
discover detailed information about the photo lineup, both
Officers Holland and Turner claimed the other was present at the
photo identification, and denied knowledge (or material
information) of the proceedings.  (Tr. 1/4/90 Hearing, 27, 46-47)
(Roach Tr. 1/19/90 Evidence, 8-9, 11, 13)

The failure of the East Ridge Police Department and the
District Attorney's office to produce the first taped statement
of the victim and the information regarding the photo lineup is
strong circumstantial evidence that they were withholding
exculpatory evidence.  Mr. Nichols made specific requests for all
exculpatory evidence well in advance of the January 4, 1990
hearing.  (R. 61-63)  Pursuant to Tenn. R. Crim. P. 16(d)(2), the
State is obligated to disclose all such information if it is

material. Yet the State did not even inform Mr. Nichols that the victim in these cases had identified another man in a photo lineup as the perpetrator. (Tr. 1/4/90 Hearing, 31) Mr. Nichols had to discover this evidence himself and when it was too late to help him in trial preparation. Without any doubt, this information was material.

Mr. Nichols should have been granted a continuance. The State has a constitutional obligation to disclose evidence which is exculpatory in nature. Brady v. Maryland, 373 U.S. 83, 87 (1963). Where the State fails to produce such evidence, the sanction a court must apply must fit the circumstances of the individual case. State v. Cadle, 634 S.W.2d at 625. If the court had granted the requested continuance (Tr. 1/4/90 Hearing, 73), the East Ridge Police Department and the State would have been compelled to disclose the missing evidence. Because the court refused Mr. Nichols' motion, the East Ridge Police Department and the State had no reason to produce such evidence. And, in fact, the evidence was never produced. (Roach Tr. 1/10/90 Evidence, 27).

To refuse to grant Mr. Nichols a continuance based on the withholding (or at best, loss) of evidence, violates his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution as well as Article I, Sections 8, 9, and 16 of the Tennessee Constitution, and a new trial should be granted on these cases.

J.    THE EVIDENCE WAS INSUFFICIENT TO CONVICT MR. NICHOLS IN
      THESE CASES AND JUDGMENTS OF ACQUITTAL ON SAME SHOULD HAVE
      BEEN GRANTED.

**THE FOLLOWING SECTION APPLIES TO THE GORE CASES ONLY**.

For a conviction to stand in a criminal case, all the
elements of an offense must be proven beyond a reasonable doubt.
Hardin v. State, 355 S.W.2d 105, 107-08 (1962).  In the above
case, the State not only failed to prove all the elements of
aggravated rape but also failed to offer any evidence whatsoever
of personal injury even though that is what it set out to prove.

Although T.C.A. § 39-2-603(a) (Michie Supp. 1988) stipulates
that the charge of aggravated rape requires proof of sexual
penetration, the State failed to prove this element.  The medical
report of Dr. Lisa Molina, the chief medical resident at Erlanger
Hospital who examined Ms. Gore on December 21, 1988, hours after
the alleged rape, clearly indicates that there was "no vaginal,
anal [or] oral penetration."  (Gore Tr. 2/21/90 Evidence, 65)
Mr. Nichols moved for judgment of acquittal (Gore Tr. 2/21/90
Evidence, 88), but the motion was denied.  (Gore Tr. 2/21/90
Evidence, 90)  Without sexual penetration, there is no rape or
aggravated rape.  T.C.A. § 39-2-604(a) (Michie Supp. 1988);
T.C.A. § 39-2-603(a) (Michie Supp. 1988).  To convict Mr. Nichols
of aggravated rape without proof he has committed the offense
violates all his constitutional rights.  Mr. Nichols should be
granted a new trial.

A new trial is also warranted because the State failed to
prove the allegations in the indictment.  Indictment 180537,

which charges aggravated rape, alleges Mr. Nichols "caused personal injury to Patricia Ann Gore." (R. 40) Yet the State failed to prove any such injury. The uncontroverted testimony of Dr. Molina indicated that there were no physical injuries, abrasions or contusions of any sort to the victim. (Gore Tr. 2/21/90 Evidence, 63)

Even if the State had proven sexual penetration, such proof could not constitute the personal injury required for conviction of aggravated rape as delineated in Indictment 180537. Under Tennessee's rape statute, rape is the unlawful sexual penetration of a victim by force or coercion. T.C.A. § 39-2-604 (Michie Supp. 1988) The offense of aggravated rape under Tennessee law requires proof of sexual penetration by force or coercion accompanied by any of the aggravating factors enumerated in that section, one of which is personal injury to the victim. T.C.A. § 39-2-603(a)(2) (Michie Supp. 1988). If the sexual penetration itself constituted personal injury, then every act that constitutes rape pursuant to T.C.A. § 39-2-604 (Michie Supp. 1988) would also constitute aggravated rape pursuant to T.C.A. § 39-2-603 (Michie Supp. 1988). Such a reading of the statutes would render rape a meaningless crime, as every rape would by definition be an aggravated rape. The State failed to prove personal injury.

Mr. Nichols moved for a judgment of acquittal based upon the failure to produce such proof (Gore Tr. 2/21/90 Evidence, 88-89); however, the motion was denied. (Gore Tr. 2/21/90 Evidence, 90)

By denying Mr. Nichols' motions for judgment of acquittal based upon the failure to prove sexual penetration and upon the failure to prove personal injury, Mr. Nichols' rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article 1, Sections 8, 9 and 16 of the Tennessee Constitution were violated, and he is entitled to a new trial on these cases.

K.    THE COURT ERRED IN REFUSING TO DISMISS TWO OF THE CHARGES OF RAPE IN THESE CASES BECAUSE BODILY INJURY HAD TO BE CAUSED BY THE ACTS AS DESCRIBED IN THE INDICTMENTS, AND SUCH PROOF WAS NOT OFFERED.

**THE FOLLOWING SECTION APPLIES TO THE ROACH CASES ONLY.**

Mr. Nichols was entitled to a judgment of acquittal in these cases because the State failed to prove the personal injury alleged in the indictments.   Indictments 175438 and 175440, which charge Mr. Nichols with aggravated rape by means of fellatio and anal intercourse, respectively, allege that such acts "caused personal injury to Patricia Ann Roach."   (R. 18, 20)   Thus the State drafted the indictments in such a way that the jury would have to find that bodily injury was caused by the acts of penetration themselves.   (R. 18, 20)

Yet the state failed to prove any such injury.   The testimonies of both the Mrs. Roach and Dr. Brian A. Glass, the physician who examined the victim after the incident, indicated that there were no physical abrasions, contusions or other injuries caused by the fellatio or anal intercourse.   (Roach Tr. 1/10/90 Evidence, 141, 162, 164)