UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA


HAROLD WAYNE NICHOLS,       )
                           )
      Petitioner,          )
v.                          )         No. 1:02-cv-330
                           )         *Edgar / Inman*
RICKY BELL, WARDEN, Riverbend  )
Maximum Security Institution,    )
                           )
      Respondent.       )


**MEMORANDUM OPINION**

# TABLE OF CONTENTS

*Harold Wayne Nichols v. Ricky Bell, Warden*
No. 1:02-cv-330, Eastern District of Tennessee

I.      FACTUAL BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.    Facts at Trial Level  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-5

        B.    Facts Introduced During the
              State Post-Conviction Hearing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-16

II.     PROCEDURAL BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-23

III.    STANDARDS OF REVIEW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        A.    Habeas Claims Cognizable Under 28 U.S.C. § 2254  . . . . . . . . . . . . . . . . . . 23

        B.    Review of Habeas Claims on the Merit  . . . . . . . . . . . . . . . . . . . . . . . . . 23-25

        C.    Factual Bases for Habeas Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25-27

        D.    Procedural Default  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-30

        E.    Miscarriage of Justice: Actual Innocence  . . . . . . . . . . . . . . . . . . . . . . 30-31

        F.    Summary Judgment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31-33

IV.     ANALYSIS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        A.    Claims Adjudicated in State Court  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

              1.    Ineffective Assistance of Counsel at Guilt Phase  . . . . . . . . . . . . . . 33-35

                    a.    Failure to Investigate
                          Serology Evidence (Claim 12a)  . . . . . . . . . . . . . . . . . . . . 35-44
                    b.    Case of T.R. (Claim 12.b)  . . . . . . . . . . . . . . . . . . . . . . . . . . 44
                    c.    Alibi Evidence in the T.M. Case (Claim 12.c)  . . . . . . . . . . . . . 45
                    d.    Coerced Statement (Claims 12.d and 12.e)  . . . . . . . . . . . . . 45-51
                    e.    Failure to Attack Confession (Claim 12.f)  . . . . . . . . . . . . . 51-52
                    f.    Failure to Investigate Critical Evidence (Claim 12.g)  . . . . . 52-53
                          (1)    Lack of Physical Evidence (Claim 12.g.i)  . . . . . . . . 53-54

             (a)     Weapon in S.T. Case
(Claim 12.g.i.(1)) . . . . . . . . . . . . . . . . . . . . . . . . 54
             (b)     2 x 4 Lumber in the Murder
Claim (Claim 12.g.i.(2)) . . . . . . . . . . . . . . . 54-56

        (2)    Confessions in Other Cases
(Claim 12.g.ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
        (3)    Pulley Confession (Claim 12.g.iii) . . . . . . . . . . . . . 56-60
        (4)    Fred Coats (Claim 12.g.iv) . . . . . . . . . . . . . . . . . . . . 60
    g.    False Confessions (Claims 12.h - j) . . . . . . . . . . . . . . . . . . 60-61
        (1)    Inadequate Investigation
(Other Suspects) (Claim 12.i) . . . . . . . . . . . . . . . . . 61-63
        (2)    Inadequate Investigation
(Physical Evidence) (Claim 12.j) . . . . . . . . . . . . . . 63-66
    h.    Ineffective Use of Psychological Expert
(Claim 12.k) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66-68
    i.    Illegal Arrest (Claim 12.i) . . . . . . . . . . . . . . . . . . . . . . . . . . . 68-72

2.    Ineffective Assistance of Counsel During
the Penalty Phase (Claim 13.a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

    a.    Abuse Evidence at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . 73-75
    b.    Abuse Evidence Introduced During
State Post-Conviction Proceedings . . . . . . . . . . . . . . . . . . . . . 75-91

3.    Prosecutorial Misconduct (Claim 13.b) . . . . . . . . . . . . . . . . . . . . . . 91-96

4.    Failure to Request Jury Instructions and
Object to Improper Instructions (Claim 13.c) . . . . . . . . . . . . . . . . . . 96-97

    a.    Failure to Request Jury Instruction . . . . . . . . . . . . . . . . . . 97-101
    b.    Improper Unanimity Instruction . . . . . . . . . . . . . . . . . . . . 101-104

5.    Counsel's Failure to Argue Against Disclosure
of Psychologist's Notes (Claim 13.d) . . . . . . . . . . . . . . . . . . . . . . 104-105

6.    Counsel's Direction of
Investigation of Mitigation (Claim 13.e) . . . . . . . . . . . . . . . . . . . . 105-107

7.    Cumulative Error (Claim 14) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

8.  Arbitrary and Invalid Death Sentence
    (Claims 15, 20, 21(g) and 25) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107-108

    a.  Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108-110
    b.  Failure to Declare Mistrial (Claim 15) . . . . . . . . . . . . . . . 110-115
    c.  Court Erroneously Refused to Re-charge
        Jury on Mitigating Circumstances (Claim 21(g)) . . . . . . . 115-120
    d.  Polling of Jury (Claim 25) . . . . . . . . . . . . . . . . . . . . . . . . 120-124
    e.  *Middlebrooks'* Error (Claim 20) . . . . . . . . . . . . . . . . . . . . 124-130

9.  Objection to Evidence (Claim 16) . . . . . . . . . . . . . . . . . . . . . . . . 130-133

10. Discovery of Experts Notes and
    Memorandums (Claim 17) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133-147

11. Prosecutorial Misconduct (Claim 18) . . . . . . . . . . . . . . . . . . . . . . 147-152

12. Change of Venue (Claim 19) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152-154

13. Unconstitutional Jury Instruction (Claim 21) . . . . . . . . . . . . . . . . . . 155

    a.  Reasonable Doubt Instruction (Claim 21.a) . . . . . . . . . . . 155-160
    b.  Presumption of No Aggravating
        Circumstance (Claim 21.b) . . . . . . . . . . . . . . . . . . . . . . . 160-160
    c.  Non-Statutory Mitigating Factors (Claim 21.c) . . . . . . . . 160-161
    d.  Unanimous Finding of Mitigating
        Circumstances (Claim 21.d) . . . . . . . . . . . . . . . . . . . . . . 161-164
    e.  Elements of Underlying Felony
        Aggravating Circumstance (Claim 24.e) . . . . . . . . . . . . . 164-165
    f.  Failure of Trial Court to Instruct the
        Jury of its Role as Both Trier of Fact
        and Law (Claim 21.f) . . . . . . . . . . . . . . . . . . . . . . . . . . . 166-167
    g.  Failure to Re-instruct Jury on
        Mitigating Circumstances (Claim 21.g) . . . . . . . . . . . . . . . . 167
    h.  Cumulative Error (Claim 21.h) . . . . . . . . . . . . . . . . . . . . 167-168

14. Videotaped Confession Evidence (Claim 22) . . . . . . . . . . . . . . . . 168-173

15. Chronological Order of Trials (Claim 23) and
    Prior Convictions (Claim 28) . . . . . . . . . . . . . . . . . . . . . . . . . . . 173-173

    a.  Chronological Order (Claim 23) . . . . . . . . . . . . . . . . . . . . 173-178
    b.  Prior Convictions (Claim 28) . . . . . . . . . . . . . . . . . . . . . . 178-179

-iii-

16.     1984 Convictions (Claim 24) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179-181

17.     Polling the Jury (Claim 25) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

18.     Unconstitutionality of Tennessee's Death
Penalty Statute (Claim 26) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181-182

19.     Notice of Prior Conviction in Case 175433
as Aggravating Circumstance (Claim 27) . . . . . . . . . . . . . . . . . . 182-184

20.     Newly Discovered Evidence (Claim 29) . . . . . . . . . . . . . . . . . . . 184-185

21.     *Caldwell* Error (Claim 30) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185-189

22.     Cumulative Error (Claim 31) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190-191

23.     Actual Innocent Claim (Claim 32) . . . . . . . . . . . . . . . . . . . . . . . . 191-192

V.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

-iv-

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA


HAROLD WAYNE NICHOLS,     )
                                )
       Petitioner,            )
v.                           )          No.1:02-cv-330
                                )          *Edgar/Inman*
RICKY BELL, WARDEN, Riverbend   )
Maximum Security Institution,     )
                                )
       Respondent.         )


## MEMORANDUM OPINION


Harold Wayne Nichols ("Nichols" or "petitioner"), a death-sentenced inmate at the Riverbend Maximum Security Institution in Nashville, Tennessee, brings this petition for writ of habeas corpus against the Warden, Ricky Bell ("State" or "respondent"), pursuant to 28 U.S.C. § 2254 [Court File No. 82]. Nichols is petitioning this Court for a writ of habeas corpus discharging him from his "unconstitutional and invalid conviction for first-degree murder" and his resulting death sentence [Court File No. 82, at 1]. Before the Court is respondent's motion and memorandum to dismiss the amended petition [Court File Nos. 119, 120], petitioner's response to the motion to dismiss the amended petition [Court File Nos. 140, 211, Attachment #1], and respondent's reply to petitioner's response to the motion to dismiss [Court File No. 155]. After carefully considering arguments of counsel and the applicable law, the Court will **GRANT** the respondent's motion to dismiss [Court File No. 119].

1

# I.
## FACTUAL BACKGROUND

On May 9, 1990, Nichols pleaded guilty to first-degree felony murder, aggravated rape, and first-degree burglary[1] in the Criminal Court of Hamilton County before a jury impaneled from Sumner County, Tennessee. The trial proceeded to the penalty phase with the State relying on two aggravating circumstances: (1) the murder's occurrence during the commission of a felony, and (2) Nichols' previous convictions of violent felonies. Tenn. Code Ann. § 39-13-204(i)(2) & (7). At the conclusion of the sentencing hearing, after deliberating approximately two hours, the jury returned a verdict of death based on the two statutory aggravating circumstances.

On direct appeal, the Tennessee Supreme Court determined the use of the felony-murder for which Nichols had been convicted as an aggravating circumstance was error; however, they determined the error was harmless and affirmed the convictions and sentences. The following recitation of the facts is from the direct appeal to the Supreme Court of Tennessee.

## A.    Facts at the Trial Level

Because of the substantial publicity surrounding the murder and rape cases, the defendant requested a change of venue prior to trial. The trial court granted the change of venue to Sumner County, but only for the limited purpose of jury selection. The court then ordered the case back to Hamilton County for trial with the Sumner County jury. The trial reconvened in Hamilton County on May 9, 1990. Following the court's denial of the defendant's motion to suppress his videotaped confessions, the defendant entered pleas of guilty to the charges of first-degree felony murder, aggravated rape, and first-degree burglary. [The State dismissed a charge of premeditated first-degree murder.]

---

[1]    Nichols was granted state post-conviction relief from the sentences in the aggravated rape and first-degree burglary convictions by the state post-conviction court. *See Nichols v. State*, 2001 WL 55747, at *3 (Tenn.Crim.App. 2001). Nichols is presently awaiting re-sentencing on those convictions.

The trial proceeded to the penalty phase with the State relying on two aggravating circumstances: (1) the murder's occurrence during the commission of a felony and (2) Nichols' previous convictions of violent felonies. Tenn. Code Ann. § 39-13-204(i)(2) & (7). The State introduced evidence concerning the nature and circumstance of the crime, which included the defendant's videotaped confession, testimony from the medical examiner about the nature and extent of the victim's injuries and the cause of her death, and testimony from the detective who had questioned the defendant on the videotaped interview. The Hamilton County Criminal Court Clerk also testified concerning the defendant's five prior convictions for aggravated rape.

The proof showed that on the night of September 30, 1988, the defendant broke into the house where the 21-year-old-victim, Karen Pulley, lived with two roommates in the Brainerd area of Chattanooga, Tennessee. After finding Pulley home alone in her upstairs bedroom, the defendant tore her undergarments from her and violently raped her. Because of her resistance during the rape, he forcibly struck her at least twice in the head with a two-by-four he had picked up after entering the house. After the rape, the defendant, while still struggling with the victim, struck her again several times with great force in the head with the two-by-four. The next morning, one of Karen Pulley's roommates discovered her alive and lying in a pool of blood on the floor next to her bed. Pulley died the next day. Three months after the rape and murder, a Chattanooga police detective questioned the defendant about Pulley's murder while he was in the custody of the East Ridge police department on unrelated charges. It was at this point that the defendant confessed to the crime. This videotaped confession provided the only link between the defendant and the Pulley rape and murder.

The evidence showed that, until his arrest in January 1989, the defendant roamed the city at night and, when "energized" relentlessly searched for vulnerable female victims. At the time of trial, the defendant had been convicted on five charges of aggravated rape involving four other Chattanooga women. These rapes had occurred in December 1988 and January 1989, within three months after Pulley's rape and murder. The convictions presented to the jury were as follows:

The defendant was indicted for feloniously engaging in sexual penetration of T.R. on December 27, 1988, by the use of force or coercion while the defendant was armed with a weapon- -a cord. The defendant plead guilty to the offense of aggravated rape.

The defendant was indicted for feloniously engaging in sexual penetration - -anal intercourse- -with S.T. on the 3rd day of January, 1989, by the use of force or coercion while he, the defendant, was armed with a weapon- -a pistol. The defendant pled guilty to aggravated rape.

3

The defendant was indicted for feloniously engaging in sexual penetration- -fellatio- -with P.A.R. on January 3, 1989, thereby causing personal injury to her. The defendant was also indicted for feloniously engaging in sexual penetration - -vaginal intercourse- -with P.A.R., on January 3, 1989. The defendant pled not guilty and the jury found the defendant guilty of aggravated rape in each case.

The defendant was indicted for feloniously engaging in sexual penetration, vaginal intercourse, with P.A.G. on December 21, 1988, by the use of force or coercion while he, the defendant, was armed with a weapon- -a knife. The defendant pled not guilty and a jury convicted the defendant of aggravated rape.

The primary factors in mitigation presented by the defense were the defendant's cooperation with the police and the psychological effects of his childhood. Several persons who knew the defendant testified to his good character and passive nature.

The defendant also took the stand and testified about his life and the violent crimes he had committed. After his mother died of breast cancer when he was ten years old, he and his older sister were placed in an orphanage for six years by his father, who was apparently emotionally abusive, at least to the defendant's older sister. In 1976, just as he was about to be adopted, he was returned to his father. In 1984 he pled guilty to attempted rape, was sentenced to five years in prison and served eighteen months. Thereafter, he violated parole and served an additional nine months. He was married in 1986. At the time of the killing, he was employed by Godfather's Pizza as a first assistant manager.

Defendant testified that when he committed these violent criminal acts, a "strange energized feeling" that he could not resist would come over him and result in actions that he could not stop. He explained that he had not asked for help for his affliction or told anyone about this criminal activity because he was afraid he would lose everything. He expressed remorse for his actions but testified that, if he had not been arrested, he would have continued to violently attack women.

Finally, Dr. Eric Engum, a lawyer and clinical psychologist, testified that he had diagnosed the defendant with a psychological disorder termed "intermittent explosive disorder." According to Engum, a person suffering from this disorder normally experiences an increasing, irresistible drive that results in some type of violent, destructive act. Dr. Engum opined that the defendant's condition may have grown out of his anger at abandonment in childhood but conceded that the disorder was rare. According to him, the defendant would function normally in a institutional regimented setting but, if released, would repeat the violent behavior. The State offered Dr. Engum's investigating notes to prove that he was a member of the defense team acting as a lawyer searching for a defense, rather than an objective psychologist searching for a diagnosis.

*State v. Nichols*, 877 S.W.2d 722, 725-27 (Tenn. 1994), *cert. denied*, 513 U.S. 1114 (1995).

**B.      Facts Introduced During the State Post-Conviction Hearing**

Some additional facts not introduced at the trial level were introduced by petitioner during his state post-conviction hearing [Addendum No. 1].[2]  The substance of the testimony of the witnesses presented at the state post-conviction hearing will be taken from different sections of the appellate opinion.  *Nichols v. State*, 2001 WL 55747 (Tenn.Crim.App. 2001).  Throughout the proceedings involving this death penalty case, the related cases, and the cases used as aggravating factors, Nichols was represented by the same two appointed counsel, against whom he has made claims of ineffective assistance counsel.  An overview of the proof presented at the state post-conviction hearing is included in the Court of Criminal Appeals decision.  The following recitation of the pertinent facts is from the appeal of the denial of his post-conviction petition to the Tennessee Court of Criminal Appeals:

> Senior trial counsel appointed by the trial court was a 1966 graduate of Vanderbilt University and a 1969 graduate of Yale Law School.  He was a law clerk for a United States District Court judge, an attorney with the Civil Rights Division of the Justice Department for three years, and an Assistant United States Attorney for three years.  Previously, he had been counsel in two capital cases, and his practice consisted of ten percent criminal work and ninety percent civil work.  He was the author of the voir dire section of the Tennessee Association of Criminal Defense Lawyers ("TACDL") Death Penalty Manual.

> Junior trial counsel was a member of both the National Association of Criminal Defense Lawyers and the TACDL.  She was on the board of directors of the TACDL in 1989 and had been a member of the organization for a number of years, holding various offices.  She had been the head of their continuing legal education program for a year.  She had attended a number of TACDL seminars and had presented a Tennessee criminal law update at "one or two" seminars.  Before representing the

---

[2]      Additional facts were introduced by petitioner to support his claim that his trial counsel were ineffective for failing to fully inform the jury of his complete mental health history.

petitioner, she had attended at least one TACDL capital case seminar, as well as a capital case seminar of the National Association of Criminal Defense Lawyers.

Additionally, she had attended criminal seminars presented by the Chattanooga Bar Association. According to testimony, as well as an exhibit introduced during the post-conviction hearing, the combined hours billed by trial counsel for the matters in which they represented the petitioner were as follows:

1,386.80 Out-of-court hours in the Karen Pulley case
  259.75 In-court hours in the Karen Pulley case
  654.50 Out-of-court hours in the rape cases
    29.25 In-court hours in the rape cases

According to counsel, the 2,330.30 hours billed were less than the actual combined hours spent on the various matters, but the total was reduced to avoid duplicative billings. Additionally, according to counsel, the 289 in-court hours "were always" with the petitioner present and usually included a meeting with the petitioner in the court anteroom. Further, trial counsel spent "at least" 69.75 hours meeting with the petitioner in jail.

The investigator retained by trial counsel was Michael Cohan, who had been a self-employed private investigator since 1986. He has a bachelor's degree in criminal justice and had been employed in "one form of police work or another" during most of the years since 1969. For four years, he had been a military police officer and was then employed for two years as a police officer by the University of Tennessee. Next, he was a Metro narcotics officer in Knoxville for about five years and then was the assistant regional director for investigations for the Department of Human Services Welfare Fraud Division for approximately five years. He left that position in 1986 to become a private investigator. According to his time records, he spent fifty-one hours conferring with trial counsel and met with the petitioner on more than one occasion, although the records showed only one six-hour meeting. He recorded 163 hours locating and interviewing witnesses. He had previously been involved in several capital cases but was unable to say exactly how many.

*Nichols v. State*, 2001 WL 55747, *2-5 (Tenn.Crim.App. 2001). As the Tennessee appellate court observed, one of petitioner's claims is that his trial counsel were ineffective for failing to investigate Nichols' confessions to ascertain whether they were "false." According to petitioner, the confessions, especially to the other crimes, were very brief and basically answers to leading questions. Therefore, according to petitioner, had counsel investigated the confessions, they would

have determined the confessions were false. The various confessions made by petitioner will be recited below as summarized in the appellate court decision.

In addition to the hour-long videotaped statement which the petitioner made regarding the death of Karen Pulley, as described in the supreme court opinion affirming his conviction for that crime, he made additional statements regarding his guilt in that case, as well as the others with which he was charged. On January 6, 1989, beginning at 12:47 a.m., he confessed to law enforcement officers to the rapes of D.L., P.G., P.R., and S.T. These confessions were short, and the purpose of the questions appeared to be to determine how many rape complaints would be closed as the result of the arrest of the petitioner. Shortly after that, he confessed to a rape and an attempted rape in Tiftonia, occurring apparently in October and December 1988, as well as a third rape that occurred in the same area, the victims not being identified by name and the intent of the questions apparently being to ascertain whether the petitioner had committed these rapes as well. Next, the petitioner confessed to two rapes occurring in Red Bank, with the victims again not being identified by name. Also, the petitioner made additional short confessions as to items he had taken from three rape scenes, one relating to the rape of P.G. The other victims were not identified by name. It appears that all of these statements were tape-recorded. It is unclear how many statements subsequently were made to law enforcement officers in addition to these.

That same morning, an oral statement was taken from the petitioner's wife, who said that beginning in July or August of 1988, the petitioner began going out at night. On some occasions, she would be aware when he left, but other times she "would wake up and he would be gone and [she] would wonder where he was." She said on January 3, 1989, he left home between 8:30 and 9:00 p.m. and returned home about 7:00 a.m. This is the period when P.R. and S.T. were both raped. She told officers that he explained the scratch on his eye when he arrived home by saying that as he was driving with gloves on to pick her up from work, his eye began to itch and, unable to scratch himself because of the gloves, he picked up a screwdriver to do so and poked himself in the eye, cutting himself. She testified in the Karen Pulley trial that she had asked him, presumably after his arrest, about the Pulley murder, and he told her that he was guilty of it.

As trial counsel noted during the post-conviction hearing, the petitioner consistently admitted to them his guilt as to the charges against him. During a meeting with Michael Cohan, the investigator for defense counsel, the petitioner described in detail his attack upon Karen Pulley. Additionally, he admitted his guilt to Dr. Eric Engum, a psychologist retained by trial counsel. Further, he admitted his guilt in the death of Karen Pulley to the victim's mother and told his uncle, during a post-trial visit to the petitioner in prison, that he was guilty. He also testified in court as to his

guilt.  During the penalty phase of the Karen Pulley trial, the petitioner testified as to his rape and murder of the victim.

*Id.* at 5-7.

Although Nichols admitted, during the sentencing hearing, that he attacked and raped Pulley after entering her residence, he maintained that he did not intend to kill the victim.  *Id.* at 8.  He explained that she was hanging onto him when he was trying to leave and that is why he hit her, numerous times, with the two-by-four.  *Id.*

A number of witnesses testified at the consolidated evidentiary hearing on Nichols' state post-conviction petitions.[3]  Not all of the testimony is relevant to this habeas petition.  Thus, the Court will summarize the pertinent portions and discuss the substance of the testimony in relevant portions of this opinion.  The Court observes that the petitioner did not personally present any relevant testimony at his state post-conviction hearing.  The state post-conviction court ruled that although petitioner did not have a privilege against self-incrimination at the hearing, the court would not require him to respond to incriminating questions from the State.  Consequently, other than providing basic biographical information, petitioner, asserting a Fifth Amendment privilege, refused to answer any of the State's questions regarding the offenses themselves.

Petitioner presented numerous witnesses, identified as mitigation witnesses, during his state post-conviction proceedings.  The first witness to testify was Mr. Winston Gonia ("Mr. Gonia").[4] A retired minister, Mr. Gonia testified he had been on the Board of Tomlinson Children's Home,

---

[3]     Nichols filed petitions for post-conviction relief in state court for his conviction for first degree felony murder and his death sentence, as well as for a number of convictions for sexual attacks on four additional victims.

[4]     Mr. Gonia testified on petitioner's behalf during his sentencing hearing.

the orphanage where petitioner temporarily resided [Court File No. 19, Addendum No. 1, Vol. X, at 27-29]. Mr. Gonia was the minister at East Chattanooga Church of God of Prophecy for approximately four years (1962-1965). Petitioner and his family attended this church during the time Mr. Gonia was the minister. Mr. Gonia visited petitioner and his family at their home and observed them at church functions. Mr. Gonia testified petitioner's home was nice and clean, and whenever he visited he felt very welcomed. [Court File No. 19, Addendum No. 1, Vol. X, at 37]. Mr. Gonia observed petitioner's mother and grandmother exhibit love and affection towards petitioner and his siblings. However, he described petitioner's father as quiet, withdrawn, and introverted. Mr. Gonia did not observe petitioner's father demonstrate any love or affection toward his family. Furthermore, Mr. Gonia sensed some uneasiness around petitioner's father which he described as a "strange feeling," but he could not say that there was or was not any abuse in the family [Court File No. 19, Addendum No. 1, Vol. X, at 33-35].

Mr. Gonia returned to the area in 1976 for a couple of years and he reconnected with the petitioner after Nichols returned home from the orphanage to live with his father, sometime in 1977. Mr. Gonia found petitioner to be outgoing and he thought petitioner was going to become an important community member [Court File No. 19, Addendum No. 1, Vol. X, at 40-42]. On cross-examination, Mr. Gonia testified he met with petitioner's trial counsel two or three times and he testified about petitioner's good character during his sentencing hearing. Mr. Gonia concluded his testimony acknowledging that he never saw any abuse in petitioner's family [Court File No. 19, Addendum No. 1, Vol. X, at 44-47].

Ms. Diane Sample Allred ("Ms. Allred"), petitioner's cousin, testified that she and her older brother began living with petitioner's family in 1961, after her parents died [Court File No. 19,

9

Addendum No. 1, Vol. X, at 49-50]. Ms. Allred first thought petitioner's family was "just one happy family" but after living there a couple of years, she observed petitioner's father going into rages and spanking petitioner's older sister "till blood would run out of her legs." [Court File No. 19, Addendum No. 1, Vol. X, at 52-53]. Neither Ms. Allred nor her brother were subjected to spankings but petitioner and his sister were whipped by their father.

Ms. Allred moved out of petitioner's home in 1967, when petitioner was almost seven (7) years old. Petitioner's grandmother lived in the house with them and was described as very loving towards petitioner and his sister, as was petitioner's mother. Ms. Allred observed petitioner's mother holding and hugging her children, unlike petitioner's father, who she never observed holding petitioner, not even when he was an infant [Court File No. 19, Addendum No. 1, Vol. X, at 53-55].

Ms. Allred recollected that petitioner loved to attend church, sing at church, and recite the Bible forward and backward. Ms. Allred did not observe anything about petitioner that made her think he was anything other than a normal child [Court File No. 19, Addendum No. 1, Vol. X, at 80-81].

During the time Ms. Allred resided with petitioner's family in the Chattanooga area, they moved several times. While living in North Chattanooga, petitioner's father would often sit on the couch naked which resulted in Ms. Allred being exposed to him as she left the bathroom to go to her bedroom, a bedroom she shared with the mother of petitioner's father.[5] Ms. Allred testified no one believed her when she complained about petitioner's father exposing himself to her. Ms. Allred's

---

[5] According to Ms. Allred, petitioner and his sibling shared a bedroom and bed with his parents. However, according to petitioner's sister, Ms. Deborah Sullivan, her parents slept in the great room, petitioner slept in a corner in the great room across from her parents, and Ms. Sullivan slept in the bedroom between Ms. Allred and the bathroom.

testimony then became confusing because she testified that when they moved to 3206 Dodson Avenue, she was fifteen (15) years old and petitioner's mother had just had her cancer surgery. At that time, petitioner's father allegedly would go to Ms. Allred's bedroom naked, asking her if he could get in the bed with her, while petitioner's mother would cry and try to get her husband to return to their bedroom with her and her children.[6] Ms. Allred responded by "cover[ing] up all over and just tell[ing] him to leave [her] alone." [Court File No. 19, Addendum No. 1, Vol. X, at 56-58]. However, when testifying about petitioner's grandmother's death, Ms. Allred testified petitioner's mother had breast cancer after the grandmother's death, but that she (Ms. Allred) had moved out prior to that time but would come back over to the house to pick up petitioner's mother for her chemo treatment [Court File No. 19, Addendum No. 1, Vol. X, at 58-62].

After petitioner's mother died, his sister called Ms. Allred crying and told her that petitioner's father was sexually mistreating her. A pastor and his wife, Eddie and Helen Gray, brought petitioner and his sister to Ms. Allred's front door requesting that she go to court and testify about petitioner's father's sexual conduct towards her. She agreed to do so, but later Mr. Gray informed her that petitioner's father had agreed to send his children to the orphanage if no one would talk about the abuse [Court File No. 19, Addendum No. 1, Vol. X, at 70-77].[7]

Ms. Allred testified she was not contacted by petitioner's trial counsel. However, on cross-examination, she explained that she had not had any contact with petitioner's family since 1971, and neither petitioner nor his sister knew she lived in Alabama. She acknowledged that from 1971 to

---

[6] Ms. Allred testified the grandmother, who shared her room and bed, would be gone on these occasions.

[7] Mr. Gray died in 1992 or 1993, prior to the state post-conviction hearing.

11

the time this crime occurred, 1988, she had no contact with petitioner or his family [Court File No. 19, Addendum No. 1, Vol. X, at 78-80].

Mr. Royce Sampley, Ms. Allred's brother and petitioner's cousin, came from Bolivar, Texas, to testify on petitioner's behalf during his state post-conviction hearing. Mr. Sampley lived in his uncle's home for approximately six years. Mr. Sampley testified the environment in petitioner's home was "threatening" because his uncle, Mr. Mack Nichols, was an angry person who took his anger out on everyone who lived with him [Court File No. 19, Addendum No. 1, Vol. X, at 92-94].

Mr. Sampley perceived his uncle's relationship towards him and his cousins as one of indifference and basically not wanting to be bothered with any of the children living in the house. Mr. Sampley described his uncle as a person who was always angry and mad. However, Mr. Sampley did state that "it wasn't so much physical that I noticed[,]" but rather, it was Mr. Mack Nichols' demeanor and attitude, which Mr. Sampley described as constantly in a rage and cussing, that set the threatening tone in the house [Court File No. 19, Addendum No. 1, Vol. X, at 94-95]. Mr. Sampley described his uncle's attitude toward his wife and mother as one of resentment when he had to transport them places. However, Mr Sampley said his uncle was pleasant whenever he wanted someone to do something for him [Court File No. 19, Addendum No. 1, Vol. X, at 95-96].

Mr. Sampley's testimony regarding the alleged abuse of his sister by Mr. Mack Nichols is somewhat confusing. First, Mr. Sampley testified that he did not realize his uncle was exposing himself to his sister until after he moved out of his uncle's house. At that time Mr. Sampley tried to talk to some of his relatives about the situation but they did not believe him. Then Mr. Sampley testified he tried to discuss the matter with some of his relatives so that he and his sister could get

12

out of the situation because they were still living with petitioner and his family [Court File No. 19, Addendum No. 1, Vol. X, at 96-99].

Mr. Sampley left petitioner's home in 1967 and never returned. However, Mr. Sampley did see petitioner, his sister, and mother about a year after he moved out of their house but that was their last contact. Mr. Sampley testified no one contacted him prior to petitioner's trial [Court File No. 19, Addendum No. 1, Vol. X, at 99-101].

On cross-examination Mr. Sampley testified he could not remember whether his sister, Joan, called and told him about petitioner's arrest before, during, or after the trial. Mr. Sampley testified petitioner would not have known how to contact him [Court File No. 19, Addendum No. 1, Vol. X, at 101-07].

The state post-conviction court also reviewed the videotaped deposition of petitioner's sister, Ms. Deborah Diane Sullivan ("Ms. Sullivan"). The video tape and sixty-eight page transcript reveals petitioner's sister was very guarded in her answers and not willing to discuss any alleged sexual abuse of her by her father. When asked if there were any allegations of abuse she responded that there were no such allegations "where Wayne is concerned" [Court File No. 67, Addendum No. 9, Exhibit 11, at 36]. Ms. Sullivan described her father's household as "mentally trying." She testified her father and grandmother spanked her and there were constant threats of spankings [Court File No. 67, Addendum No. 9, Exhibit 11, at 11-12, 37].

As previously noted, Ms. Sullivan's testimony differed from Ms. Allred's testimony, in that Ms. Sullivan testified her mother and father slept out in the great room and she had a bedroom between Ms. Allred's and the grandmother's room and the bathroom. Ms. Allred testified petitioner, his sister, and parents slept in the same bedroom. Ms. Sullivan testified her bed was a double bed

and her recollection was that petitioner slept in the corner of the great room across from where her parents slept [Court File No. 67, Addendum No. 9, Exhibit 11, at 9].

Ms. Sullivan's testimony paints a picture of a family who, more or less, stayed to themselves. The children did not bring friends home from school. Other than relatives, the only other visitors the children had were a neighbor's grandchildren, but that apparently was only on a rare occasion. Petitioner's father was described as the disciplinarian and although Ms. Sullivan remembered being spanked with a switch until there were welts, when asked if Mr. Mack Nichols ever spanked until there was blood, Ms. Sullivan responded "[p]robably" [Court File No. 67, Addendum No. 9, Exhibit 11, at 10]. Although she was sure her father spanked petitioner, Ms. Sullivan could not recall a particular time when he did so. Ms. Sullivan stated her mother did not attempt to stop the spankings and her Grandmother Tillman, who lived with them and was Mr. Nichols' mother, also spanked them with switches. Ms. Sullivan's testimony indicates there was very little communication in the family. When asked if anyone tried to explain death in relation to the death of their mother she responded that "[y]ou have to, you just, you're handed these things or these things take place and you just, you roll with it, you just go with it, whatever. . . There is a death and then you know they are dead and you go to the funeral and you don't have them anymore and that's it" [Court File No. 67, Addendum No. 9, Exhibit 11, at 33-34].

Ms. Sullivan did admit that there were allegations her father abused her but she would not elaborate on the subject [Court File No. 67, Addendum No. 9, Exhibit 11, at 36-37]. She stated she was constantly living in fear at home and the atmosphere was not healthy, but she and petitioner never discussed their home-life [Court File No. 67, Addendum No. 9, Exhibit 11, at 38]. When asked specifics about the alleged abuse, Ms. Sullivan generally responded that the abuse, if there

14

was any, was against her and not petitioner [Court File No. 67, Addendum No. 9, Exhibit 11, at 40-42]. She stated that, to her knowledge, petitioner was never physically or sexually abused by their father [Court File No. 67, Addendum No. 9, Exhibit 11, at 43]. Ms. Sullivan has always told people that she and petitioner were sent to the orphanage because their father was unable to care for them. She was told by Sue Puryear, the lady she ran to for protection from her father, that was all she needed to tell people. However, Ms. Sullivan stated her father was emotionally unable to take care of her and petitioner:

> . . . but then that was always. I mean we didn't - - you know, emotionally mother I guess and grandma probably was the emotional support if there was such a thing back then. There again, it goes back to that old mentality where kids are to be seen and not heard and emotional support was not - - I don't know. That wasn't - - I don't know if that was even in the vocabulary back then, you know, give kids emotional support.

[Court File No. 67, Addendum No. 9, Exhibit 11, at 45-47].

Ms. Sullivan described her relationship with petitioner as a close loving relationship. Ms. Sullivan wanted petitioner to stay with his father because she did not think a father and son should be separated [Court File No. 67, Addendum No. 9, Exhibit 11, at 43]. Her recollection was, as a child, petitioner was always with his father, but when he was older petitioner would stay out late and basically felt he could come and go as he pleased [Court File No. 67, Addendum No. 9, Exhibit 11, at 53]. Although she described an incident where petitioner came home to his father's house drunk, she stated her father drank very little [Court File No. 67, Addendum No. 9, Exhibit 11, at 54].

Ms. Sullivan testified petitioner had a sleepy eye, speech impediment, and pneumonia when he was young [Court File No. 67, Addendum No. 9, Exhibit 11, at 56]. When she thinks of her mother she thinks of love. When asked about her memories of her father, who was still alive at the time, petitioner's sister stated that when she needed to have contact with her father, she knew where

to contact him [Court File No. 67, Addendum No. 9, Exhibit 11, at 59]. Ms. Sullivan revealed that petitioner's trial attorneys probably tried to contact her and probably spoke with her husband because her husband told her that the petitioner's lawyers were calling and trying to get in touch with her.

A number of other witnesses, family and neighbors, testified at the state post-conviction evidentiary hearing. Since much of the testimony was not mitigating, the Court will discuss the relevant substance of their testimony in the relevant portions of this opinion.

**II.**
**PROCEDURAL BACKGROUND**

The State of Tennessee has provided the Court with copies of petitioner's state court proceedings [Court File Nos. 17-24, 26-27, 30-33, 37-43, 50, 52, 55, 67-75, 122-23, 194; Addenda 1-11]. Petitioner's conviction and sentence were affirmed on direct appeal. *State v. Nichols,* 877 S.W.2d 722 (Tenn. 1994).

Petitioner filed his original petition for post-conviction relief on April 20, 1995, in the Criminal Court of Hamilton County, Tennessee. Petitioner alleged twenty-five instances of constitutional violations [Court File No. 17, Addendum No. 1, Vol.2, at 9-25]. Petitioner, through his attorneys, filed an amended petition on September 15, 1995, and December 16, 1996 [Court File No. 17, Addendum No. 1, Vol. 2, at 31, 138-163]. At the conclusion of an evidentiary hearing and after considering post-hearing briefs, the trial court denied the petition on March 18, 1998 [Court File No. 18, Addendum No. 1, Vol. 3, at 498-516].

On April 17, 1998, petitioner, through counsel, filed a notice of appeal to the Tennessee Court of Criminal Appeals on the following issues:

I.  Whether petitioner received effective assistance of counsel at the guilty stage of his capital trial and in his non-capital cases?

II.  Whether Mr. Nichols was denied the effective assistance of counsel by his counsel's failure to move to suppress his confessions on the theory that the statements were made during a period of illegal arrest?

III.  Whether Mr. Nichols was denied the effective assistance of counsel in the penalty phase of his capital trial?

IV.  Was Mr. Nichols denied effective assistance of counsel by the failure of his trial counsel to object to improper argument and cross-examination by the prosecutor and failure to raise prosecutorial misconduct in the motion for a new trial or on appeal?

V.  Whether petitioner's counsel were ineffective for failing to request jury instructions and for failing to object to the trial court's improper jury instructions?

VI.  Are the findings of fact by the court below clearly erroneous?

VII.  Did counsel render ineffective assistance by failing to raise at trial or on appeal that death by electrocution is cruel and unusual punishment?

VIII.  Did trial and appellate counsel render ineffective assistance by failing to argue in the trial court or on appeal that requiring the petitioner to turn over his psychiatric expert's rough notes, which included statements made by petitioner to his psychiatric expert, violated petitioner's right to remain silent in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States and Article I, § 9 of the Tennessee Constitution?

IX.  Were the accumulation the [sic] errors in this case prejudicial?

X.  Must the sentence of death in the instant case be set aside as the imposition of death is unreliable and violates the values recognized and protected by the Eighth and Fourteenth Amendments to the Constitution of the United States and Article I § 16 of the Tennessee Constitution?

XI.  Is the death sentence unconstitutional, because it infringes upon Mr. Nichols' fundamental right to life, and is not necessary to promote any compelling state interest?

[Court File No. 26, Addendum No. 2, Doc. 1, at xiv-xv].

In addition to attacking his first degree murder conviction, as well as convictions for aggravated rape and first degree burglary resulting from the same facts, Nichols had also filed petitions for post-conviction relief from a number of convictions for sexual attacks on four additional victims. The appellate court consolidated the cases and affirmed the judgments of the post-conviction court, which denied petitioner post-conviction relief from his convictions, but granted him new sentencing hearings in the noncapital cases. *Nichols v. State*, 2001 WL 55747 (Tenn.Crim.App. 2001).

Nichols filed a petition for rehearing which was denied [Court File No. 26, Addendum No. 2, Docs. 5-6]. Petitioner then filed a motion to consider post-judgment facts which was denied by the appellate court [Court File No. 26, Addendum No. 2, Docs. 7-8]. Nichols next appealed the judgment of the Tennessee Court of Criminal Appeals to the Tennessee Supreme Court. In his application for permission to appeal, petitioner raised the following issues:

I.      Did the Court of Criminal Appeals apply an improper standard of review, thus requiring that this Court intervene to secure uniformity of decision, and to assert its supervisory authority over the lower courts?

II.      Should this Court grant permission to appeal to address to [sic] conclusions of the Court of Criminal Appeals regarding the [sic] Mr. Nichols' privilege against self-discrimination?

   A.      Did the decision of the Court of Criminal Appeals deny Mr. Nichols' right to due process under the 14th amendment to the United States Constitution by deciding an issue which had neither been briefed nor argued?

   B.      Did the decision of the Court of Criminal Appeals violate established procedural rules requiring the intervention of this court by deciding an issue which had neither been briefed or argued?

   C.      Should this court grant permission to appeal to clarify the scope of a post-conviction petitioner's right to remain silent under the Fifth Amendment to the United States Constitution or Article I, Section 9 of the Tennessee Constitution?

18

III.     Did the Court of Criminal Appeals err in denying Mr. Nichols the opportunity to return to the trial court for additional DNA testing?

IV.     Whether Mr. Nichols received ineffective assistance of counsel at the guilt stage of his capital trial and in his non-capital cases.

V.     Whether Mr. Nichols was denied the effective assistance of counsel by his counsel's failure to move to suppress his confessions on the theory that the statements were made during a period of illegal arrest.

VI.     Whether Mr. Nichols was denied the effective assistance of counsel in the penalty phase of his capital trial.

VII.     Was Mr. Nichols denied effective assistance of counsel by the failure of his trial counsel to object to improper argument and cross-examination by the prosecutor and failure to raise prosecutorial misconduct in the motion for a new trial or on appeal?

VIII.     Whether Mr. Nichols' counsel were ineffective for failing to request jury instructions and for failing to object to the trial court's improper jury instructions.

IX.     Are the findings of fact by the court below clearly erroneous?

X.     Did trial and appellate counsel render ineffective assistance by failing to argue in the trial court or on appeal that requiring Mr. Nichols to turn over his psychiatric expert's rough notes, which included statements made by him to his psychiatric expert, violated Nichols' right to remain silent in violation of the fifth and fourteenth amendments to the Constitution of the United States and Article I, § 9 of the Tennessee Constitution?

XI.     Were the accumulation [of] the errors in this case prejudicial?

XII.     Must the sentence of death in the instant case be set aside as the imposition of death is unreliable and violates the values recognized and protected by the Eighth and Fourteenth Amendments to the Constitution of the United States and Article I, § 16 of the Tennessee Constitution?

XIII.     Is the death sentence unconstitutional, because it infringes upon Mr. Nichols' fundamental right to life, and is not necessary to promote any compelling state interest?

[Court File No. 27, Addendum No. 3, Tab 1, p. xv-xvi].

19

The Tennessee Supreme Court granted the application for permission to appeal, and informed the parties that the Court was particularly interested in the issue of whether the Court of Criminal Appeals erred in raising and deciding the issue of how the Fifth Amendment right against self-incrimination applied to Nichols at the petitioner's post-conviction hearing. The Tennessee Supreme Court instructed the parties that "[t]his statement of the issue for oral argument does not prevent the parties from raising additional issues . . . ," [Court File No. 27, Addendum No. 3, Tab 3].

Petitioner's brief included the following issues:

I.      Does a death-sentenced post-conviction petitioner have a right to remain silent under the fifth amendment to the United States Constitution or Article I, Section 9 of the Tennessee Constitution?

II.     Did the decision of the Court of Criminal Appeals deny Mr. Nichols his right to due process under the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 and 16 of the Tennessee Constitution by deciding an issue which had neither been briefed nor argued?

III.    Did the Court of Criminal Appeals err in denying Mr. Nichols the opportunity to return to the trial court for additional DNA testing?

IV.     Did the Court of Criminal Appeals apply an improper standard of proof concerning petitioner's claims of ineffective assistance of counsel?

V.      Was Mr. Nichols denied effective assistance of counsel by the failure of his trial counsel to object to improper argument and cross-examination by the prosecutor and failure to raise prosecutorial misconduct in the motion for a new trial or on appeal?

VI.     Did Mr. Nichols receive ineffective assistance of counsel at the guilt stage of his capital trial and in his non-capital cases?

VII.    Was Mr. Nichols denied the effective assistance of counsel by his counsel's failure to move to suppress his confessions on the theory that the statements were made during a period of illegal arrest?

VIII.   Was Mr. Nichols denied the effective assistance of counsel at the penalty phase of his capital trial?

20

IX.     Were Mr. Nichols' counsel ineffective for failing to request jury instructions and for failing to object to the trial court's improper jury instructions?

X.      Are the findings of fact by the court below clearly erroneous?

XI.     Did trial and appellate counsel render ineffective assistance by failing to argue in the trial court or on appeal that requiring Mr. Nichols to turn over his psychiatric expert's rough notes, which included statements made by him to his psychiatric expert, violate Mr. Nichols' right to remain silent in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States and Article I, Section 9 of the Tennessee Constitution?

XII.    Were the accumulation of errors in this case prejudicial?

XIII.   Must the sentence of death in the instant case be set aside as the imposition of death is unreliable and violates the values recognized and protected by the Eighth and Fourteenth Amendments to the Constitution of the United States and Article I, Section 16 of the Tennessee Constitution?

XIV.   Is the death sentence unconstitutional because it infringes upon Mr. Nichols' fundamental right to life, and is not necessary to promote any compelling state interest?

Nichols requested the Court to consider all issues, even though some issues were not repeated in this brief [Court File No. 27, Addendum No. 3, Tab 4, p. x-xi]. The Supreme Court of Tennessee ultimately affirmed the judgment of the Court of Criminal Appeals on October 7, 2002 [Court File No. 27, Addendum No. 3, Tab 7].

On October 23, 2002, in the United States District Court for the Eastern District of Tennessee, Southern Division, Chattanooga, Tennessee, Nichols' counsel filed a motion and application to appoint counsel under 21 U.S.C. § 848(q)(4)(B) to investigate, prepare and file a petition for writ of habeas corpus [Court File No. 1]. Nichols did not request a stay of execution and it did not appear that an execution date had been set. Nevertheless, this Court ordered that if an execution date had been set, that it was stayed pending further orders of this Court.

Petitioner's motion was granted; counsel was appointed; and petitioner was permitted to proceed without payment of fees [Court File No. 3]. During the course of this proceeding, petitioner

has filed numerous motions. A motion for discovery [Court File No. 47] was filed on petitioner's behalf and was denied [Court File No. 77]. Nichols filed a motion to conduct destructive testing and discovery [Court File No. 85] and a motion to stay the habeas proceedings pending the resolution of state court DNA testing [Court File No. 87], both of which were denied [Court File No. 102]. In addition, petitioner's renewed motions to conduct destructive testing and discovery and to hold this matter in abeyance [Court File No. 106] were also denied [Court File No. 124]. Nichols' motion to expand the record [Court File No. 111] was granted [Court File No. 124]. Petitioner also filed a motion for an order directing the filing of additional transcripts and appellate brief [Court File No. 143] which was denied [Court File No. 149]. A second motion by Nichols to expand the record [Court File No. 160] was denied by the Court as moot since the attachments petitioner requested to expand the record with were already a part of the record [Court File No. 178]. Petitioner's third motion for discovery requesting an order permitting DNA testing of evidence [Court File No. 182] was partially withdrawn and the remaining portion of the motion was denied [Court File No. 206]. Petitioner's motion for a copy of the addenda [Court File No. 212] was denied [Court File No. 218] and his motion to direct the State to file missing or incomplete documents [Court File No. 214] was granted in part [Court File No. 227]. Petitioner's motion for reconsideration of the Court's decision denying him a copy of the addenda was referred to the United States Magistrate Judge, as was a portion of the motion requesting the State to file missing or incomplete documents [Court File No. 228]. The claims were eventually resolved by agreement of the parties (respondent provided a copy of the addenda to the petitioner and the incomplete or missing documents were filed with the Court) [Court File Nos. 247, 249].

On May 23, 2003, Nichols filed his petition for writ of habeas corpus [Court File No. 9] which the Court returned as insufficient [Court File No. 14]. On September 2, 2003, petitioner filed another habeas corpus petition [Court File Nos. 34, 35] which was stricken from the record [Court File No. 77]. On November 20, 2003, Nichols filed an amended habeas petition [Court File No. 78]. The State has filed a motion to dismiss pursuant to 28 U.S.C. § 2254(d) [Court File No. 119], to which petitioner has objected [Court File Nos. 140, 211, 213].

## III.
## STANDARDS OF REVIEW

### A.  Habeas Claims Cognizable Under 28 U.S.C. § 2254

A federal district court has jurisdiction to grant a writ of habeas corpus under § 2254 of Title 28 to the United States Code. 28 U.S.C. § 2254. Section 2254(a) limits the court's jurisdiction to those cases in which a petitioner "in custody pursuant to the judgment of a State court" alleges "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The initial question in a habeas petition is, therefore, whether the petitioner raises claims cognizable under § 2254(a).

### B.  Review of Habeas Claims on the Merits

The Antiterrorism and Effective Death Penalty Act ("AEDPA") made a number of procedural and substantive changes to the habeas corpus provisions codified in Chapter 153 of Title 28 of the United States Code. Section 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), limits a federal district court's review of habeas claims that were adjudicated on the merits in state court. In particular, a court considering a habeas claim must defer to any decision by a state court concerning that claim unless the state court's judgment (1)

23

"resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). The United States Supreme Court has interpreted the language of § 2254. *See Williams v. Taylor*, 529 U.S. 362, 402 (2000) (O'Connor, J., delivering the opinion of the Court as to Part II and concurring as to Parts I and III-V); *see also Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000), *cert. denied*, 532 U.S. 947 (2001) (construing *Williams*).

According to the *Williams* Court, the phrase "clearly established Federal law, as determined by the Supreme Court of the United States" refers to "holdings, as opposed to dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. Hence, a federal district court hearing a habeas corpus petition may not look to lower federal court decisions to determine whether the state court's decision "was contrary to, or involved an unreasonable application of, clearly established law." *See id.; Harris*, 212 F.3d at 943-44.

The phrase "contrary to . . . clearly established precedent" means "substantially different from the relevant precedent of [the Supreme Court]." *Williams*, 529 U.S. at 405. A state court decision is "contrary to . . . clearly established precedent" if the state court applied a rule contradicting the governing law set forth in Supreme Court cases. *Id.* Similarly, a state court decision is "contrary to . . . clearly established precedent" if the state court confronted a set of facts materially indistinguishable from a Supreme Court decision and arrived at a different result. *Id*. at 405-08. However, a state court decision applying valid Supreme Court precedent does not fall

within the "contrary to" language and cannot be reviewed by a federal court under § 2254(d)(1), even if the federal court would have reached a different result in applying the rule.

The phrase "an unreasonable application of . . . clearly established precedent" means an "application of clearly established law [that] was objectively unreasonable." *Id*. at 409. It does not mean "an incorrect application of federal law." *Id.* at 410 (emphasis original). Hence, if a federal court concludes in its independent judgment that the state-court decision applied clearly established federal law erroneously or incorrectly, it could grant habeas relief under § 2254(d)(1) only if the application was also unreasonable. *Id*. at 410-13.

In sum, the changes made to § 2254(d) by the AEDPA require federal courts to pay greater deference to the determinations made by state courts than they were required to under the previous statutory language. *Tinsley v. O'Dea*, 142 F.3d 436 (6th Cir.) (unpublished table decision), available in 1998 WL 124045, at *2, *cert. denied*, 525 U.S. 937 (1998); *Harpster v. Ohio*, 128 F.3d 322 (6th Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998); *Spreitzer v. Peters*, 114 F.3d 1435, 1441 (7th Cir.), *modified on other grounds*, 127 F.3d 551 (1997), *cert. denied*, 522 U.S. 1120 (1998).

## C.    Factual Bases for Habeas Claims

In reviewing a state court's adjudication of a habeas claim, the federal district court must presume the state court's factual determinations were correct. 28 U.S.C. § 2254(e)(1). The petitioner may rebut this presumption of correctness by clear and convincing evidence. *Id*. If the petitioner has failed to develop the factual basis for his habeas claim in the state-court proceedings however, he generally is not entitled to an evidentiary hearing unless (1) the legal or factual basis of the habeas claim did not exist at the time of the state-court proceedings, and (2) "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for

constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense." *Id.* § 2254(e)(2).

A petitioner "fail[s] to develop the factual basis" for his habeas claim in the state-court proceedings through a lack of diligence or some greater fault attributable to him or his counsel. *Williams v. Taylor*, 529 U.S. 420, 431-35 (2000). Congress intended that "prisoners who are at fault for the deficiency in the state-court record must satisfy a heightened standard to obtain an evidentiary hearing." *Id.* Hence, whether a petitioner must satisfy the heightened standard imposed by § 2254(e)(2) depends on whether the petitioner was diligent in his efforts to develop a factual basis for his claim, not on whether the facts could have been discovered or whether those efforts would have been successful. *Id.* at 433-37.

Lack of diligence will not bar an evidentiary hearing if efforts to discover the facts would have been in vain because there is no relationship between the petitioner's fault and the impossibility of discovery. 28 U.S.C. § 2254(e)(2)(A)(i). Similarly, a petitioner's lack of diligence or fault will not bar a hearing if there is clear and convincing evidence a reasonable trier of fact would not have found the petitioner guilty of the underlying offense but for constitutional error, *id.* § 2254 (e)(2)(B), or if a new rule of constitutional law not available at the time of the earlier proceedings is made retroactive to cases on collateral review by the Supreme Court, *id.* § 2254(e)(2)(A)(i). Thus, a petitioner who failed to develop the factual basis of a claim in state court proceedings through lack of diligence or fault has an opportunity to obtain an evidentiary hearing if the legal or factual basis of the claim did not exist at the time of state court proceedings. *Williams*, 529 U.S. at 435-37.

In summary, a petitioner must be diligent in developing the record and, if possible, in presenting all claims of constitutional error so the state court will have its rightful opportunity to

adjudicate federal rights. If the petitioner contributes to the absence of a full and fair adjudication in state court and fails to diligently develop the record, then an evidentiary hearing is prohibited in federal court pursuant to § 2254(e)(2) unless the other stringent requirements of the statute are met. If a petitioner made insufficient effort to pursue a claim in state court, then he will be prohibited from pursuing the claim in federal court. However, if a petitioner failed to develop the factual basis of a claim because he was unable to develop his claim in state court despite diligent effort, then an evidentiary hearing will not be barred by § 2254(e)(2). *See id.* at 437.

**D.    Procedural Default**

Title 28, United States Code, Section 2254(b), limits federal court jurisdiction to hear a habeas claim to those cases in which a petitioner has exhausted all available state court remedies:

> (1)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—
> (A)      the applicant has exhausted the remedies available in the courts of the State; or
> (B)(i)   there is an absence of available State corrective processes; or circumstances exist that render such process ineffective to  protect the rights of the applicant.
> (2)  An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

28 U.S.C. § 2254(b); *see also Granberry v. Greer*, 481 U.S. 129, 133-34 (1987); *Rose v. Lundy*, 455 U.S. 509, 519 (1982); Rule 4 of the Rules Governing § 2254 Cases in the United States District Courts.

A petitioner has failed to exhaust his available state court remedies if he still has the opportunity to raise his claim by any available state court procedure. *Gray v. Netherland*, 518 U.S. 152, 161 (1996), *Preiser v. Rodriguez*, 411 U.S. 475, 477, 489-90 (1973); *Gall v. Parker*, 231 F.3d

265, 283-84 (6th Cir. 2000), *cert. denied*, 533 U.S. 941 (2001). To exhaust these state remedies, the petitioner must have presented to the state courts both the legal basis of the claim for which he seeks habeas relief and the factual basis of the claim. *Gray*, 518 U.S. at 162-63 (stating that the exhaustion requirement is not satisfied "by presenting the state courts only with the facts necessary to state a claim for relief"); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). The factual allegations made in federal court must be the same factual allegations made in state court, and the substance of a federal habeas claim presented to the federal court must first be presented to the state court. *Picard*, 404 U.S. at 276.

When a petitioner raises different factual issues under the same legal theory, he is required to present each factual claim to the highest state court in order to exhaust his state remedies. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999). A petitioner has not exhausted his state remedies if he has merely presented a particular legal theory to the courts without presenting each factual claim. *Pillette v. Foltz*, 824 F.2d 494, 497-98 (6th Cir. 1987). Moreover, each factual claim must be presented to the state courts as a matter of specific federal law. *Anderson v. Harless*, 459 U.S. 4, 6 (1982) ("It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made"); *Gray*, 518 U.S. at 163 ("It is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court"); *Duncan v. Henry*, 513 U.S. 364, 366 (1995) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

28

Conversely, if a petitioner presented the substance of his habeas claim to the state courts, an elaboration of the facts or legal theories will not result in a new claim. *Jones v. Washington*, 15 F.3d 671, 674-75 (7th Cir.), *cert. denied*, 512 U.S. 1241 (1994). The standard for determining whether the petitioner has exhausted the factual basis of his claim is whether the additional facts "fundamentally alter the legal claim already considered by the state courts." *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986). The supplementation and clarification of the state-court factual record does not necessarily change a claim so dramatically as to require that the state courts be given a new opportunity to hear the issues. *Id*. at 258-60. The "failure to make every factual argument to support [a] claim does not constitute a failure to exhaust." *Patterson v. Cuyler*, 729 F.2d 925, 929 (3rd Cir. 1984); *see also Picard*, 404 U.S. 270 (1971) (A claim may be fairly presented to the state court without citing chapter and verse of the Constitution.).

At bottom, a claim sought to be vindicated in a federal habeas proceeding must have first been raised in the state courts so the state courts have the first opportunity to hear the claim. The state court to which the petitioner presented the issue of federal law must address the merits of those claims. *Coleman v. Thompson*, 501 U.S. 722, 734-35 (1991). If the state court decides those claims on an adequate and independent state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, the petitioner is barred by this procedural default from seeking federal habeas review, unless he can show cause and prejudice for that default. *Edwards v. Carpenter*, 529 U.S. 446 (2000); *Teague v. Lane*, 489 U.S. 288, 297-99 (1989); *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977). Cause for a procedural default depends on some "objective factor external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule. *Coleman*, 501 U.S. at 752-53; *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

29

### E.    Miscarriage of Justice:  Actual Innocence

A petitioner may avoid the procedural bar and the necessity of showing cause and prejudice by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.  The petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent of the crime." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (quoting *Carrier*, 477 U.S. at 496).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence."  *Id.*; *see also Sawyer v. Whitley*, 505 U.S. 333, 339 n.5 (1992) (holding that a petitioner must "show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial, the trier of the facts would have entertained a reasonable doubt" (citations omitted)).

In addition to a claim of actual innocence, a habeas petitioner must demonstrate "an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993).  Thus, "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id*. at 404.  The Supreme Court of the United States has explicitly tied the fundamental miscarriage of justice exception to the petitioner's innocence to ensure the exception would remain rare and only be applied in the extraordinary case, while also ensuring relief would be extended to those who are truly deserving. *See Schlup*, 513 U.S. at 299.

The miscarriage of justice exception is concerned with actual — not legal — innocence. *See Smith v. Murray*, 477 U.S. 527, 537 (1986). Hence, to show "actual innocence" of the death penalty imposed, a petitioner must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found petitioner eligible for the death penalty. *See Sawyer*, 505 U.S. at 336. Actual innocence "does not translate easily into the context of an alleged error at the sentencing phase of a trial on a capital offense." *Smith*, 477 U.S. at 537, *quoted in Sawyer*, 505 U.S. at 339-40. "Actual innocence" of the death penalty is a very narrow exception and must be determined by relatively objective standards. The "actual innocence" requirement must focus on those elements that render a defendant eligible for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer*, 505 U.S. at 347. Finally, "if a prisoner purposefully or by inadvertence lets the time run under which he could have filed his [habeas] petition, he cannot file a petition beyond the statutory time, even if he claims 'actual innocence.'" *Workman v. Bell*, 227 F.3d 331, 342 (6th Cir. 2000), *cert. denied*, 531 U.S. 1193 (2001).

**F.      Summary Judgment**

Under Rule 56(c) of the Federal Rules of Civil Procedure, the Court will render summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994), *cert. denied*, 516 U.S. 806 (1995); *Kentucky Div., Horsemen's Benevolent & Protective Assoc., Inc. v. Turfway Park Racing Assoc., Inc.*, 20 F.3d 1406, 1411 (6th Cir. 1994). The Court must view the facts and all inferences drawn therefrom in the light most favorable to the nonmoving party.

31

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Oakland Gin Co., Inc. v. Marlow*, 44 F.3d 426, 429 (6th Cir. 1995); *City Management Corp. v. U.S. Chemical Co., Inc*., 43 F.3d 244, 250 (6th Cir. 1994).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party may not rest on its pleadings, but must come forward with some significant probative evidence to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Lansing Dairy*, 39 F.3d at 1347; *Horsemen's Benevolent*, 20 F.3d at 1411; *see also Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404-06 (6th Cir. 1992) (holding courts do not have the responsibility to search *sua sponte* the record for genuine issues of material fact). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

The Court determines whether sufficient evidence has been presented to make the issue of fact a proper question for the trier of fact, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986); 60 *Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435-36 (6th Cir. 1987). The standard for summary judgment mirrors the standard for directed verdict. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [fact finder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. There must be some probative evidence from which the fact finder could reasonably find for the nonmoving party. If the Court concludes a fair-minded fact finder could not return a verdict in favor

of the nonmoving party based on the evidence presented, it may enter a summary judgment.  *Id.*;
*Lansing Dairy*, 39 F.3d at 1347; *Horsemen's Benevolent*, 20 F.3d at 1411.

# IV.
## ANALYSIS

The Court will address petitioner's numerous claims in his amended petition for writ of
habeas corpus and identify them as they are identified in his amended petition [Court File No. 82].

**A.      Claims Adjudicated in State Court**

**1.      Ineffective Assistance of Counsel at the Guilt Stage (Claim 12)**

Petitioner contends he received ineffective assistance of counsel at the guilt stage of his
capital case in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States
Constitution.  Although this claim is confusingly pled with numerous sub-claims, the claims will be
addressed in the sequence in which petitioner pled them in an effort to keep the claims in this
memorandum opinion in the same sequence as petitioner pled them.  Petitioner maintains that due
to counsel's alleged inadequate performance there is a reasonable probability —  sufficient to
undermine confidence in the outcome of trial, sentencing, appeal and post-conviction proceedings
— that had counsel performed reasonably, petitioner would not have been convicted or sentenced
to death and/or would have received relief on appeal or in post-conviction proceedings.  Petitioner
alleges numerous instances of counsel's ineffectiveness.

The criteria for analyzing a claim of ineffective assistance of counsel is set forth in *Strickland
v. Washington*, 466 U.S. 668 (1984).  *Strickland* requires a defendant to demonstrate two essential
elements:  (1) counsel's performance was deficient (*i.e.*, counsel was not functioning as counsel
guaranteed the defendant by the Sixth Amendment), and (2) counsel's deficient performance

33

prejudiced the defense (*i.e.*, deprived the defendant of a fair trial rendering the outcome of the trial unreliable). *Id.* at 687-88; *see also McQueen v. Scroggy*, 99 F.3d 1302, 1310-11 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997); *Sims v. Livesay*, 970 F.2d 1575, 1579-81 (6th Cir. 1992); *Flippins v. United States*, 808 F.2d 16, 17-18 (6th Cir.), *cert. denied*, 481 U.S. 1056 (1987). To establish his attorney was not performing within the range of competence demanded of attorneys in criminal cases, a defendant must demonstrate the attorney's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687-88; *McMann v. Richardson*, 397 U.S. 759, 771 (1970). "Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). There is a strong presumption counsel's conduct was within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Sims*, 970 F.2d at 1579-80.

"Reviewing courts focus on whether counsel's errors have undermined the reliability of and confidence that the trial was fair and just." *Austin v. Bell*, 126 F.3d 843, 847 (6th Cir. 1997) (*citing Strickland*, 477 U.S. at 687; *United States v. Cronic*, 466 U.S. 648, 658, (1984); *McQueen*, 99 F.3d at 1310-11). The Court cannot indulge in hindsight but must instead evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors. *Strickland*, 466 U.S. at 690; *McQueen*, 99 F.3d at 1311. Trial counsel's tactical decisions are particularly difficult to attack. *McQueen*, 99 F.3d at 1311; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). A defendant's challenge to such decisions must overcome a presumption that the challenged actions might be considered sound trial strategy. *McQueen*, 99 F.3d at 1311; *O'Hara*, 24 F.3d at 828. Effective assistance of counsel is presumed, and the Court will not generally

question matters involving trial strategy. *See United States v. Chambers*, 944 F.2d 1253, 1272 (6th Cir. 1991). "[R]eviewing court[s] must remember that 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Wong v. Money*, 142 F.3d 313, 319 (6th Cir. 1998) (quoting *Strickland*, 466 U.S. at 690).

To establish the prejudice prong, a petitioner who enters a guilty plea must "show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). The Court must make an independent judicial evaluation of counsel's performance and determine whether counsel acted reasonably under all the circumstances. *McQueen*, 99 F.3d at 1311; *O'Hara*, 24 F.3d at 828; *Ward v. United States*, 995 F.2d 1317, 1321-22 (6th Cir. 1993); *Sims*, 970 F.2d at 1580-81. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the [ultimate] judgment." *West*, 73 F.3d at 84 (quoting *Strickland*, 466 U.S. at 691 (further citation omitted)).

### a. Failure to Investigate Serology Evidence (Claim 12.a)

Petitioner claims his state trial counsel failed to investigate and analyze evidence of his innocence. Petitioner asserts that trial counsel failed to review serology evidence contained within the Tennessee Bureau of Investigation ("TBI") reports which contained demonstrable evidence that petitioner was excluded as the rapist and murderer of Karen Pulley. Because no antigens were detected from the Pulley rape kit and because petitioner was noted as a secretor of H antigens, he claims he is excluded as the rapist and murderer of Karen Pulley.

35

Contrary to the respondent's argument that petitioner's claim of ineffective assistance of counsel during the guilt phase of his trial is waived, or incognizable, or fails to state a claim upon which habeas corpus relief may be granted because the petitioner pleaded guilty, petitioner may challenge his counsel's performance during the guilt phase of his trial. Petitioner raised the claim of ineffective assistance of counsel at the guilt stage in his state post-conviction proceedings. *See Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). To obtain habeas relief, petitioner must meet the prejudice prong of the ineffective assistance of council test by demonstrating that there is a reasonable probability that if it had not been for counsel's errors, he would have pleaded not guilty and gone to trial.

This claim has been presented to the state courts; thus it as been exhausted. In his state post-conviction proceedings, petitioner alleged counsel was ineffective for failing to investigate serology evidence that excluded him as the perpetrator of the murder and aggravated rape of Karen Pulley. *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002).

Petitioner has not directed the Court's attention to any testimony in the record reflecting that trial counsel failed to review the serology evidence contained within the TBI reports. The record reveals, contrary to petitioner's contention, that counsel did review the serology evidence and made a decision not to conduct DNA testing on the serology sample referred to in the TBI report. Mr. Moore, petitioner's trial counsel, testified there was sperm on a slide [Court File No. 21, Addendum No. 1, Vols. 13-14, p. 492]. However, when asked about whether he thought it was important to see whether that sperm head matched up with his client, counsel testified that he could not reconstruct the situation or explain what led them to the decision not to retain a DNA testing lab, but in petitioner's case, defense counsel did not think it would be fruitful to determine to whom the sperm

36

head belonged. When asked whether counsel thought it was important to exclude the possibility that someone else had sex with the victim other than the petitioner, counsel responded that in this case, he did not think this line of inquiry would be fruitful [Court File No. 21, Addendum No. 1, Vols. 13-14, p. 492-94]. Once counsel was told that petitioner waived his attorney-client privilege counsel elaborated:

> I didn't think the line of inquiry was fruitful, I just didn't, from my - - the conversations Ms. Bryan and I had had with Mr. Nichols trying to determine whether someone else had raped Ms. Pulley did not seem to us to be - - that seemed to be a waste of time.
>
> . . . .
>
> We had a lot of conversations with Mr. Nichols and based on those conversations and based on our work on the case that did not seem like a fruitful line of inquiry. If I for a minute had thought that someone else had raped and killed Karen Pulley, I would have gone after that tooth and nail.

[Court File No. 21, Addendum No. 1, Vols. 13-14, at 495-98]. Defense counsel could not recall specifics, but did remember having a discussion with co-counsel about the serology results and the secretor status of petitioner and the victim [Court File No. 21, Addendum No. 1, Vols. 13-14, at 506-08].

Petitioner's other attorney, Ms. Bryan, testified they inquired about having DNA tests performed on some of the evidence. She was not able to remember specifics but believed they spoke with a DNA expert up North and in Atlanta. Ms. Bryan also testified they took some slides to someone co-counsel knew at Memorial Hospital, and she remembered that someone told them "the samples didn't have enough materials to make the determinations that needed to be made" [Court File No. 21, Addendum No. 1. Vols. 13-14, at 688-90].

Petitioner refers the Court to the report of Joe Minor, a serologist with the TBI, which reflects that the liquid blood sample from Karen Pulley was not suitable for typing. Additionally, the report reflects the vaginal and saliva cotton swabs were tested, but the typing test failed to indicate the presence of the A, B, or H antigens [Court File No. 70, Addendum No. 9, Exhibit 95]. Petitioner is apparently a blood type O secretor who produces H antigens in his bodily fluid. *Nichols v. State*, 90 S.W.3d at 588. In addition, typing tests conducted on the liquid blood sample contained in the rape evidence collection kit from Karen Pulley were consistent with the ABO Blood Type O. Petitioner contends that the reports "showed that there was demonstrable evidence that Mr. Nichols was excluded as the rapist and murderer of Karen Pulley, because, despite evidence of sperm, no antigens were detected from the Pulley rape kit and Mr. Nichols was noted as a secretor of H antigens" [Court File No. 78, at 7].

The Court has not been directed to, nor has it found, any testimony by Joe Minor or any other expert witness demonstrating that Joe Minor's report concludes petitioner did not rape and murder Karen Pulley. Petitioner called Mr. Mike VanSant ("Mr. VanSant"), a serologist for the TBI who was involved in training Joe Minor during the late 1980s. Although Mr. VanSant did not test the rape kit in the instant case, he testified that petitioner is "a blood type O; PGM type is 2-1; the H antigen was present; and that would indicate that Mr. Nichols is a type O secretor and he would secrete the H antigen in his body fluids." [Court File No. 23, Addendum No. 1, Vol. 17-18, at 1211-12]. Mr. Vansant also testified that the H antigen is a universal antigen and if a person is a secretor he will normally secrete the H antigen. However, he also testified, "Some people don't have a lot" [Court File No. 23, Addendum No. 1, Vols. 17-18, at 1197].

The state post-conviction transcript reflects that Joe Minor was expected to be called to testify about this report; however, neither party has directed the Court's attention to his testimony. Moreover, the Court has not found a transcript of Joe Minor's testimony in the record.[8] When post-conviction counsel attempted to ask Mr. VanSant about the report on the instant case, the State objected, arguing the victim had massive blood transfusions at the hospital that were not her blood type and may not have had her exact antigen patterns. Although Mr. VanSant's testimony is confusing, he clearly did not testify petitioner was excluded as the perpetrator of this crime. Petitioner's post-conviction counsel then asked Mr. VanSant if massive blood transfusions in the hospital could have had any affect on the blood samples to which he answered "yes." [Court File No. 23, Addendum No. 1, Vol. 17-18, at 1232-33]. Mr. VanSant also testified that blood transfusions would not have any affect on other body fluids [ *Id*. at 1134], but when asked whether there was a way to distinguish blood from semen on the vaginal swab if the swab was bloody he responded:

> ANSWER: No, on a vaginal swab if semen is present I'm dealing with a mixture of two fluids from two different people if semen is present in a vaginal swab.
>
> QUESTION: Even if there's a lot of blood?
>
> ANSWER: That, I really couldn't answer. If there's a lot of blood, blood flow then yes, naturally it's going to have the cleansing action over a period of time.
>
> QUESTION: Over a period of time, but just because there's a lot of blood, that doesn't hide the fact that there's semen there, that whatever antigens you would get from the semen?
>
> ANSWER: Not necessarily.

---

[8] Neither Joe Minor nor any other serologist testified for the State during the state post-conviction proceedings.

[Court File No. 23, Addendum No. 1 Vol. 17-18, at 1235-36]. There was no follow-up testimony or evidence on this issue and the state appellate court determined that, given the equivocal nature of the evidence regarding whether massive bleeding may have had a cleansing action that affected the discovery of antigens, as well as the lack of expert testimony indicating the petitioner was excluded as the perpetrator, the evidence was inconclusive. The Tennessee Supreme Court agreed with the state trial court's conclusion that the evidence presented during the post-conviction proceedings failed to establish trial counsel's performance was deficient. In addition, the Tennessee Supreme Court summarized it's finding as follows:

> In sum, as the trial court found, nothing at post-conviction established that trial counsel's representation fell below an objective standard of reasonableness . . . in failing to investigate evidence of innocence. . . .
>
> In addition, we also agree with the Court of Criminal Appeals' conclusion that the petitioner failed to show any prejudice under the second prong of the analysis with respect to his guilty plea to the offenses involving Karen Pulley. As we have pointed out in detail, the record reveals that Nichols confessed to the offenses against Karen Pulley and that he knowingly and voluntarily entered pleas of guilty. The petitioner was well aware that the defense strategy was to accept responsibility for his actions and focus on mitigating evidence. Moreover, given his confessions and the consistent statements of guilt he made to his trial counsel and others, it would be speculation to find that the evidence at the post-conviction, which did not exclude Nichols as the perpetrator or otherwise establish a defense, would have resulted in a decision to proceed to trial instead of pleading guilty.

*Nichols v. State*, 90 S.W.3d at 595.

It is strongly presumed that counsel has rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. An attorney's strategic decisions, based on information supplied by the defendant and from a thorough investigation of relevant facts and law, are virtually unchallengeable. *See Ransom v. Johnson*, 126 F.3d 716, 721 (5th Cir. 1997). Standing alone, petitioner's claim that counsel failed to review serology evidence may have been

40

professionally deficient because counsel has a duty to make a reasonable investigation of a defendant's case or to make a reasonable decision that a particular investigation is unnecessary. *Strickland*, 466 U.S. at 691. However, the reasonableness of decisions regarding investigation depends on information supplied by the defendant. *See McCoy v. Lynaugh*, 874, F.2d 954, 964 (5th Cir. 1989). Counsel is not required to advance every non-frivolous argument or to investigate every conceivable claim.

In the instant case, petitioner has merely alleged trial counsel failed to review the serology report which petitioner claims demonstrates that there was demonstrable evidence that he was excluded as the rapist and murderer of the victim, "because, despite evidence of sperm, no antigens were detected from the Pulley rape kit and Mr. Nichols was noted as a secretor of H antigens" [Court File No. 78, at 7]. There is no proof in the record that counsel failed to review the serology evidence. The proof before this Court contradicts petitioner's claim as trial counsel testified they contemplated having DNA tests run on the serology evidence but ultimately decided against having such test conducted. [Court File No. 20, Addendum No. 1, Vols. 11-12, p. 432-33; Court File No. 21, Addendum No. 1, Vols. 13-14, p. 492-508, 688-90].

Moreover, even if trial counsel's performance was deficient in this regard, petitioner has not demonstrated any prejudice as a result of alleged deficient performance by his counsel. Petitioner's post-conviction counsel failed to ask Mr. VanSant if the information contained in Joe Minor's report excluded the petitioner as the rapist and murderer in this case. Petitioner has not provided any expert testimony that this serology report excludes him as the rapist and murderer in this case. Indeed, the evidence at the post-conviction proceeding did not exclude Nichols as the perpetrator and, as the state courts observed, nothing presented during petitioner's post-conviction proceedings

41

established that trial counsel's representation fell below an objective standard of reasonableness in failing to investigate evidence. The record does not reflect that counsel failed to investigate and analyze the serology evidence, but rather, reflects that counsel was aware of the serology report, made contact with DNA experts, but ultimately determined the material on the slide was not sufficient for DNA testing [Addendum No. 1, Vols. 13-14, at 688-690].

For petitioner to meet his burden of demonstrating counsel was ineffective as it relates to this issue, he must state with specificity what the investigation would have revealed, what evidence would have resulted from that investigation, and how such would have altered the outcome of the case. *Moawad v. Anderson*, 143 F.3d 942, 948 (5th Cir. 1998). Furthermore, when trial counsel's decision not to pursue further investigation into a potential defense is based on investigation and consultation with the defendant which leads the attorney to believe that further investigation would be fruitless, that decision may not be challenged as unreasonable.

This is a case where petitioner consistently admitted his guilt to authorities, his counsel, and his wife. Additionally, petitioner testified during the sentencing portion of his criminal proceedings that he broke into the victim's home, raped her, and beat her with a 2 x 4 as he was leaving the crime scene. Although petitioner initially denied having intercourse with the victim, he eventually told counsel that it was possible that he could have penetrated the victim [Addendum No. 1, Vols. 13-14, at 693]. Petitioner has not shown that the serology evidence excluded him as the rapist and murderer of the victim. Indeed, a recent DNA test revealed that petitioner shares the same genetic profile as the source of the spermatozoa from the victim's gown. Consequently, petitioner cannot be eliminated as the source of the spermatozoa from the victim's gown [Court File No. 244-2]. Petitioner has failed to demonstrate that the alleged error had any effect on the judgment. Petitioner

42

has not shown that counsel's alleged deficient performance caused the outcome to be unreliable or the proceeding to be fundamentally unfair.

In evaluating this claim of ineffective assistance of counsel during the guilt stage, the Court must determine if there is a reasonable probability that had trial counsel reviewed the serology report, petitioner would not have pleaded guilty and would have insisted on going to trial. *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *Miller v. Straub*, 299 F.3d 570, 581 (6th Cir. 2002); *Lyons v. Jackson*, 299 F.3d 588, 599 (6th Cir. 2002). As to the sentencing phase, petitioner must establish a reasonable probability that the jury would not have imposed the death sentence in the absence of the alleged error. *Strickland,* 466 U.S. at 691. Petitioner does not argue, nor does the Court find, that there is a reasonable probability that he would not have pleaded guilty and insisted on going to trial had counsel investigated and analyzed the serology reports. Additionally, petitioner has not shown, nor does the Court find, that there is a reasonable probability that the jury would not have imposed the death sentence in the absence of the alleged error.

The appellate court found the serology evidence to be equivocal and inconclusive. The court reached this conclusion because petitioner failed to demonstrate that massive bleeding would not have had a cleansing action affecting the discovery of antigens. Furthermore, petitioner failed to introduce expert testimony that the petitioner was excluded as the perpetrator. Thus, the appellate court denied relief on this claim concluding the evidence was inconclusive. *Nichols v. State*, 90 S.W.3d 576, 588 (2002).

The rejection of this claim by the Tennessee courts was neither the product of an unreasonable application of clearly established Federal law nor the result of an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding. This aspect of petitioner's ineffective assistance claim does not warrant federal habeas relief.

### b.    Case of T.R.(Claim 12.b)

Petitioner asserts that trial counsel failed to provide Mr. VanSant with facts that would have transformed his conclusion – that the tests he performed on the sperm found in the vagina in the T.R. case were inconclusive – to a conclusion that petitioner was excluded as a suspect. Although petitioner fails to explain why this Court should review counsel's actions in an unrelated rape case, a review of the record reveals that petitioner's conviction for the aggravated rape of T.R. was used at the sentencing hearing as an aggravating factor to sentence petitioner to death. However, petitioner is not claiming counsel failed to obtain and review material that counsel knew the prosecution would probably rely on as evidence of aggravation during the sentencing stage of his capital murder proceedings, *see Rompilla v. Beard*, 545 U.S. 374 (2005), but rather, petitioner is attacking the performance of counsel during their handling of his case involving the rape of T.R.

Petitioner claims his prior conviction for the aggravated rape of T.R. was flawed because counsel failed to provide necessary information to VanSant which would have enabled him to exclude petitioner as a suspect in the T.R. case. Petitioner may not attack his conviction and sentence for the rape of T.R. in this habeas proceeding. To challenge counsel's performance during the state court proceedings in the T.R. case, petitioner must file a habeas petition pursuant to 28 U.S.C. § 2254 in that case.

Accordingly, petitioner is not entitled to relief in this habeas proceeding on his claim that trial counsel failed to provide necessary information to VanSant in the T.R. case.

44

### c.    Alibi Evidence in the T.M. Case (Claim 12.c)

Petitioner contends trial counsel missed solid alibi evidence in the T.M. case which would have demonstrated petitioner was physically at work at Godfather's Pizza in Red Bank, Tennessee, at the time of the rape of T.M. in Tiftonia, Tennessee.  Petitioner contends the residence of T.M. was too far from the Red Bank store for petitioner to have been the perpetrator of the rape.  Petitioner contends that this alibi evidence should have put trial counsel on notice that his confession in the T.M. case was unreliable and should have led counsel to question the reliability of any statement he made.

Once again, petitioner is challenging trial counsel's performance in relation to a conviction for which he has yet to be re-sentenced and for which he has no habeas petition pending.  This Court has no jurisdiction at this time to consider this claim.  Accordingly, petitioner is not entitled to any habeas relief on this claim.

### d.    Coerced Statement  (Claims 12.d and 12.e)

Petitioner claims his trial counsel failed to properly debrief him about the circumstances surrounding his interrogation and subsequent confession.  Thus, petitioner argues, trial counsel failed to obtain evidence that his statement was coerced.[9]

---

[9]    Petitioner is mistaken.  Trial counsel did question petitioner about the circumstances surrounding his interrogation and subsequent confession.  Counsel's investigation into petitioner's confession led them to file a motion to suppress his statement on the ground that law enforcement coerced petitioner into making an involuntary statement.  *See State v. Nichols*, 877 S.W.2d 722, 732 (Tenn. 1994).

Respondent, questioning whether this claim is properly before the Court, asserts the claim is without merit because the investigation conducted by petitioner's trial counsel was objectively reasonable in light of petitioner's repeated confessions.[10]

First, petitioner asserts that trial counsel failed to properly debrief him to find evidence of coercion. Petitioner argues there was evidence that the officers told him that, if he cooperated, he would receive treatment. Petitioner also claims that he was told if he requested counsel the officers would have to wake the judge and the judge would treat him more harshly. As explained below, these claims were addressed by the trial judge in petitioner's motion to suppress his statements during his criminal proceedings.

Second, petitioner contends the coercive nature of the interrogation process was demonstrated through the testimony Dr. Richard Ofshe[11] and the victim's former boyfriend, Scott Simcox.[12] Petitioner claims Mr. Simcox's testimony that Detective Heck showed him diagrams of the murder scene and familiarized him with the evidence demonstrates Detective Heck educated Mr. Simcox about the facts of the crime. Petitioner also claims Detective Heck used psychological coercion by showing Simcox the victim's picture and telling him the victim had been telling people how much she loved him. Detective Heck asked Mr. Simcox if his fingerprints would be in the victim's bedroom, and petitioner contends Detective Heck was suggesting that Simcox's fingerprints had been found.

---

[10]     Petitioner made this argument when he appealed his post-conviction case to the Tennessee appellate court [Court File No. 26, Addendum No. 2, Doc. 1].

[11]     Dr. Ofshe did not testify that petitioner's statement was coerced.

[12]     Simcox testified Detective Heck did not start telling him things or sharing any information with him, including showing him the diagram, until after the detective had questioned him [Court File No. 24, Addendum No. 1, Vol. 19-20, at 1479].

46

The alleged coercive nature of the interrogation of Scott Simcox does not demonstrate petitioner was coerced to confess in the instant case. Consequently, his argument that Scott Simcox was subjected to a coercive interrogation process, offers petitioner no relief in this habeas proceeding.

Dr. Richard Ofshe has a Ph.D. in sociology and is a professor at the University of California at Berkeley. Dr. Ofshe is a social psychologist who teaches, works, and researches in the field of coercive police interrogation techniques and the phenomenon of false or coerced confessions. Dr. Ofshe testified through his deposition at petitioner's state post-conviction hearing.[13]

Dr. Ofshe testified experts in the field agree that false confessions exist, that individuals can be coerced into giving false confessions, and that there exist identifiable coercive police interrogation techniques which are likely to produce false confessions. Dr. Ofshe testified that more investigation is necessary to determine whether certain of those techniques were used in petitioner's case.

Petitioner's assertion that Dr. Ofshe found significant examples of coercion used in taking the petitioner's statement is simply incorrect. Rather, Dr. Ofshe testified he did not see any evidence that trial counsel thoroughly debriefed petitioner about the history of the interrogation. Dr. Ofshe did not testify that the interrogation methods used in this case demonstrate petitioner was coerced into confessing to the crime. Dr. Ofshe testified petitioner "volunteers certain things during the course of the suppression hearing, but the attorneys don't develop those points which makes me suspect that they never gave them adequate consideration" [Addendum No. 68, Addendum No. 9,

_____

[13]     Dr. Ofshe was not subjected to cross-examination because, although the Assistant District Attorney had been noticed for the deposition, he informed petitioner's counsel he was waiving his appearance [Court File No. 68, Addendum No. 9, Exhibit 79, p. 4].

Exhibit 79, p. 57].  This is mere speculation on Dr. Ofshe's part, and petitioner has not submitted any evidence demonstrating what information counsel failed to develop.

Dr. Ofshe observed that petitioner testified during the suppression hearing that the officers indicated Nichols would receive treatment if he cooperated with them.  It was Dr. Ofshe's opinion, that the officer's assurance of treatment should have caused trial counsel to very carefully debrief petitioner to determine how the subject of petitioner receiving help was broached during the interrogation.  This is important, according to Dr. Ofshe, because a promise of a benefit, the treatment in this instance, for an admission of guilt would render the statement involuntary.  Dr. Ofshe testified that the discussion of treatment could have been raised in such a way that would have been coercive but because of the "jumbled way" in which petitioner testified about that discussion Dr. Ofshe was unable to determine whether the treatment discussion was coercive [Court File No. 68, Addendum No. 9, Exhibit 79, p. 57-59].

In Dr. Ofshe's opinion, there appeared to have been no investigation of the circumstances surrounding the interrogation and the reliability of petitioner's statement confessing to the instant criminal episode.  Dr. Ofshe's testimony referred generally to all of petitioner's cases.  Dr. Ofshe stated that a detailed history of the interrogation process should have been investigated and a thorough evaluation of the physical evidence should have been conducted to determine whether the atmosphere of the interrogation and the physical evidence supported the confession.  Dr. Ofshe found it astounding that there was no evidence linking petitioner to the crime.  Dr. Ofshe concluded the lack of physical evidence linking petitioner to the crime, along with the physical evidence disconfirming petitioner as the perpetrator, should have signaled to his trial counsel there was a

distinct possibility Nichols may be innocent.[14]  Dr. Ofshe did not identify any physical evidence in the case before this Court which "disconfirmed" petitioner's involvement in the instant crime [Court File No. 68, Addendum No. 9, Exhibit 79, at 62-66].

Dr. Ofshe said petitioner asked for counsel; and law enforcement's response, that they would have to wake the judge who would in turn treat petitioner more harshly, is a tactic to coerce a person not to press for his right to counsel.  In petitioner's case, however, trial counsel filed an unsuccessful motion to suppress his statement on the basis that his statement was coerced.  Trial counsel specifically argued that petitioner's confession was coerced on the basis that law enforcement ignored petitioner's invocation of his right to counsel and law enforcement promised to obtain treatment for petitioner [Court File No. 37, Addendum No. 5, Vol. 1, at 226-239, Brief in Support of Motion to Suppress]. However, the trial court specifically concluded that it did not believe Mr. Nichols' claim that he requested counsel.

> The Court, first, does not believe Mr. Nichols.  Mr. Nichols testimony is [sic] to the fact that he was not — or that he did ask for an attorney.  The court finds that he did not make that.  The Court thinks that the Court is a pretty good lie detector.  And I did observe Mr. Nichols' manner and demeanor.  I observed Mr. Dyer's manner and demeanor and I observed Mr. Holland's manner and demeanor as they were testifying.  And Mr. Nichols was telling the truth on most things but Mr. Nichols was not telling the truth as to that particular point.
>
> . . . And there's no indication or no evidence whatsoever that there was any intimidation, other than the statement by Mr. Nichols, which the Court does not believe.

[Court File No. 39, Addendum No. 5, Vol. 10, pp. 151-53].

---

[14]     Additionally, Dr. Ofshe testified he did not formulate any opinion as to the veracity of petitioner's confession.

The trial judge credited the testimony of law enforcement over that of petitioner's, concluding the confession was not coerced and was admissible. The failed attempt by trial counsel to have petitioner's statement suppressed on the grounds of coercion and involuntariness demonstrate that counsel did investigate the circumstances surrounding petitioner's confession. Petitioner has failed to produce clear and convincing evidence that the trial court's credibility determinations and factual determination that his interrogation lacked coercion was unreasonable. Absent clear and convincing evidence that those determinations were unreasonable, the trial court's conclusion that the confession was admissible and not coerced must stand. Accordingly, this claim is without merit.

Even assuming counsel was deficient for failing to investigate the alleged coercive tactics more thoroughly, petitioner has not demonstrated he was prejudiced by counsel's alleged deficient actions. Petitioner has not demonstrated what evidence trial counsel would have discovered had they debriefed him more thoroughly regarding his confession. Therefore, petitioner is not entitled to habeas relief on this claim because not only has he not demonstrated counsel was deficient, petitioner has not demonstrated any prejudice as a result of counsel not debriefing him more thoroughly in the instant case. Thus, he has not demonstrated trial counsel rendered ineffective assistance during his criminal proceedings.

Petitioner's failure to demonstrate counsel's representation fell below an objective standard of reasonableness for failing to investigate the confession as coerced and his failure to demonstrate he was prejudiced by counsel's alleged deficient performance results in the dismissal of this claim. The state court's determination that petitioner did not establish ineffective assistance of counsel was

50

not an unreasonable application of clearly established federal law or an unreasonable determination of the facts. Accordingly, this claim will be **DISMISSED**.

### e. Failure to Attack Confession (Claim 12.f)

Petitioner contends that had counsel investigated the circumstances surrounding his interrogation and confession to determine the reliability of petitioner's confessions, counsel would have been prepared to attack Nichols' confession at both the hearing on the motion to suppress and at trial. According to petitioner, trial counsel never heard a continuous tape recording of the statements made starting at 12:47 a.m. on Friday, January 6, 1989, including the statement petitioner made after he was taken to each of the East Ridge crime scenes. Petitioner's reference to the East Ridge crime scenes indicates he is referring to evidence that does not pertain to this case, but rather, to his cases pending in state court. Nevertheless, petitioner has failed to demonstrate he was prejudiced by counsel's failure to listen to this continuous tape recording.

To the extent petitioner is challenging trial counsel's performance in relation to the suppression motion in the instant case, he fails to state a viable claim. Petitioner does not reveal what trial counsel would have uncovered had "this investigation been undertaken" [Court File No. 82, p. 8]. Therefore, he has failed to demonstrate counsel rendered ineffective assistance of counsel and he has failed to demonstrate he suffered any prejudice from counsel's alleged ineffective assistance. Specifically, petitioner has not demonstrated that had counsel listened to the continuous tape recording or investigated the circumstances surrounding his interrogation and confession that he would have gone to trial rather than entered a guilty plea.

Accordingly, the state court's decision that counsel was not deficient for failing to investigate the nature of the interrogation was neither an unreasonable application of clearly established

Supreme Court law or contrary to Supreme Court precedent. In addition, the state court decision did not involve an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, this claim does not entitle petitioner to any habeas relief and it will be **DISMISSED**.

### f.     <u>Failure to Investigate Critical Evidence (Claim 12.g)</u>

As the next illustration of ineffective assistance of counsel, petitioner alleges his attorneys, convinced of his guilt, failed to investigate evidence suggesting his confession was false. As an initial matter, to the extent petitioner has made this an attack on other cases not before this Court, he is not entitled to any habeas relief on a claim pertaining to any of his cases which are not the subject of this habeas petition.[15]

The Court will address each claim below, but as to petitioner's general claim that trial counsel failed to investigate critical evidence because counsel was erroneously convinced petitioner was guilty, the Court finds nothing in the record to reflect that Nichols ever told his attorneys any of these confessions were false or that he was not guilty of these crimes. The state courts had no specific information demonstrating his confessions were false or that he was innocent, nor has Nichols presented any such evidence in this Court.

At no time did petitioner give counsel any reason to doubt he committed the crimes to which he confessed, nor has he submitted any evidence in this Court to demonstrate his confessions are false or that he is not guilty of the murder in the instant case. The Tennessee Supreme Court found petitioner's argument, that his statements should have been challenged as false because they contain

---

[15]     The Court will consider Claims 12.g.i.1, 12.g.ii, and 12.g.iv only as they pertain to the instant habeas petition.

inaccuracies and omissions, "is immediately undercut . . . by the fact that the petitioner never refuted his confessions or his own statements to his trial counsel and others." *Nichols v. State*, 90 S.W.3d 576, 594 (Tenn. 2002)   The Tennessee Supreme Court observed, "nothing at post-conviction established that trial counsel's representation fell below an objective standard of reasonableness either in failing to investigate evidence of innocence or in failing to challenge the confession as false when viewed in the context of the petitioner's own confessions and statements of guilt." *Nichols v. State*, 90 S.W.3d at 595.

Petitioner has not demonstrated that the performance of his counsel was deficient.  The state courts found the evidence presented at the state post-conviction proceedings did not alter the fact that Nichols consistently admitted his guilt and never provided a basis for trial counsel to challenge his confessions as false.  Although petitioner had the right to have counsel present all appropriate defenses, this right does not extend to using perjury, and an attorney's duty to a client does not extend to assisting a client in committing perjury.  In view of petitioner's detailed and compelling video-taped confession and his constant admission of guilt, counsel was not deficient for failing to investigate the lack of physical evidence.  Petitioner has failed to demonstrate the state court's conclusion is unreasonable.

### (1)    Lack of Physical Evidence (Claim 12.g.i.)

In Claim **12.g.i.,** petitioner asserts there was no physical evidence linking him with the subject offense for which he was convicted.[16]   Petitioner contends counsel ignored the lack of evidence linking him to the subject offense because counsel was erroneously convinced petitioner

---

[16]     For reasons of clarity the Court has rephrased the claims to show that only allegations related to the Pulley case will be considered.

was guilty of all offenses to which he confessed. First, the Court observes that, at the time of trial, there was serology evidence that did not exclude petitioner as the perpetrator of the crime for which he is convicted.

### (a)    Weapon in S.T. Case (Claim 12.g.i.(1))

As this allegation does not relate to any of the Pulley offenses, it will not be addressed.

### (b)    2 x 4 Lumber in the Murder Case (Claim 12.g.i.(2))

In Claim **12.g.i.(2)**, petitioner contends no physical evidence links him to the instant murder and rape. Petitioner maintains the State incorrectly argued the 2x4 links him to this case since there is no proof that it is the same 2x4 described in his confession. Petitioner had confessed that he used a 2x4 to kill the victim in this case.

In his post-arrest confession, petitioner explained that he had hit Karen Pulley with a 2x4 piece of lumber; put it in his car; and later tossed it out his open passenger window, down a sloped wooded area near an intersection. Chattanooga police officers searched the area and found nothing. Shortly afterwards, the area was searched again and this time the 2x4 was discovered lying at the base of a tree. No other 2x4 was found in the area and petitioner, who was present at this search, said that "it looked like" the one he had thrown through his car window.

During the post-conviction hearing, the unsuccessful initial search was presented as a claim. Also considered was testimony from the victim's roommate that she had gone to the area where the 2x4 was found, which was already occupied by a number of people, and the 2x4 was leaning against a tree as though it had been placed there. The victim's roommate said she was uncertain the board came from her home.

54

According to the forensic report from the Hamilton County Medical Examiners Office, the 2x4 had no hair or fibers on it. Also presented through the affidavit of Craig Lahren ("Lahren"), the author of the forensic report from the Hamilton County Medical Examiners Office, was his testimony that Lahren looked for blood during the initial examination of the 2x4 but had found no blood on it. Additionally, during state post-conviction proceedings a forensic entomologist testified he found no hair, blood, or soft tissue on the board, though he did not believe the blood "would have worked off" or that blood or soft tissue would have been eaten by insects. Nor did he find plant material though he would have expected to find it, given the length of time the board had supposedly been exposed to the elements.

Lead counsel testified that, while the 2x4 did not contain the victim's hair or blood, it was located where petitioner said he had thrown it. Junior defense counsel also testified that she was aware of the forensic report and had interviewed its author, though the author himself offered testimony to the contrary concerning an interview. When reviewing this issue on post-conviction appeal, the Tennessee Supreme Court, though recognizing in hindsight counsel might have explored more fully the serology and the absence of physical evidence on the murder weapon, found no deficient performance concerning defense counsel's investigation of any proof of innocence. *Nichols v. State*, 90 S.W.3d 576, 595 (Tenn. 2002).

Given that petitioner had confessed to the crime; had voluntarily and knowingly pled guilty; and had agreed to his counsel's strategy to accept responsibility for the conduct, focusing instead on evidence to mitigate the crime, the Tennessee Supreme Court concluded no prejudice had been shown.

Based upon petitioner's damaging confession and the fact that he continued to confess to counsel, his investigator, his psychological expert, and his wife, the Court finds that the state court's conclusion, that trial counsel did not render deficient performance by failing to investigate any proof of innocence, is reasonable. Moreover, since petitioner has failed to demonstrate he would have insisted on going to trial had he known there was no forensic evidence linking him to the 2 x 4, he has failed to demonstrate he was prejudiced by counsel's alleged failure to investigate any proof of innocence. *See Hill v. Lockhart*, 474 U.S. 52, 58 (1985) (In order to satisfy the prejudice requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would have not pleaded guilty but would have insisted ongoing to trial).

When a claim has been adjudicated on the merits in state court, a petitioner can only be granted relief if the state court decision is contrary to or involves an unreasonable application of federal law, in light of the evidence presented or is based on an unreasonable determination of the facts. The state court decision was none of these things. Therefore, the writ will not issue with respect to this claim.

### (2) Confessions in Other Cases (Claim 12.g.ii)

As this allegation does not relate to any of the Pulley offenses, it will not be addressed.

### (3) Pulley Confession (Claim 12.g.iii)

Petitioner claims that, during and for hours before his confession, Detective Heck fully briefed him as to the facts in this case. Petitioner contends Detective Heck often referred him to a notebook, to assist the petitioner when his memory failed, as to details of the layout of Pulley's room, items found in the house, and the location of the house.

56

As alleged in the habeas petition, this claim contains no factual development – indeed, petitioner did not place the facts underlying his claim before the state courts either. Petitioner invoked his right against self-incrimination when called as the State's witness at the post-conviction hearing, and refused to answer questions about the offenses or his post-conviction allegations. Having failed to flesh out his claim with facts, apparently petitioner is relying here, as he did in the state court, on his videotaped confession to supply the missing factual allegations.[17]

Petitioner's factually unsupported claim that Detective Heck fully briefed him for hours as to the facts in this case is not sufficient to state a claim for habeas relief. Because petitioner has not identified any facts of which he was unaware prior to Detective Heck's alleged coaching, his claim that Detective Heck coached him for hours prior to his video-taped confession lacks a factual basis, even though Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts requires a habeas petitioner to "specify all the grounds for relief which are available" and "set forth facts to the claim asserted that is important." *See* Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts (Advisory Committee Note to 1976 Amendment to Rule 2). For this reason, it is insufficient to state a claim. Thus, petitioner's claim, that counsel was ineffective for failing to investigate the several hour briefing to which he was subjected by Detective

---

[17]     Though petitioner is responsible for making out his own claims and though factually-unsupported claims, such as these, do not entitle petitioner to relief, *Barefoot v. Estelle,* the Court, being mindful that this is a death penalty case has viewed petitioner's videotaped confession. In it he gives a detailed narrative of the evening's events; describes the route he traveled to reach the victim's home; recounts how he surreptitiously approached the victim's house and looked through the window before leaving, only to return later to commit the rape and murder; and identifies the location where he parked his car. Petitioner has not alleged, much less shown, that Detective Heck was aware of these facts prior to petitioner's divulging them. Nothing in the videotape supports petitioner's allegations that Detective Heck briefed him on the facts of the case resulting in his false confession or, indeed, his allegations that the confession was false.

Heck prior to giving his video-taped confession, will be **DISMISSED** for failing to set forth in summary form the facts supporting this claim. Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts.

A review of petitioner's video-taped confession reveals that petitioner knew the facts of the case and there is no indication that petitioner's confession was untrue. Petitioner provided facts during his video-taped confession that Detective Heck had no way of knowing prior to petitioner divulging them. Petitioner provided Detective Heck with details of where he initially parked when he was surreptitiously surveying the house and the occupants, in addition to providing the route he drove when he departed and returned to commit the crime. This is information about which Detective Heck would have no independent knowledge. Therefore, it was reasonable for petitioner's counsel to rely upon his confession of guilt to law enforcement and to them and other parties when making strategic decisions on how to proceed with the case.

Finding it was entirely reasonable for counsel's actions to be influenced by petitioner's statements, the Tennessee Supreme Court observed that Nichols had given a detailed emotional videotaped confession to the murder and rape of the victim in the instant case, in which he had given a description of the victim's house, his point of entry into the house, the layout of the victim's bedroom, and the circumstances surrounding the rape and murder. *Nichols v. State*, 90 S.W.3d at 593, *citing Strickland v. Washington*, 466 U.S. at 691 (stating that reasonableness of counsel's actions "may be determined or substantially influenced by the defendant's own statements or actions"). Ultimately, the state court found that the evidence offered during the post-conviction proceedings did not demonstrate any deficiency of performance on the part of trial counsel. *Id.* at 596 (concluding that "nothing at post-conviction established that trial counsel's representation fell

below an objective standard of reasonableness either in failing to investigate evidence of innocence or in failing to challenge the confessions as false when viewed in the context of the petitioner's own confessions and statements of guilt."). The state courts also found that Nichols failed to demonstrate prejudice. *Id.*

Petitioner submits that, for two reasons, the state court's decision does not pass muster under AEDPA's standard of review for adjudicated claims. First of all, he proposes that the state court decision was reached by employing the wrong standard of review under Tennessee law. Even if this allegation is true, it does not present a cognizable issue in this instant proceeding because federal habeas courts do not sit to correct errors of state law. *Estelle v. McGuire*, 502 U.S. 62 (1991).

Secondly, petitioner maintains that the state courts violated the *Strickland* standard. Petitioner must do more than demonstrate that the Tennessee judiciary's application of federal law was incorrect because a federal habeas court may not issue the writ simply because it concludes, in its independent judgment, that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, the application must also be unreasonable. *Williams v. Taylor*, 529 U.S. 362, 411 (2000). Hence, the Court finds no merit to either of these submissions. The Tennessee Supreme Court determined Nichols failed to present evidence that established trial counsel's performance was deficient. Specifically, the Tennessee Supreme Court found "nothing at post-conviction established that trial counsel's representation fell below an objective standard of reasonableness either in failing to investigate evidence of innocence or in failing to challenge the confessions as false when viewed in the context of the petitioner's own confessions and statements of guilt." *Nichols v. State*, 90 S.W.3d at 596. The state court also found that Nichols failed to demonstrate prejudice as it observed that "it would be speculation to find that the evidence at the

post-conviction, which did not exclude Nichols as the perpetrator or otherwise establish a defense, would have resulted in a decision to proceed to trial instead of pleading guilty." *Id.*

In view of petitioner's confession and his various statements of guilt, as well as the lack of any evidence excluding him as the perpetrator or establishing a defense to the rape and murder charges, the state court's application of the test in *Strickland*, as modified by *Hill v. Lockhart,* 474 U.S. 52 (1985), to petitioner's claim, was not objectively unreasonable and was based upon a reasonable determination of the facts in light of the evidence presented to that court. Accordingly, petitioner is not entitled to any habeas relief on this claim.

### (4)    Fred Coats (Claim 12.g.iv.)

Petitioner also invites the Court to consider facts relating to his conviction in the rape case of S.T. In essence, Nichols is proposing to prove that because counsel's representation was allegedly sloppy in S.T.'s case, ergo it was sloppy in the instant case also. Counsel's performance is to be judged on the particular facts and circumstances of the conviction under attack, not on the facts underlying a conviction not being challenged. This claim will not be addressed.

### g.    False Confession (Claims 12.h - j)

As his next example of attorney error, petitioner alleges trial counsel failed to investigate the possibility that his confession was false – indeed petitioner asserts that counsel admitted as much (**Claim 12.h**). In addition, petitioner claims counsel relied upon the statements of the investigating detective concerning other suspects, rather than conducting their own independent investigation of those persons (**Claim 12.j**).

It is important to note what petitioner is not claiming in this instance. Petitioner is not claiming that his confessions are false – indeed, he has never so asserted. Instead, he is claiming

counsel should have challenged his confessions as false because they contained inaccuracies and omissions. In essence, petitioner is attacking trial counsel's strategy to have petitioner be honest and admit his guilt and to concentrate on presenting a mitigation defense to avoid a sentence of death. Petitioner now insists his attorneys should have pursued a different strategy – to attack the way the law enforcement officers handled his case and, thereby, emphasize that there was reasonable doubt as to his guilt. However, petitioner has failed to demonstrate trial counsel's strategic decision was not reasonable sound trial strategy. *See Strickland v. Washington*, 466 U.S. at 689. Moreover, petitioner has neither alleged nor demonstrated that he would have proceeded to trial if counsel had conducted an investigation into the possibility of a false confession, thus, he has failed to demonstrate any resulting prejudice.

### (1)  Inadequate Investigation (Other Suspects)

Petitioner asserts that Phillip Redwine, Jim Snow, and Fred Coats were suspects whom trial counsel failed to adequately investigate (**Claim 12.i**). According to petitioner, there was evidence that Phillip Redwine shaved all the hair off his body from the neck down as the police were approaching his home to question him about the rapes; proof that Jim Snow had been charged with making sexually harassing phone calls to members of Ms. Pulley's church and was suspected of making a sexually harassing phone call to Ms. Pulley's housemate after Ms. Pulley's death; and evidence that Fred Coats was a prime suspect in the murder and rape of Ms. Pulley as well as the rape of several of the other victims to which petitioner pleaded guilty.[18]

---

[18]  Furthermore, as noted earlier, the Court will not consider allegations of ineffective assistance of counsel with respect to other cases, such as the allegations presented in (Claim 12.i), because attorney errors in those cases, if there are any, will not furnish a basis for habeas relief arising out of petitioner's conviction in the Pulley case.

During the state post-conviction proceedings, senior trial counsel testified he was fully aware of the "Coats matter."  Junior defense counsel stated she had no reason to believe Redwine had raped and murdered the victim in this case.  In addition, she had discussed the other suspects with Detective Heck and corroborated the information from him when necessary.  The post-conviction court made the following finding:

> Trial counsel and investigator Cohan testified that any allegation that counsel should have more fully researched the possibility of a false confession was "ludicrous."  The petitioner gave very detailed statements to trial counsel separate from his statements given to the police.  Trial counsel testified that they thoroughly discussed the options available with the petitioner and that the petitioner understood that his confessions would be very damaging evidence at the guilt phase.  They advised him that if he entered a guilty plea and took responsibility for his actions that the jury might take this into consideration in the penalty phase and not impose the death penalty despite the obviously weighty aggravating factors.  Under all the circumstances, the decision to plea was a strategic decision which will not now be questioned using 20-20 hindsight.  It is also noted that counsel's time records "speak for themselves" as to the substantial amount of time expended by counsel on this case.

*Nichols v. State*, 2001 WL 55747, at *33 (Tenn.Crim.App. 2001).

Ultimately, the state court found that, based upon the record, trial counsel's investigation of other suspects was adequate and not deficient.  Petitioner has failed to explain what additional evidence counsel would have obtained had counsel investigated the other suspects rather than depending on Detective Heck's explanation of his investigation of the suspects.   Petitioner has failed to provide any evidence that would have been revealed by further investigation, demonstrating his confessions were false or that there was reasonable doubt as to his culpability.  Accordingly, Nichols has failed to demonstrate defense counsel was deficient or that he suffered any prejudice as a result of his attorneys' alleged failure to further investigate other possible suspects.

Having found no deficiency of performance, the state court did not, and need not, address the prejudice component of *Strickland*.   *Strickland v. Washington*, 466 U.S. 668 (1984).

Nevertheless, it does not appear that petitioner has identified any additional evidence which would have been discovered had his attorneys conducted a more in-depth investigation of the suspects, nor pointed to any proof that would have shown his confessions to be false had counsel pursued the matter further. Absent such evidence, there was no prejudice flowing from counsel's alleged unprofessional conduct. Accordingly, the state court decision was reasonable.

### (2)     Inadequate Investigation (Physical Evidence)

Petitioner complains that trial counsel's reliance on the explanations given by Detective Heck caused his attorneys to overlook a number of important facts which would have undermined his confession. Nichols contends that the lack of physical evidence linking him to the instant crime; the difference in the physical evidence and characteristics of the crime scene and his description in this statement; the hair and other biological samples that excluded him; and the two pubic hairs obtained from the victim which matched neither the victim nor petitioner, are all factors that counsel should have considered and which should have caused counsel to question the reliability of petitioner's confessions (**Claim 12.j**).

The state appellate court determined petitioner failed to demonstrate that the outcome of this case would have been different had trial counsel defended the case by claiming that his confession was false and making the various other arguments which Nichols contends would have established reasonable doubt. The state appellate court could not "conclude that the juries in these cases would have agreed that there was reasonable doubt as to his guilt, in light of his detailed confessions, including the lengthy, detailed, emotional videotaped confession he provided in the Karen Pulley case." *Nichols v. State*, 2001 WL 55747, at *40. The appellate court supported its conclusion with the following findings:

63

Trial counsel testified that, after their investigations of the evidence and many conversations with the petitioner concerning the details he provided them in the Pulley and other cases, there was no reason whatsoever to believe that the petitioner did not commit the offenses. Therefore, junior trial counsel described any idea of presenting a defense based on the petitioner's actual innocence as "ludicrous."

In view of petitioner's confessions to police and his detailed statements to his trial counsel, there is no indication that an investigation as to the truth of the statements or of the evidence would have led counsel to any findings which, in turn, would have changed their recommendation that the petitioner plead guilty to the Pulley rape and murder. The petitioner maintains that advising him to plead guilty to the capital murder could only have made sense, and therefore been done on the reasonable advice of counsel, if such a plea were entered in order to avoid the possibility of a death sentence. Trial counsel testified, however, that after losing the battle to have the videotaped confession suppressed, their focus shifted to a strategy of trying to save the petitioner's life by presenting him in the best light possible, which included his taking responsibility for his crimes and offering mitigation evidence which might cause the jury to be sympathetic toward him despite his crimes.

*Id.* at *42. The appellate court applied the "prejudice rule" in *Hill v. Lockhart*, and concluded petitioner did not show that, but for the alleged errors of his trial counsel, he would not have pleaded guilty but would have insisted on going to trial.

Petitioner's claim that the Tennessee Court of Criminal Appeals used the wrong standard of review under Tennessee law is of no consequence in this proceeding because the focus of this proceeding is on violations of the federal Constitution, statutes, and treaties. *Estelle v. McGuire*, 502 U.S. 62 (1991). The focus is not on violations of purely state law. Petitioner's claim that the Tennessee Court of Criminal Appeals also violated the *Strickland* standard does not entitle him to habeas relief because the federal habeas scheme authorizes federal court intervention only when a state court decision is objectively unreasonable. It is not here. Moreover, it is not clear why Nichols is alleging *Strickland* was violated.

The appellate court began its analysis of the ineffective assistance claim by citing *Strickland* and by ultimately concluding that petitioner failed to show his trial counsel did not perform within

the range required of attorneys in criminal cases and failed to show a reasonable probability that, but for the alleged attorney errors, the result would have been different. *Nichols v. State*, 2001 WL 55747, at 40. Further in its discussion, the appellate court stated it could not say "no reasonable lawyer would have represented his or her client as petitioner's counsel did." *Id*. at 43. Assuming petitioner is attacking the "no reasonable lawyer" language, the district court finds that the state court recited the complete *Strickland* standard elsewhere and thus, any alleged incorrect word did not render the appellate court's decision unreasonable. *See Holland v. Jackson*, 542 U.S. 649, 654 (2004) ("§ 2254(d) requires that 'state-court decisions be given the benefit of the doubt' . . . . [R]eadiness to attribute error is inconsistent with the presumption that state courts know and follow the law." *Citing Woodford v. Visciotti*, 537 U.S. 19, 23-24 (2002).)

Taking into consideration Nichols' confessions and consistent statements of guilt made to trial counsel and others, the Tennessee Supreme Court concluded, "it would be speculation to find that the evidence at the post-conviction [proceedings], which did not exclude Nichols as the perpetrator or otherwise establish a defense, would have resulted in a decision to proceed to trial instead of pleading guilty." *Nichols v. State*, 90 S.W.3d 576, 595 (Tenn. 2002).

Trial strategy itself must be objectively reasonable. "A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Huges v. United States*, 258 F.3d 453, 457 (6th Cir. 2001). Petitioner has failed to demonstrate counsel's strategic decision to advise petitioner to enter a guilty plea was unreasonable or based upon a unreasonable investigation. Petitioner has not demonstrated that counsel's strategic decision fell below an objective standard of reasonableness under prevailing professional norms and permeated the entire proceeding with obvious unfairness.

65

*See Strickland*, 466 U.S. at 688.  Assuming for the sake of discussion, that counsel's strategy was unreasonable, thus resulting in deficient performance, petitioner still would not be entitled to habeas relief because he has not alleged nor demonstrated that, but for counsel's unprofessional errors, he would have proceeded to trial.

This Court finds it was not an unreasonable application of *Strickland* and *Hill* for the state court to conclude that there was no showing of prejudice resulting from the alleged error in failing to investigate the physical evidence, or lack thereof, and thereby disprove the truth of petitioner's confession.  Based on Nichols' numerous confessions and consistent statements of guilt – none of which have been repudiated – there simply was no basis for trial counsel to investigate a false-confession defense.   The Tennessee Supreme Court made reasonable factual determinations in light of the evidence in the state court record and reasonably applied the standards set forth in *Strickland v. Washington* and *Hill v. Lockhart*.  Consequently, petitioner is not entitled to any habeas relief on his claims alleged in Claims 12.i. and 12.j of his § 2254 petition.

### h.      Ineffective Use of Psychological Expert (Claim 12.k)

Petitioner contends counsel ineffectively used the psychological expert which had been provided by the Court.  Specifically, petitioner claims counsel was ineffective  when they permitted petitioner to plead guilty to the S.T. and T.R. cases prior to being examined by his court authorized psychologist.  Respondent maintains that this claim, which relates to two of petitioner's non-capital convictions in which no final judgments have been entered, is not cognizable in this proceeding.

66

Additionally, respondent argues that this claim was not raised in the Tennessee Supreme Court, and thus is procedurally, defaulted.[19]

Nevertheless, petitioner's assertion that this Court may properly review whether trial counsel engaged in an adequate investigation of evidence supporting the aggravating circumstance is worded in such a way so as to obfuscate petitioner's actual claim. Petitioner's actual claim is an attack on trial counsel's performance (alleged ineffective performance for advising petitioner to plead guilty in the S.T. and T.R. cases prior to petitioner being evaluated by his court authorized psychologist) in handling the underlying convictions which were used by the State as aggravating circumstances to support the death penalty. Petitioner is not claiming trial counsel failed to examine his prior convictions to determine whether the records of the prior convictions contained any potentially mitigation evidence, but rather, petitioner is challenging trial counsel's performance in relation to Nichols' prior criminal convictions which are not before this Court. While *Rompilla v. Beard*, 125 S.Ct. 2456, 2467 (2005), found "[c]ounsel fell short . . . because they failed to make reasonable efforts to review the prior conviction file, despite knowing that the prosecution intended to introduce Rompilla's prior conviction not merely by entering a notice of conviction into evidence but by quoting damaging testimony of the rape victim in that case[,]" *Rompilla* does not apply here. This

---

[19]        Petitioner has recently filed a motion to dismiss certain claims which are dependent upon a showing of actual innocence. Petitioner has moved to dismiss certain claims, including his *Schlup* gateway argument with respect to this claim [Court File No. 243-1]. On or about October 25, 2005, Dr. Blake reported to the state trial court conducting the post-conviction DNA proceedings, that new scientific testing reveals Nichols is not excluded as the source of the spermatozoa from the victim's gown. In fact, the report reflects that the source of the spermatozoa on the Pulley gown was characterized as Unknown Male #1 and that petitioner "is identified as Unknown Male #1." (Court File No. 244). Therefore, petitioner moves to withdraw his *Schlup* gateway arguments with respect to Claim 12(k).

is so because trial counsel represented Nichols in the cases which furnished the basis for the prior-convictions aggravating circumstance and was already familiar with the material in those files. Moreover, in the instant case, petitioner is attacking counsel's performance in relation to the convictions used as aggravating circumstances. This is not permissible in this habeas proceeding.

This claim is not cognizable in this habeas proceeding because it attacks counsel's performance in cases not before this Court. When a conviction is legally flawed, counsel should seek to have it set aside. However, this is not the proper forum for petitioner to attack counsel's performance in relation to a conviction being used as an aggravating circumstance.

Accordingly, this claim does not entitle petitioner to any habeas relief.

### i. Illegal Arrest(Claim12.l)

Petitioner contends, in this claim, that trial counsel failed to investigate and properly argue that his arrest was not supported by probable cause, since his arrest was based solely on information given by an anonymous caller. Further, Nichols contends he was not identified in a photographic array until after his arrest and that his lawyers failed to pursue this claim. Finally, he maintains that counsel had possession of reports upon which to construct these arguments and that their failure to do so constitutes ineffective assistance.

When this claim was urged on the post-conviction court, it acknowledged that the record contained ambiguities regarding probable cause since two officers involved in the arrest had given inconsistent statements regarding the timing of the photo identifications. However, it also pointed out that one of those officers testified at the post-conviction hearing – the other officer was deceased at the time – and that the petitioner did not question him concerning the issue, thereby passing on the opportunity to clear up the ambiguities. Lead counsel testified that, while he could not

remember what he did in regard to investigating whether or not there was probable cause to arrest petitioner, he was sure he and junior counsel "were satisfied that there was probable cause from the evidence that [they] had or [they] wouldn't have gone forward with it" [Court File No. 20, Addendum No. 1, Vol. 12, at 444]. The state court ultimately concluded that, absent proof by petitioner that the pre-arrest identification had not occurred, he had failed to show prejudice resulting from counsel's failure to assert a probable cause challenge.

Neither party in this action has directed the Court's attention to the records supporting their argument on this claim nor the records that supported the state court's decision.[20] It is neither a proper use of judicial resources nor the Court's responsibility to search through the thousands of pages of record to determine whether petitioner can support his claim with facts. The State has failed to direct the Court's attention to the "[n]umerous documents and/or statements" referring "to some pre-arrest identifications" relied upon by the state court [Court File No. 18, Addendum No. 1, Vol. 3, at 540]. Moreover, petitioner has not directed the Court's attention to any record indicating that none of the photo identifications were made prior to police going to his residence to arrest him. Petitioner has not demonstrated that the state court decision was based on an unreasonable determination of the facts.

Although there are ambiguities in the record, some of the records reflect Nichols was identified prior to his arrest. For example, the record includes an arrest report reflecting that "[a]fter Nichols was identified in a photo line up by the victim in incident #88-9459 and six other victims in cases pending in Chattanooga and East Ridge Police Officers responded to his residence where

---

[20]     Petitioner expanded the record with Exhibit 47, at 88, which includes a newspaper article reflecting that Capt. Larry Holland stated petitioner was arrested after four East Ridge rape victims identified him in a photo lineup [Court File No. 250].

he was taken into custody without incident" [Court File No. 69, Addendum No. 9, Vol. 81A]. In addition, a January 6, 1989 report prepared by Officer Dyer and approved by R.E. Dodd, reflects that a warrant on one of the East Ridge cases was secured and detectives from East Ridge, Chattanooga, and Red Bank responded to petitioner's residence and took him into custody [Court File No. 69, Addendum No. 9, Vol. 81A].

The record also contains handwritten notes from some unidentified source reflecting Detective Holland received an anonymous call on January 5, 1989, Officer Buck Turner of the East Ridge Police Department held a photo lineup, and P.R. positively identified petitioner. It appears D.L., S.T., and P.G. all positively identified petitioner as their assailant and then law enforcement was sent to pick up petitioner [Court File No. 74, Addendum No. 9, Vol. 130]. There are also handwritten notes, also from an unidentified source, reflecting that on Wednesday, January 4, 1989, an anonymous call was received; and there was a follow-up call giving petitioner's date of birth. The note reflects petitioner was run on NCIC and it reflected he had a prior conviction. A mug shot of petitioner was obtained and a photo lineup was conducted on Friday and then law enforcement picked up petitioner [Court File No. 74, Addendum No. 9, Vol. 129]. There are also affidavits of complaints stating petitioner was arrested after giving his voluntary statement in the P.G., S.T., P.R. and D.L. cases. However, these affidavits do not contradict the fact that D.L., S.T., and P.G. all positively identified petitioner as their assailant prior to law enforcement picking up petitioner.

Based on Officer Dyer's report, it appears that petitioner was arrested on an East Ridge, Tennessee, case and then after he was arrested on that case and made statements, he was arrested on the other cases. Although the record arguably consists of some ambiguities, petitioner has not demonstrated his arrest was not based on probable cause [Court File No. 69, Addendum No. 9, Vol.

70

81A]. Petitioner has not directed the district court's attention to, nor has this Court found, anything in the record demonstrating petitioner's arrest was not based on probable cause. Indeed, the record reflects petitioner was arrested on some of the charges subsequent to being identified in a photo lineup. Petitioner has not provided any evidence to contradict the evidence demonstrating petitioner's arrest was based on probable cause.

The Tennessee Supreme Court determined that the petitioner failed to establish his arrest was illegal, because there was evidence in the record indicating that he had been identified before his arrest. The Tennessee Supreme Court referred to an East Ridge Police Department offense report dated January 6, 1989, reflecting that officers received an anonymous tip on January 5, 1989, which led them to conduct a computer check on petitioner resulting in the discovery of his prior arrest for a sex offense. In addition, the report indicates a victim identified petitioner as the perpetrator from his mug shot and that "she was the fourth victim in a row" to identify him [Court File No. 69, Addendum 9, Exhibit 81A]. The Tennessee Supreme Court also observed, "the record reveals that at the trial of P.R., Captain Holland of the East Ridge Police Department testified that the victim identified Nichols prior to his arrest on January 5, 1989." *Nichols v. State,* 90 S.W. 3d at 597. Observing that none of the victims were called to testify during the post-conviction proceedings as to when they identified petitioner, the state court concluded that the evidence did not preponderate against the trial court's factual findings that although petitioner identified ambiguities, he failed to establish the lack of pre-arrest identifications.

Petitioner has not demonstrated that he was denied effective assistance of counsel as it relates to his claim that probable cause was lacking when he was arrested. Lead counsel testified that although he could not remember what he did in regard to investigating whether or not there was

71

probable cause to arrest petitioner, he was sure he and junior counsel "were satisfied that there was probable cause from the evidence that [they] had or [they] wouldn't have gone forward with it" [Court File No. 20, Addendum No. 1, Vol. 12, at 444]. There is evidence in the record which supports the state court findings that petitioner had been identified prior to his arrest and thus, his arrest was based on probable cause. This conclusion was not based on an unreasonable determination of the facts, nor was this conclusion contrary to or an unreasonable application of clearly established federal law. Nichols has not demonstrated that the state court finding is unreasonable. The state court finding that petitioner was legally arrested and counsel was not deficient is reasonable and not contrary to any federal law. Petitioner is not entitled to any habeas relief on this claim.

## 2. Ineffective Assistance of Counsel During the Penalty Phase (Claim 13.a)

Petitioner contends counsel was ineffective during the penalty phase of his capital trial. First, petitioner contends counsel failed to adequately investigate the circumstances of the case and present a competent mitigation case during the sentencing phase of his trial. Petitioner contends that rather than present evidence of the abuse he suffered growing up, counsel presented "good boy" and "good Christian" evidence. Petitioner asserts that the testimony presented during his state post-conviction hearing of his abusive childhood should have been investigated by his trial counsel and presented during the penalty phase of his trial. The Court will summarize the mitigating evidence that trial counsel relied upon and compare it to the mitigating evidence presented during petitioner's post-conviction hearing.

### a. Abuse Evidence Introduced at Trial

The first witness presented by petitioner during the penalty phase of his trial was his then wife, Joanne Nichols ("Mrs. Nichols"), who testified petitioner and his father did not have a close relationship. Mrs. Nichols testified petitioner and his father did not get along and there was always conflict between the two of them. Mrs. Nichols believed his father accused him of things he had no control over. Mrs. Nichols testified petitioner's father was a very cold, very harsh, and very unloving person. Mrs. Nichols felt very uneasy around petitioner's father. [Court File No. 42, Addendum No. 5, Vols. 22-23, at 305-310].

Petitioner's next mitigation witness during the penalty phase of his death penalty trial was Reverend L.E. Butler. Reverend Butler did not testify about any abuse [*Id*. at 322-337].

Next, Nichols took the stand during the penalty of his death penalty trial and testified about his life. Petitioner was unable to recall what type of relationship he had with his father when he was younger and had no memory of his father treating him badly. However, he did recall that his older sister had a kidney problem which resulted in her wetting the bed and one time his father directed him to get a rope so he could tie petitioner's sister to the bed and whip her for wetting the bed. Petitioner went to tell his mother and she held him while the father whipped his sister [*Id.* at 326-47].

While at an orphanage from 1970-1976, petitioner's father visited two or three times [*Id*. at 351]. Nichols stated he lived with his father and although his father wanted him to go to work, he finished high school and then went to work for Willwear Hosiery Company. Petitioner testified his relationship with his father was a strange relationship because whenever petitioner wanted to go out with the other kids from school, his father did not want him associating with the other kids and the

two of them would end up in a "big cuss fight." [*Id.* at 354]. On cross-examination, the petitioner testified he has no memory of his father being abusive to him [*Id.* at 382].

Petitioner's next mitigation witness during the penalty phase of his death penalty trial was Dr. Eric S. Engum, a clinical psychologist, who has a Masters Degree in Psychology, a Ph.D. in Clinical Psychology, and a law degree. Dr. Engum diagnosed Nichols with intermittent explosive disorder which is characterized by a loss of control of behavior. Dr. Engum described the disorder as an impulse that continues to build and build until, unable to resist, the person acts on the impulse [*Id.* at 433-36]. Dr. Engum explained the development of petitioner's internal rage as coming from psychosocial or developmental factors as follows:

> The types of things that the experts in the field identify are punitive, hostile environment in which the child is raised, maybe alcoholic, abusive parent, abandonment, lack of love or empathy in the family unit, estrangement or essentially being socially isolated from the social milieu or, as we say the world as it exists. Social isolation I guess is the best term. Tremendous feelings of impotence, and what I say by that is a person who feels that they're not worth anything, they're not important, who've met a lot of defeats in life and kind of internalized that and get the picture of themselves as somebody who really has not succeeded in anything. They see themselves in a very negative light.
>
> . . . .
>
> [F]rom the evidence that I was able to pull together over many months, it appears that [Nichols] was at a number of points in his life subjected to a punitive, aggressive, hostile father. It also appears that at various points in his life figures to whom he bonded, mother, grandmother, were just ripped away from him. For instance, his first remembrance is at age five. He simply remembers his grandmother dying without any warning, without even being aware. At age ten, even though his mother had been sick for a long time, he apparently was never told of that, and one day she literally dies. He's taken away and put in an orphanage. He has - - - he bonds with a number of the different house parents and they mysteriously disappear. And it seems that his life is through that. So you have a child who builds up this sense of being abandoned and he responds angrily.

[Court File No. 42, Addendum No. 5, Vols. 22-23, at 437-40].

74

Dr. Engum testified that Nichols' self-esteem is very poor and he engaged in self-defeating behaviors; for example, petitioner would have a decent job and then do something to undermine himself. While in the military and in the orphanage petitioner seemed to be the model individual. Dr. Engum testified a person with intermittent explosive disorder would probably be "[v]iolent, wild, absolutely out of control . . . probably somebody who's unthinking, who is just acting" [*Id*. at 445]. However, Dr. Engum identified petitioner's strengths as able to function well in institutional settings and possessing high average to bright normal in the level of intelligence.

Reverend Winston Gonia was petitioner's next witness during the penalty phase of his death penalty trial. Reverend Gonia knew petitioner when he was ten or eleven, attending East Chattanooga Church of God of Prophesy, and testified he was a real congenial child, but Reverend Gonia was not questioned about any abuse [Court File No. 43, Addendum No. 5, Vols. 24-27, at 477-78].

### b. Abuse Evidence Introduced During State Post-Conviction Proceedings

During his state post-conviction proceedings, petitioner presented numerous mitigating witnesses. The Court will summarize the most pertinent post-conviction mitigation testimony. During the post-conviction proceeding, Reverend Gonia provided more of an insight to Nichols' home life than he did when testifying during the penalty stage of petitioner's original trial. However, he did not present any evidence of abuse during either proceeding. Winston Gonia, a retired minister, was petitioner's first mitigation witness during his state post-conviction proceedings. Rev. Gonia testified he was acquainted with petitioner's family and was in their home at least once a month to visit.

75

Reverend Gonia described petitioner's father as very shy, withdrawn, introverted. He had observed petitioner's father hug the children, but never observed him taking petitioner or other children aside and talking to them. However, Reverend Gonia then stated petitioner's father showed no emotion to his family and Gonia did not observe him showing affection to his family. On the other hand, Reverend Gonia observed quite a bit of affection being shown by petitioner's mother and grandmother towards Nichols and his sister [Court File No. 19, Addendum No. 1, Vols. 5-10, at 28-34].

When asked how the orphanage disciplined, Reverend Gonia testified he was not sure but he had heard that at times a switch or strap was used on the children. In addition, Gonia testified petitioner's father sent a social security check to the orphanage to help pay petitioner's expenses [*Id.* at 39-40]. Reverend Gonia testified he never saw any abuse in petitioner's house [*Id.* at 45-47].

Diane Allred, petitioner's cousin, testified her parents died and she and her brother lived with petitioner and his family. Ms. Allred described the relationship between petitioner's parents and the relationship between petitioner's father and his family as very happy, just one happy family at the beginning. However, after a couple of years, petitioner's father began going into rages and spanking Deborah. According to Ms. Allred, he would whip Deborah until the blood would run out of her legs, and once Nichols got older, his father did the same to him. When his wife told him not to whip the children, Nichols' father would "say ugly things and curse" [*Id.* at 52-53]. Ms. Allred also testified that although petitioner's father was often an angry man for the three to five years she lived there (until petitioner was seven), petitioner was loved and hugged by his mother and grandmother [*Id.* at 54-55].

Ms. Allred revealed that petitioner's father exhibited inappropriate behavior towards her. Ms. Allred testified petitioner's father would sit on the couch naked exposing himself to her as she got ready for school. When she complained to people, they basically ignored her and told her to quit telling lies. When Ms. Allred was fifteen, petitioner's mother had cancer surgery. At that time, petitioner's father began to go to Ms. Allred's bedroom without any clothes on while petitioner's mother would stay in her bed crying for petitioner's father to return to their bedroom. According to Ms. Allred, petitioner, his sister, and parents slept in one bed. Ms. Allred shared a bed with the petitioner's paternal grandmother, but whenever this happened the grandmother was away on a visit. Ms. Allred would tell petitioner's father to leave her alone. Petitioner's father was very angry one Friday when he had to bring his mother home in the middle of grocery shopping after she became ill. According to Ms. Allred, petitioner's father was very angry that day and walked the floors saying ugly things, never checking on his mother, who died the next Monday from a heart attack [Court File No. 19, Addendum No. 1, Vols. 5-10, at 59-61].

After the grandmother's death, petitioner's mother was diagnosed with cancer. At that time, petitioner's father took care of running the household and taking care of the children. Ms. Allred did not reside at Nichols' home after petitioner's mother died; however, petitioner's sister called Ms. Allred and told her she (petitioner's sister) was being sexually abused by her father. At a later point in time, Eddie and Helen Gray brought petitioner and his sister to Ms. Allred's house, told her inappropriate things were happening in the home, and asked Ms. Allred whether she would testify in court about the abuse she suffered at the hands of petitioner's father. Thereafter, Ms. Allred was told that an agreement was reached where petitioner's father would turn his children over to the

orphanage and he would not be prosecuted [Court File No. 19, Addendum No. 1, Vols. 5-10, at 70-75].

According to Ms. Allred, she was never contacted by petitioner's trial counsel and she had no contact with petitioner's family from 1971until petitioner's post-conviction counsel contacted her. She testified neither petitioner nor his sister knew where she was and had no way of knowing how to contact her. She had no contact with petitioner or his sister from 1971 to 1988 [*Id.* at 79-83]. Ms. Allred had no knowledge of petitioner ever being sexually molested or mistreated and had no knowledge of petitioner's life from 1971 to 1988 [*Id.* at 82-83].

Ms. Allred's brother and petitioner's cousin, Royce Sampley ("Mr. Sampley"), was the next post-conviction witness. When Mr. Sampley was twelve years old his parents died, and he and Ms. Allred were placed in petitioner's home. Mr. Sampley's other siblings were placed in an orphanage. Mr. Sampley lived with his cousin for approximately six years and described the home as threatening because petitioner's father was angry all the time and took it out on the rest of the family. He described petitioner's father as indifferent and angry whenever he had to take one of the family members somewhere. Mr. Sampley testified petitioner's father was angry but he was not physical.

Mr. Sampley did not realize petitioner's father was exposing himself to Ms. Allred until after he left their home. Once he became aware of the situation he spoke with relatives who did not believe him. Mr. Sampley left petitioner's home in 1967, living there from the age of 13-18. Mr. Sampley testified he was not contacted by trial counsel.

On cross-examination Mr. Sampley verified he never saw petitioner's father sexually abuse anyone [Court File No. 19, Addendum No. 1, Vols. 5-10, at 103-05]. However, he described

78

petitioner's father as a person who was continually in a rage. Mr. Sampley also testified that petitioner would not have known how to contact him during the time of his trial. The prosecutor demonstrated that although Ms. Allred and Mr. Sampley were raised in the same environment as petitioner, neither of them turned to a life of crime.

Juanita Herron ("Ms. Herron"), a sixty-two year old cousin of Nichols, testified she was familiar with petitioner's family because they would see each other every month or so when her family would visit his family, or petitioner's family would travel to Huntsville, Alabama, to visit her family. Ms. Herron testified that petitioner's sister accused her father of molesting her. Ms. Herron's father was involved in getting petitioner and his sister out of their father's house and into the orphanage [*Id*. at 121-28].

Margaret Elizabeth Crox ("Ms. Crox") was petitioner's neighbor for a period of time when his cousins lived in the house with them. Ms. Crox described petitioner as a loving and affectionate child and his mother as a spiritual and good woman [Court File No. 19, Addendum No. 1, Vols. 5-10, at 141-43]. Ms. Crox described petitioner's father as very quiet. She observed petitioner's father sporadically attending church with the rest of the family. Ms. Crox testified she had no knowledge of the relationship between petitioner and his father [*Id.* at 146-57].

Linda Crox Johnson testified she grew up in the house next to petitioner's, and has no memory of petitioner's father having contact with his children and has no memory of ever speaking to petitioner's father [Court File No. 20, Addendum No. 1, Vols. 11-12, at 151-53].

Petitioner's seventy-two year old uncle, Claude Nichols, testified on behalf of petitioner at his state post-conviction hearing. Mr. Nichols testified petitioner's father was his older brother. Their father left their mother with three children and petitioner's father worked hard to help the

family [Court File No. 20, Addendum No. 1, Vols. 11-12, at 156-58]. Petitioner's father never gave his mother any trouble, he did not run around, and he did all he could to try to take care of his mother and siblings. Petitioner's father did not have much of a childhood. He served three years in World War II before being honorably discharged [*Id.* at 168-72]. On re-direct, Claude Nichols testified petitioner's father acted inappropriately towards his daughter [*Id.* at 180-81].

Louella Wagoner, petitioner's cousin, described petitioner's mother and grandmother as very pleasant people and petitioner's father as very stern and strict [*Id.* at 183-187].

Ms. Jacqueline Boruff ("Ms. Boruff") lived three or four blocks from petitioner in the late 1970's into the early 1980's, and knew him because petitioner and her son were friends. Petitioner was 14 or 15 years old when Ms. Boruff met him. Ms. Boruff described petitioner as a nice child and "a really neat guy" [*Id.* at 242-43]. Ms. Boruff knew petitioner's mom from Kay's Kastle and she described her as a very sweet and happy lady. However, Ms. Boruff never met petitioner's father but did talk to him on the phone several times. Ms. Boruff described petitioner's father as very fanatical, very cold, and uncaring [*Id.* at 244-55].

Linda Cannon Melton ("Ms. Melton") was a house-parent at Tomlinson Home for Children. She worked at the girl's home and supervised petitioner's sister, and from 1975-76 she took care of petitioner. Petitioner and his sister visited each other often while at Tomlinson. Ms. Melton described petitioner as a sweetheart. Ms. Melton never met petitioner's father and was not aware of any communication between petitioner and his father during the time he was at Tomlinson Home for Children. Ms. Melton testified that they were not allowed to paddle the girls, instead, they gave them more chores as punishment. Ms. Melton believes, but is not sure, that her ex-husband followed the same rule for the boys [Court File No. 20, Vols. 11-12, at 282-91].

80

On cross-examination, Ms. Melton said she knew petitioner from 1973-1976, and she was one of his house-parents from 1975-76. Ms. Melton never paddled petitioner and she never saw anyone else paddle petitioner; "during the period of time that my ex-husband and I were there I would have to answer it [paddling of Wayne] did not happen." [*Id.* at 294]. Ms. Melton stated the law on corporal punishment changed around 1976 and she knew of no change in the church's policy but in any event, while she worked at the orphanage petitioner was never paddled. Ms. Melton provided petitioner with a loving environment and gave him every benefit she could [Court File No. 20, Vols. 11-12, at 295-96].

Dennis Samply ("Dennis"), petitioner's cousin, went to the Tomlinson Home for Children when he was six years old and lived there until he was about 14 years old, at which time he left to live with his brother, Royce Samply, and his wife. Dennis testified that a lady contacted him more than once about Wayne after he was arrested on this charge and questioned him about his background and his life at the orphanage, and whether he knew why petitioner's father was not attending the trial [Court File No. 20, Addendum No. 1, Vols. 11-12, at 311-15]. Dennis contacted petitioner's father during the trial and was told not to call back. Dennis was contacted on petitioner's behalf two or three times and he related some of his family history to the lady.

Dennis was not in the orphanage at the same time as petitioner, and he does not know much about petitioner's family background. Dennis was not sure whether petitioner had the same house-parents he had when he was there, but Dennis claims his house-parents, the West's, whipped him until he bled. Dennis testified he was never allowed to talk about anything that went on in the orphanage. He stated they were whipped for anything, that by just saying something wrong they would be sent to their room, stripped, laid across the bed and whipped [*Id.* at 316-21]. On cross-

81

examination, Dennis testified petitioner had the West's as house-parents when he first went to the orphanage, but they retired soon after petitioner's arrival and petitioner lived in another house. Dennis had no idea whether petitioner was ever beaten at the orphanage. Dennis also testified that he had been beaten by all three house-parents he had while living at the orphanage [*Id.* at 322-25].

Michael Cohan ("Mr. Cohan") was petitioner's trial investigator. Mr. Cohan noted that petitioner said his father asked him to be his girl on one occasion.

Petitioner's junior counsel, Ms. Rosemarie Bryan, testified it was her opinion that the mitigation witnesses presented by state post-conviction counsel was cumulative to what trial counsel put on during the penalty phase. Moreover, she thought that had they put those witnesses on, the State would have done as they did during the state post-conviction proceeding and demonstrate that although some of the witnesses were raised in an environment similar to petitioner, they never committed crimes. For example, Royce Sampley lost both of his parents at a young age, lived with petitioner's father in their house, had no heat in his bedroom, but never committed a crime. Ms. Bryan's investigation revealed that the family members whom they chose not to call, were not going to testify to anything that would make the jury want to spare petitioner's life. Moreover, some of the people she interviewed suggested that she should avoid the family members. The family members she called either would not talk to her or after she spoke with them she determined their testimony would not be helpful. She believed the fact that most of the family members who were raised under the same or similar circumstances, but had never been arrested, would have hurt the defense in front of the jury more than they would have helped them.

Ms. Bryan testified she believed the only option was to show a fair assessment of petitioner's life and have him take the stand and take responsibility for his actions. She did not think anything

post-conviction counsel presented demonstrated that she was ineffective [*Id.* at 629-60]. Ms. Bryan testified the family members were not as cooperative with them as they apparently were with post-conviction counsel.

Ms. Bryan testified she spoke with petitioner's sister and her husband numerous times, but his sister was the most unwilling witness that anyone would ever want to put on the stand. The sister was not going to talk about any abuse in their family, and told Ms. Bryan that there was nothing she could say that would help petitioner or she would be there. Ms. Bryan was told by the sister's husband that she was not going to testify under any circumstances [*Id.* at 664-65]. Ms. Bryan discussed this situation with petitioner and Ms. Bryan called his sister's residence again, and once more was told the sister would not testify. Ms. Bryan then discussed the sister's response with petitioner. Counsel and petitioner decided that it was better not to call petitioner's sister since she was not going to add anything in mitigation and they were afraid she might end up hurting them. Petitioner did not want his sister called because he did not want her to go through the ordeal of testifying. Ms. Bryan testified that if his sister said no one ever called her that is not true [*Id.* at 666].

Jacqueline Bailey ("Ms. Bailey") was a part-time counselor at Tomlinson Children's Home from 1974 until it closed in 1977. She testified petitioner's sister had a problem with wetting the bed at least up until the time she got married. Ms. Bailey testified she had no knowledge of petitioner having any behavior problems and observed that petitioner and his sister had a very close relationship. When they were closing the home, petitioner's sister attempted to have petitioner live with her but for some unidentified reason, that did not happen. Ms. Bailey stated she had information from petitioner's sister that their household was abusive when they lived at home, but

83

she was not a party to the decision to send petitioner to his father's house. On cross-examination, Ms. Bailey testified that none of the other children she worked with at Tomlinson Orphanage became serial rapists and murders. On re-direct examination, Ms. Bailey testified she could not remember any of the orphanage children going to jail but a lot of the children from the orphanage had problems even after leaving the orphanage [Court File No. 22, Addendum No. 1, Vols. 15-16, at 760-69].

Petitioner's sister, Ms. Deborah Diane Sullivan ("Ms. Sullivan") testified by videotaped deposition. When asked whether she was concerned, while growing up in her parents home, that her father would explode into a rage, she responded that she could not think of any specific incident when that happened nor was she able to describe her father in those words. However, she did testify she recalled feeling afraid of getting a spanking. When asked whether her father ever spanked until there was blood she replied probably. When asked whether he spanked until there were welts, she answered "yes." [Court File No. 67, Addendum No. 9, Exhibit 11, pp. 9-10]. Although Ms. Sullivan was sure her dad spanked petitioner, she was unable to recall a specific time or incident when a spanking of petitioner occurred.

Ms. Sullivan revealed that as children, she and petitioner were generally isolated from other children other than the contacts they made through attending school. Petitioner and his sister were not permitted to play with other children after school or go to the community center with their friends. Ms. Sullivan has no recollection of anyone explaining the seriousness of her mother's illness to her or petitioner. At the time of her mother's death, the only people living in the home was Ms. Sullivan, petitioner, and their parents. Ms. Sullivan has no recollection of she and petitioner ever discussing her mother's death. Although Ms. Sullivan admitted there were allegations that her

84

father abused her, there is no evidence in her testimony that petitioner was ever abused by his father [Court File No. 67, Addendum No. 9, Exhibit 11, pp. 36-68]. Ms. Sullivan described the household as "mentally trying" causing her to be in constant fear [Court File No. 67, Addendum No. 9, Exhibit 11, pp. 37-38]. Ms. Sullivan had no knowledge of petitioner ever being physically or sexually abused by their father [Court File No. 67, Addendum No. 9, Exhibit 11, pp. 43].

Dr. David Solovey ("Dr. Solovey"), a forensic psychologist practicing in Chattanooga, Tennessee, interpreted Dr. Engum's testimony as petitioner being an aggressor or someone who would not contribute in a positive way to society. It appeared to Dr. Solovey that Dr. Engum was attempting "to define how it was that this person could do these terrible things, you know, what the makeup of a person who would do, you know, things like this. As opposed to presenting a humane side, he seemed to present a side that identified Mr. Nichols as being an aggressor or somebody who would be - - well, not, not render much positive to society . . . ." [Court File No. 22, Vols. 15-16, at 869-76].

Dr. Solovey found petitioner to be a very difficult individual to assess because looking at him to determine how to explain his aggressive acts was difficult and very different than looking at him strictly for mitigation purposes. Dr. Solovey assessed petitioner as an individual who was damaged early in life and although he initially attempts to handle stressful situations in a mature way, as the stress continues he falls apart and loses confidence and when he is really cornered and threatened, he acts out aggressively. Dr. Solovey said state post-conviction counsel provided him material that was similar in nature to what Dr. Engum had, but his materials were more extensive than Dr. Engum's. Dr. Solovey's final diagnosis was impulse control disorder which he testified was similar but different than Dr. Engum's diagnosis of intermittent explosive disorder. An impulse disorder

was described as a failure to resist an impulse or drive or temptation and an intermittent explosive disorder was described as discreet experiences of just blowing up and acting out of control.

Frank Einstein ("Mr. Einstein"), a sentencing consultant, testified on behalf of petitioner. Mr. Einstein testified that trial counsel successfully identified all or most of the major issues to investigate [*Id.* at 954]; however, in his opinion, trial counsel presented very little of the information about petitioner's background to the jury [*Id*. at 962-63]. According to Mr. Einstein, counsel should have presented evidence about petitioner reciting the books of the Bible, singing in the church, and being a bright little happy red-haired child. One of the main mitigation themes Mr. Einstein identified was problems in petitioner's home, *i.e.*, living with a controlling, intimidating father, who was emotionally aloof and cold to people and who allegedly subjected petitioner to physical abuse. In addition, Mr. Einstein believes trial counsel should have introduced evidence explaining the reasons for petitioner being placed in the orphanage and evidence of the prevalence of sexual abuse within petitioner's home. Mr. Einstein also suggested evidence of the family's isolation should have been introduced along with evidence of the failure of adults and institutions to protect petitioner and his sister from their father's abuse [*Id*. at 963-969]. Finally, Mr. Einstein also suggested that trial counsel should have presented evidence of petitioner's history of adjusting positively to incarceration [*Id.* at 970].

The Court has read the mitigating evidence presented at trial and the mitigating evidence presented during petitioner's state post-conviction proceedings. Although post-conviction counsel presented numerous witnesses which they allege are mitigation witnesses, they in fact, offered very little additional mitigation proof. In his original trial, petitioner's expert, Dr. Engum, testified petitioner suffered from intermittent explosive disorder which developed for two reasons: (1) as a

86

result of his father being punitive, aggressive, and hostile; and (2) as a result of petitioner's life figures to whom he bonded – mother and grandmother – being ripped away from him [Court File No. 42, Addendum No. 5, Vols. 22-23, at 437-40]. Dr. Engum also explained petitioner remembered his grandmother dying without warning, his mother being sick with cancer and dying without anyone preparing him for such outcome, and then being taken away from his father, separated from his sister, and being placed in the orphanage. In addition, Nichols bonded with a number of different house parents and then they disappeared. Thus, according to Dr. Engum, petitioner, as a child, grew up with a sense of being abandoned and he responded angrily [*Id.*].

Although Dr. Engum's testimony at the trial's sentencing phase could probably have been more detailed, the end result is that it included the information about which Dr. Solovey testified. The evidence which petitioner introduced during his state post-conviction hearing is basically the same as the evidence introduced during his sentencing phase hearing. Trial counsel was aware of most of the evidence post-conviction counsel presented to support petitioner's post-conviction petition. The Supreme Court of Tennessee made the following findings and conclusions:

> The trial court, after considering the testimony of all of these witnesses during the post-conviction hearings and reviewing the record, made extensive finding of fact, including:
>
> Petitioner presented numerous relatives and acquaintances at the hearings in this matter to demonstrate the amount and type of mitigating evidence which was not presented at the sentencing hearing at the original trial . . . . Many of these witnesses, however, were cumulative and only expounded on issues which were raised through the evidence presented by trial counsel at the sentencing hearing . . . . The psychologist retained by post-conviction counsel even testified that while he may have had more personal history in conducting his evaluation, it was essentially the same kind of information Dr. Engum and trial counsel had at the original trial.
>
> The trial court further concluded:

87

Many of the witnesses testified that they were not contacted and that the petitioner probably did not know how to contact them. Some witnesses, however, testified that the petitioner knew how to contact them but that they received no contact and did not step forward on their own. Using 20-20 hindsight more witnesses may have been preferable; based upon all the evidence and documentation, however, this court finds that counsel [were] not derelict in their investigation of this case and that no prejudice has been shown . . . . Any additional witnesses would have been cumulative or the weight of their testimony would have been minimal. The aggravator of prior violent felonies was very substantial.

We agree with the Court of Criminal Appeals that the evidence in the record supported the trial court's findings and conclusions.

*Nichols v. State*, 90 S.W.3d 576, 601 (Tenn. 2002).

The Supreme Court of Tennessee observed that the nature and extent of the evidence at post-conviction focused on the petitioner's family background, abusive father, placement in a children's home, and pleasant personality as a child. In addition, petitioner never testified he suffered any abuse; and his sister, who made herself unavailable to trial counsel and refused to testify, testified in a video-deposition at the state post-conviction proceedings she has no knowledge of petitioner ever being abused physically or sexually by their father [Court File No. 67, Addendum 9, Exhibit 11, p. 43]. One witness testified physical abuse took place at the orphanage, but there was no evidence that petitioner was ever the victim of abuse while at the orphanage. Indeed, several other witnesses testified the orphanage was not an abusive environment. The state court concluded trial counsel identified and supported the relevant mitigating themes.

The evidence of petitioner's unstable and deprived childhood presented at the post-convictions proceedings, though more extensive, was virtually identical. The evidence at both hearings revealed petitioner was raised by an unloving and abusive father, and that the important family members in his life who showed him love were all taken away from him suddenly.

88

However, the record of the state post-conviction hearing reflects some discrepancies in the mitigating evidence presented during petitioner's state post-conviction hearing. For example, Mr. Sampley, a relative who resided with petitioner for several years, testified that although petitioner's father was an angry man who would have fits of rage, he did not exhibit his rage physically. On the other hand, Mr. Sampley's sister, Ms. Allred, who also resided with petitioner, testified that when petitioner was older his father would whip him until blood ran from his legs. However, the record reflects petitioner has no recollection of such beatings and petitioner's sister described no such beating of petitioner. Additionally, Ms. Allred's contention that petitioner's family all slept in the same bed is contradicted by the testimony of petitioner's sister that she had her own bedroom and petitioner slept separate from his parents in a corner of the room.

The Supreme Court of Tennessee concluded that any evidence at post-conviction which was not cumulative or may have bolstered the evidence presented at trial would not have affected the jury's determination given the strong evidence supporting the prior violent felonies aggravating circumstance. "Nichols has not established a reasonable probability that the jury would have concluded that the 'balance of aggravating and mitigating circumstances did not warrant death.'" *Nichols v. State*, 90 S.W.3d at 602 (quoting *Strickland*, 466 U.S. at 695).

In light of the fact that post-conviction counsel presented virtually the same mitigating evidence as trial counsel, the quantity of mitigating evidence does not persuade this Court that there is a reasonable probability that a jury would have returned a different sentence had the evidence introduced during the post-conviction proceeding been introduced during the penalty phase of

petitioner's trial.[21]   The proof before the jury was that petitioner's father was emotionally detached and the death of petitioner's grandmother and mother, the only two adults whom he loved and with whom he had a close relationship, was very traumatic for petitioner and virtually left him alone at the age of ten.   The proof introduced during petitioner's state post-conviction proceedings was virtually the same as that introduced during petitioner's sentencing hearing.

As the state court observed, there was very strong evidence supporting the prior violent felonies aggravating circumstance.  Although the abuse and atmosphere in the household is relevant, there is no evidence that petitioner suffered any abuse to such a degree that the jury's decision would have been influenced.[22]  A comparison of the mitigating evidence actually presented at sentencing with the mitigating evidence contained in the post-conviction record does not reveal that the additional mitigating evidence is so compelling that there is a reasonable probability that the outcome of the sentencing trial would have been altered.  *See Neal v. Puckett,* 286 F.3d 230, 241 (5th Cir. 2002), *cert. denied,* 537 U.S. 1104 (2003) ("In determining prejudice, we are thus required to compare the evidence actually presented at sentencing with all the mitigating evidence contained in the post-conviction record.  Stated to the point: Is this additional mitigating evidence so compelling that there is a reasonable probability at least one juror could reasonably have determined that ...death was not an appropriate sentence?").

---

[21]     Although habeas counsel presented, in her response to respondent's motion to dismiss, a very compelling argument designed to persuade a jury to spare petitioner's life, much of counsel's evidence is not properly before this Court as it  was not presented by witnesses under oath in state court [Court File No. 213-2, pp. 74-105].

[22]     Habeas counsel's presentation of abuse to petitioner is not supported by sworn testimony or affidavits in the record.  Therefore, the Court compares the testimony presented during petitioner's state post-conviction proceedings and the testimony presented during his sentencing hearing.

Consequently, the state court's resolution of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. In addition, the state court decision was not based on an unreasonable determination of the facts in light of the evidence presented in the post-conviction court proceedings. Accordingly, petitioner is not entitled to any habeas relief on his claim of ineffective assistance of counsel during the penalty phase of his death penalty proceeding.

### 3.      Prosecutorial Misconduct(Claim 13.b)

Next, petitioner asserts that trial counsel was ineffective during the penalty phase of his murder trial, as well as during the motion for new trial and on appeal, when his attorneys failed to object to the prosecutor questioning petitioner about the specific facts of the convictions used as aggravating circumstances. The prosecutor during the penalty phase elicited acknowledgment from petitioner about the facts of certain cases used as aggravators. Petitioner acknowledged that he raped a female, who was home alone in East Ridge, at knife-point using a knife from her kitchen [Court File No. 42, Addendum No. 5, Vols. 22-23, at 409]. Petitioner also acknowledged he raped a female on December 27, 1988, using an electrical cord; and on January 3, 1989, he raped a lady twice [*Id*. at 410]. Lastly, Nichols admitted that he raped another young girl in East Ridge using a knife and pistol.

In closing argument, the prosecutor identified the aggravating circumstance the State was relying upon by identifying the date, the victim, and the weapon petitioner used to accomplish the rape [Court File No. 43, Addendum No. 5, Vols. 24-27, at 508-09]. Later in the closing argument, the prosecutor referred to the aggravating felonies, asking petitioner whether he was crying when

he held a knife to the throat of one victim, a cord to another, and a pistol to another [Court File No.

43, Addendum No. 5, Vols. 24-27, at 563].

The Supreme Court of Tennessee made a few observations when disposing of this claim:

First, we note that [*State* v.] *Bigbee*, [885 S.W. 2d 797 (Tenn. 1994)], had not been decided at the time of the sentencing in this case; thus, counsel cannot be considered deficient for failing to object to a violation of its holding. Second, the record indicates that the facts of the underlying rapes were briefly cited by the prosecutor and admitted by Nichols without a lengthy discussion or detailed description of the rapes. Finally, the prosecution did not enhance the aggravating circumstance by unduly or repeatedly emphasizing the underlying facts of the prior convictions, nor did it imply that the jury should impose the death penalty based on the facts of the prior convictions in such a manner that affected the verdict to the prejudice of the petitioner.

*Nichols v. State*, 90 S.W. 3rd at 603.

The appellate court concluded that trial counsel was not ineffective for failing to object to

the prosecutor's conduct, and there was no reasonable probability of a different outcome even if

counsel had objected. To determine whether counsel was ineffective for failing to object or raise

a claim of prosecutorial misconduct, the Court must first determine if the prosecutor engaged in

misconduct.

Prosecutorial misconduct must be so egregious as to deny a petitioner a fundamentally fair

trial before habeas relief becomes available. *Darden v. Wainwright,* 477 U.S. 168, 181 (1986);

*Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974). "[I]t 'is not enough that the prosecutor's

remarks were undesirable or even universally condemned.'" *Darden*, 477 U.S. at 181 (citation

omitted). "The relevant question is whether the prosecutors' comments 'so infected the trial with

unfairness as to make the resulting conviction a denial of due process.'" *Id*. (quoting *Donnelly*). The

appropriate standard of review for such a claim on a writ of habeas corpus is the narrow one of due process. *Id.*

In determining when prosecutorial misconduct warrants a new trial, this Court uses a two-step approach. First, the Court must determine whether the prosecutor's conduct and remarks were improper. If the remarks were improper, the Court then considers and weighs four factors to determine whether the conduct warrants habeas relief. *See United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001). The factors this Court considers in determining whether prosecutorial misconduct resulted in a denial of due process are the following:

> 1.    The degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused;
>
> 2.    Whether they are isolated or extensive;
>
> 3.    Whether they were deliberately or accidentally placed before the jury; and
>
> 4.    The strength of the competent proof to establish the guilt of the accused.

*Byrd v. Collins*, 209 F.3d 486, 528-534 (6th Cir. 2000), *cert. denied*, 531 U.S. 1082 (2001).

The questions asked by the prosecutor in petitioner's case did not have a tendency to mislead the jury and although they arguably prejudiced the accused, they were factual questions. They were very isolated but apparently deliberately placed before the jury. However, the guilt of the petitioner was proven without those facts. Assuming without deciding that the prosecutor is not permitted to ask questions about the facts and circumstances of the underlying felony used as an aggravating circumstance in a death penalty case, "[n]evertheless, a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct

must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Young,* 470 U.S. 1, 11 (1985).

Initially, the Court observes that although the charge of aggravated rape arguably suggests a crime of violence or threat of violence, it does not indicate on its face that the offense involves violence or a threat of violence. Moreover, under Tennessee law at the time petitioner was tried for these crimes, aggravated rape included certain circumstances where violence was not involved.[23] Additionally, the prosecutor's reference to the weapons used to commit the crime established that the aggravating circumstance was a felony involving the use of violence to the person. Under Tenn. Code Ann. § 39-13-204, the statutory aggravating circumstance relied upon by the State in the penalty phase of petitioner's first degree murder trial was, "(2) The defendant was previously

---

[23] Tenn. Code Ann. § 39-2-603 (1988) (Repealed November 1, 1989) stated:

(a) Aggravated rape is unlawful penetration penetration of a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:
  (1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon;
  (2) The defendant causes bodily injury to the victim;
  *(3) The defendant is aided or abetted by one (1) or more other persons; and*
      (A) Force or coercion is used to accomplish the act; or
      *(B) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless*; or
  *(4) The victim is less than thirteen (13) years of age.*

(Emphasis added). Petitioner committed this crime on September 30, 1988, and it appears the other rapes used as aggravating circumstances were committed between December 1988 and January 1989.

convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the *use of violence to the people*[.]" Tenn. Code Ann. § 39-13-204 (i)(2)(1990).

Unlike *Cozzolino v. State*, 584 S.W.2d 765 (Tenn. 1979), one of the cases cited by petitioner, where the evidence of subsequent crimes argued by the prosecutor was not admissible to establish any of the aggravating circumstances, the challenged questions and statements made by the prosecutor in the instant case were relevant to the proof of the statutory aggravating circumstance in that it explained the weapons used by petitioner to commit the felonies and established the felonies used as aggravating circumstance were in fact, crimes of violence or involved the threat of violence. The case of *State v. Bigbee*, 885 S.W.2d 797, 812 (Tenn. 1994), cited by petitioner, involved a substantial amount of facts and arguments about the facts of the felony used as an aggravating circumstance. In *Bigbee*, the jury was informed of the sentence the defendant received from the aggravating circumstance in addition to being informed of the underlying facts of defendant's previous conviction, *i.e.*, "the murder occurred around 1:17 a.m. in a Montgomery County convenience store when the clerk, a forty-year-old mother of four, had been shot and killed . . . . During closing argument, the prosecutor not only discussed the sentence imposed as a result of the Montgomery County conviction but also extensively referred to the facts of the Montgomery County murder, the character of the victim of that killing and the impact of her death upon her family[.]" *State v. Bigbee*, 885 S.W.2d at 809-810. In addition, the *Bigbee* court concluded the prosecutor "engaged in improper argument by strongly implying during argument that imposition of the death penalty in this case would be an appropriate way to further punish the defendant for the Montgovery County killing, for which he had already received a life sentence." *Id*. at 812.

95

In the case before the Court, the prosecutor did not extensively refer to the facts of the underlying felonies supporting the aggravating circumstance. Nevertheless, even if the prosecutor improperly questioned Nichols and referred to the weapons used in the underlying felonies during closing argument, the prosecutor's questions and argument were not nearly as egregious or extensive as that in *Bigbee*. This Court finds that the state court's determination is reasonable that counsel was not deficient for failing to object to a violation of a state case, *Bigbee*, a case which had not been decided at the time of petitioner's sentencing. Additionally, that finding along with the state court's conclusion that the argument did not affect the jury's determination to the prejudice of petitioner is not contrary to, or an unreasonable application of, federal law. The state court conclusions were based on reasonable factual determinations in light of the evidence in the state court record.

Even if the comments were improper, the comments in the context of the entire penalty phase trial do not rise to the level of a constitutional violation. Therefore, the State's isolated questions and argument about the facts and circumstances of the underlying felony convictions did not deny petitioner due process. Trial counsel's failure to object to the questions or raise the issue of prosecutorial misconduct in the motion for new trial or on appeal was not deficient assistance.

The burden is on petitioner to demonstrate the state court adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or that the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in state court. Petitioner has failed to carry his burden on this claim. Accordingly, petitioner is not entitled to any relief on his claim that trial counsel were ineffective for failing to object to the prosecutor's questions relative to petitioner's prior convictions.

96

### 4.    Failure to Request Jury Instructions and
###         Object to Improper Instructions (Claim 13.c)

Petitioner makes two claims regarding jury instructions. First, petitioner claims trial counsel was ineffective for failing to request jury instructions, and secondly, he claims counsel was ineffective by failing to object to the trial court's improper jury instructions. The Court will first address the claim that counsel was ineffective for failing to request jury instructions.

### a.    Failure to Request Jury Instruction

Petitioner complains that trial counsel failed to ask the trial court to provide the jury with a definition of mitigation and an instruction regarding the weight to be given to mitigating evidence. Petitioner also contends that, based on the evidence presented, trial counsel should have requested the trial court to charge the jury that his youthfulness and his substantial mental impairment were to be considered as mitigating factors pursuant to Tenn. Code Ann. § 39-13-204(j)(7). Other jury instructions that petitioner contends were supported by the evidence and should have been given were petitioner's remorse for committing the crime; his difficult childhood; his suffering abuse from his dad; he had the love and support of family and friends; he did not have the intent to kill; and he did not flee when arrested or offer any resistance.

The trial court instructed the jury of its duty to consider mitigating factors as follows:

[A]ny mitigating circumstances which shall include, but not limited to, the following:

(1) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(2) The defendant acted under extreme duress.

(3) The capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect which was insufficient to establish a defense to the crime but which substantially affected his judgment.

97

(4) Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense.

[Court File No. 43, Addendum No. 5, Vols. 24-27, at 579-560].

The Supreme Court of the United States has emphasized the need for broad inquiry into all relevant mitigating evidence to permit the jury to make an individualized determination regarding whether to sentence a defendant to death. *Tuilaepa v. California*, 512 U.S 967, 969-72 (1994). This requirement is satisfied when the jury is allowed to consider all relevant mitigating evidence. *Blystone v. Pennsylvania*, 494 U.S. 299 (1990). Additionally, in the penalty phase, the Supreme Court case law has established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. *Penry v. Lynaugh*, 492 U.S. 302, 317-18 (1989). However, states are permitted to "structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" *Johnson v. Texas*, 509 U.S. 350, 362 (1993) (*quoting Boyde v. California*, 494 U.S. 370, 377 (1990)). The Supreme Court's consistent concern has been that juries not be precluded from being able to give effect to mitigating evidence. *See Boyde v. California*, 494 U.S. 370 (1990). However, the Court has not held "that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence," but instead their "decisions suggest that complete jury discretion is constitutionally permissible." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998). Furthermore, the United States Supreme Court has ruled that "[t]he absence of an instruction on the concept of mitigation and of instructions on particular statutorily defined mitigating factors did not violate the Eighth and Fourteenth Amendments to the United States Constitution." *Buchanan*, 522 U.S. at 279.

98

In the instant case, the state appellate court determined an instruction on the definition of mitigation and the weight to be given mitigating circumstances was not required.  As to the claim that trial counsel failed to request a jury instruction regarding statutory mitigating factors of youthfulness and substantial mental impairment, the appellate court concluded the record did not support an instruction on the mitigating circumstance of the youthfulness of the petitioner as he was a 28-year-old high school graduate who had served in the military.  Petitioner is simply incorrect as to his claim that the trial court failed to instruct the jury about his substantial mental impairment because the record reflects the trial court did charge the jury on the statutory mitigating circumstance regarding substantial mental impairment.  As to the non-statutory mitigating circumstances, the Supreme Court of Tennessee determined that at the time of this offense and trial, the trial court was not required to charge the jury on specific non-statutory mitigating circumstances.

The jury instructions in petitioner's case did not violate the constitutional principles requiring broad inquiry into all relevant mitigating evidence.  The statutory mitigating circumstance regarding youthfulness of a defendant was not applicable to the petitioner who was 28 years old, a high school graduate, and described as "bright normal, if not - - - high average to bright normal in the level of intelligence" [Court File No. 42, Addendum No. 5, Vols. 22-23, at 446].  Petitioner was previously in the military, was married, and worked as an assistant manager at Godfather's Pizza.  There is no evidence to support this instruction, thus, counsel's failure to request such instruction is not deficient performance.

The trial court gave the substantial impairment instruction, thus, this claim is frivolous [Court File No. 43, Addendum No. 5, Vols. 24-27, at 580,584].  The trial court instructed the jury that they shall consider specified mitigating circumstances and all mitigating factors raised by the evidence.

99

The instruction did not foreclose the jury's consideration of any mitigating evidence nor did it constrain the manner in which the jury was able to give effect to mitigation. The entire context in which the instructions were given expressly informed the jury it could consider any mitigating factor raised by the evidence. Additionally, the context of the proceedings, along with the extensive arguments by both the defense and prosecutor on the mitigating evidence, would have led reasonable jurors to believe the evidence of petitioner's background, his alleged remorse, and his lack of intent to kill could be considered in mitigation, in addition to any other evidence the jurors considered mitigating. The instruction to the jury to consider any other mitigating factor raised by the evidence directed consideration of any circumstance that might excuse the crime, including post-crime mitigating evidence as well as background and character evidence of the petitioner. *See Brown v. Payton*, 544 U.S. 133, 141-42 (2005). Consequently, it is not reasonably likely that the jurors in petitioner's case understood the lack of specific non-statutory mitigating factors to preclude consideration of relevant mitigating evidence offered by petitioner.

The Tennessee Supreme Court did not unreasonably apply Supreme Court precedent in concluding petitioner's counsel performed adequately. Nor was its decision contrary to any federal law. Petitioner has not directed the Court to, nor has the Court found, any Supreme Court law which requires the instructions petitioner claims should have been requested. The trial court instructed the jury to consider a list of specific mitigating factors in addition to "[a]ny other mitigating factor which is raised by the evidence produced by either the prosecution or defense" [Court File No. 43, Addendum No. 5, Vols. 24-27, at 580, 584]. Because the state court instructed the jury that it could consider any factor -- necessarily including [petitioner's remorse, difficult childhood, love and support of family and friends, lack of intent to kill, and submission to arrest] --

100

and because federal courts generally "presume that juries follow their instructions," *Washington v. Hofbauer*, 228 F.3d 689, 706 (6th Cir. 2000), counsel could reasonably have expected that the decision not to request a specific instruction regarding [these presumably mitigating circumstances] would not have changed the jury's deliberations. Consequently, counsel was not deficient for failing to request mitigating instructions. The state court's rejection of this claim was not unreasonable and petitioner is not entitled to any habeas relief on his claim that trial counsel failed to request mitigating instructions.

### b. <u>Improper Unanimity Instruction</u>

Next petitioner avers that trial counsel failed to object to the state court's unanimity instruction that stated "[t]he verdict must be unanimous and each juror must sign his or her name beneath the verdict. The trial court's instructions raise the constitutionally unacceptable specter that Mr. Nichols' death sentence results from a juror's misapprehension about the results of a hung jury." [Court File No. 82, at 21].

This claim is confusingly pled. However, the Court understands petitioner to assert that counsel was ineffective for failing to object to the trial court's unanimity instruction, an instruction which petitioner claims misled the jury as to the consequences of failing to unanimously agree on petitioner's sentence. The Tennessee Supreme Court rejected the argument on the basis that it had rejected arguments contesting the unanimous verdict instruction in the past. *Nichols v. State,* 90 S.W.2d at 604.

To the extent petitioner contends counsel was deficient for failing to object to the unanimity instruction, he has failed to state a claim. The Tennessee statute provides that whether the jury decides to sentence a defendant to death or life, the sentence must be agreed upon unanimously by

101

all jurors. Tenn. Code Ann. § 39-13-204. Thus, the jury instruction stating whatever verdict the jury reached must be unanimous was a correct statement of applicable Tennessee law and not unconstitutional. Nevertheless, if this instruction was allegedly incorrect under state law, it is not a basis for habeas relief absent a showing that a defendant's federal constitutional rights were violated by the instruction. *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991); *Coe v. Bell*, 161 F.3d 320, 339-40 (6th Cir. 1998). Petitioner has not directed the Court to a United States Supreme Court case holding that such a unanimity instruction is unconstitutional. Consequently, petitioner has failed to demonstrate his federal constitutional rights were violated and has failed to demonstrate counsel was deficient in failing to object to the unanimity instruction and that he suffered any prejudice due to counsel's failure to object to the unanimity instruction. Now the Court will turn to petitioner's claim that counsel should have requested that the jury be instructed as to the consequence of failing to unanimously agree on a sentence.

Petitioner has not directed the Court's attention to, nor has the Court found, any Supreme Court precedent constitutionally requiring that a jury must be instructed as to the consequences of a breakdown in the deliberation process. *See Roe v. Baker*, 316 F.3d 557, 563-564 (6th Cir. 2002); *Buell v. Mitchell*, 274 F.3d 337, 357 (6th Cir. 2001). The United States Supreme Court has discussed the effect of denying a petitioner's request for a jury instruction on the consequences of a jury deadlock in the context of the Federal Death Penalty Act of 1994, 18 U.S.C. § 3591, in *Jones v. United States*, 527 U.S. 373 (1999). The Supreme Court concluded that the United States Constitution does not require that a jury in every capital case be instructed as to the consequences of a breakdown in the deliberation process. *Id.* at 382-83. Errors in jury instructions must be so

egregious that they render the entire trial fundamentally unfair. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

The petitioner, in effect, argues that the jury should be told the consequence of failing to reach a unanimous verdict. This has been addressed and repeatedly rejected by the Tennessee Supreme Court. *See State v. Nesbit*, 978 S.W.2d 872, 902-03 (Tenn. 1998); *State v. Brimmer*, 876 S.W.2d 75, 87 (Tenn. 1994). The United States Court of Appeals for the Sixth Circuit has also rejected the argument that jurors should be instructed that a defendant will receive a life sentence if they fail to reach a unanimous sentence. *Coe v. Bell*, 161 F.3d 320, 339 (6th Cir. 1998).

The trial court in petitioner's case instructed the jury as follows: "The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous." [Court File No. 43, Addendum No. 5, Vol. 24, at 574]. However, the Court further instructed the jury about its duty,

> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

[Court File No. 43, Addendum No. 5, Vol. 24, at 574-75]. The jury instructions required the jury to unanimously agree upon the punishment, whether they determined the punishment should be death or life. The jury was not instructed on the consequence of failing to reach a unanimous verdict and that is what the petitioner is complaining about in this issue.

The Court first notes the state court neither expressly discussed or articulated any specific federal constitutional authority as the basis for its decision, nor did it provide the reasoning

103

underlying its resolution of petitioner's challenge to Tennessee's death penalty scheme. However, its decision is not disconsonant with Supreme Court decisions involving the constitutionality of state capital sentencing procedures. *See, e.g.*, *Jones v. United States*, 527 U.S. 373, 381 (1999) (holding the Eighth Amendment does not require that the jury be instructed about consequences of failure to agree on capital sentence); *Buchanan v. Angelone*, 522 U.S. 269, 276-77 (1998) (finding a state may shape and structure jury's consideration of mitigating evidence, but must allow broad inquiry into all such evidence and must not preclude jury from giving effect to it).

In order to be entitled to habeas corpus relief on this claim, petitioner must demonstrate the state court decision is "contrary to" or an "unreasonable application of "clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362 (2000). Here, petitioner has failed to do so. A constitutional violation does not occur when a jury is not instructed of the consequence of failing to reach a unanimous verdict. Thus, the state court's determination that defense counsel's representation was not deficient for not challenging the court's jury instructions or for failing to request the jury be instructed as to the consequences of a deadlock, was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, petitioner has not demonstrated counsel was ineffective for failing to object to the instruction. Thus, a writ may not issue with regard to this claim.

     **5.**    **Counsel's Failure to Argue Against
               Disclosure of Psychologist's Notes (Claim 13.d)**

Petitioner claims trial counsel rendered ineffective assistance of counsel for failing to argue in the trial court or on appeal that his Fifth Amendment right to remain silent and Fourteenth Amendment rights were violated when the trial court required petitioner to turn over his psychiatric expert's rough notes, which included statements made by him to his psychiatric expert.

This claim is withdrawn by petitioner in his Response to Respondent's Motion to Dismiss Pursuant to 28 U.S.C. § 2254 [Court File No. 213-3, at 113; Court File No.253-1, at 1-2]. Accordingly, petitioner is not entitled to any habeas relief on this claim.

6.      **Counsel's Direction of Investigation of Mitigation (Claim 13.e)**

Petitioner claims counsel failed to provide direction and focus with respect to the investigation of mitigation evidence, resulting in ineffective assistance for failing to properly define and explain the role of the retained expert. Petitioner has failed to set forth facts supporting this claim in his habeas petition as required by Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts.[24] Petitioner has failed to cite to that part of the record pertinent to this claim. *See* 28 U.S.C. § 2254(f). Accordingly, he is not entitled to relief on this claim.

The Court has reviewed the record and alternately finds this claim is procedurally defaulted. Petitioner contends he raised this claim and sub-claim in his direct appeal of the denial of post-conviction relief and in his application for permission to appeal to the Tennessee Supreme Court. The Court, however, is unable to find a claim that counsel failed to provide direction and focus with respect to the investigation of mitigation evidence to the retained expert. Petitioner has failed to identify that portion of the record demonstrating this claim, Claim 13.d, was raised in state court [Court File No. 26, Addendum No. 2, Vol. 1].[25] However, assuming for the sake of discussion that

---

[24]      The Court observes that petitioner provides factual support in his response to the State's motion to dismiss [Court File No. 213-3].

[25]      Additionally, petitioner has recently notified the Court Dr. Blake's report to the state trial court reveals petitioner is identified as the source of the spermatozoa from the victim's gown, and thus, petitioner moves to withdraw his *Schlup* gateway arguments with respect to this claim, Claim 13(e).

this claim is properly before the Court, a review of the record reveals that petitioner is not entitled

to any habeas relief on this claim.

The post-conviction court determined defense counsel tried to present the defendant as an

individual who had been a good child with a harsh childhood, the same defense presented by post-

conviction counsel. The post-conviction court observed that post-conviction counsel simply had

developed more witnesses over a substantial amount of time but petitioner failed to establish any

prejudice on this issue. The report of petitioner's trial expert explains that petitioner was raised in

a hostile, physically and emotionally abusive environment. The report explains that after the death

of his protective and nurturing mother, he was subject to physical and emotional abuse by his father.

The expert discussed the petitioner's problems in terms of abandonment, physical and emotional

abuse, and frustration [Court File No. 68, Addendum No. 9, Vol. 68]. Although the evidence could

perhaps have been presented in a more persuasive and compelling manner, the basic information of

petitioner's traumatic, disruptive, and abusive childhood was presented to the sentencing jury. The

Court does not find anything in this voluminous record that reflects trial counsel failed to provide

direction and focus for the investigation of mitigating evidence to the expert.[26] Petitioner did not

---

[26] Although petitioner was permitted to expand the record with the reports of Dr.
David Liska and Dr. Faye E. Sultan, the Court has determined these records will not be
considered as they are cumulative and were not considered by the state court. The Court will
consider only the facts actually presented to the state court and contained in its record in
determining whether the state court's decision involved an unreasonable application of the law to
the facts when it adjudicated petitioner's ineffectiveness claim. 28 U.S.C. § 2254(d)(2).
Considering new facts presented for the first time in this habeas proceeding would skew the
determination to be made under AEDPA's standards of review because, logically, the state court
could not have applied the law to facts that were not before it.
    Dr. David Liska's report relies upon evidence that was not introduced by sworn
testimony during the state court proceedings. Many of the alleged incidents Dr. Liska relies
upon to reach his conclusion directly contradict the sworn testimony. For example, Dr. Liska
refers to petitioner's father sexually abusing him and his sister, both in the bath and in bed, and

106

present Dr. Engum during his state post-conviction proceeding to testify regarding this claim. Accordingly, the Court rejects petitioner's contention and finds he is not entitled to any habeas relief on this claim.

### 7. <u>Cumulative Error</u>

Petitioner contends he was denied due process by the accumulation of errors by trial counsel. The Tennessee Supreme Court determined petitioner failed to establish any individual errors and, therefore, concluded that there was no cumulative effect of errors. *Nichols v. State*, 90 S.W.3d 576, 607 (Tenn. 2002).

Likewise, petitioner's habeas petition has failed to establish any individual errors and, therefore, there is no cumulative effect of errors. The state court decision is not contrary to, or an unreasonable application of, federal law, nor is it based upon an unreasonable factual determination. Accordingly, petitioner's cumulative error claim is without merit and respondent's motion to dismiss will be **GRANTED** on this claim.

### 8. <u>Arbitrary and Invalid Death Sentence (Claims 15, 20, 21(g), and 25)</u>

Petitioner has raised several claims concerning the manner in which the death sentence was imposed. Because the claims are intertwined and all claims challenge the manner in which the death sentence was imposed, the Court will address all claims concerning the imposition of the death penalty in this section. The Court will first identify each claim, summarize the pertinent facts, and then dispose of the claims.

---

petitioner witnessing the abuse of his sister [Court File No. 111-2, p.25-26]. Neither petitioner nor his sister have ever testified that such occurred. Moreover, Dr. Liska's report and Dr. Sultan's report are generally cumulative to the evidence presented at the sentencing hearing and the state-post conviction hearing.

First, petitioner contends the trial court violated his Sixth, Eighth, and Fourteenth Amendment rights when it refused to declare a mistrial when the jury invalidly and erroneously sentenced petitioner to death based upon non-statutory aggravating factors (**Claim 15**). Petitioner next avers his death sentence violates his rights under the Sixth, Eighth, and Fourteenth Amendments because after the jury returned a death sentence based on non-statutory aggravating circumstances, the judge recharged the jury but only recharged them on aggravating circumstances, permitting the jury to correct its judgment (**Claim 21(g)**). In his third related claim, petitioner contends the trial court erred when it improperly polled the jury by misstating the applicable requirements of the law (**Claim 25**). Lastly, petitioner contends his death sentence is unconstitutional because the jury relied upon an aggravating circumstance declared unconstitutional on direct review; and the Tennessee Supreme Court's application of *Chapman v. California*, 386 U.S. 18 (1967), harmless error review was contrary to, or an unreasonable application of federal law (**Claim 20**).[27]

### a. Facts

The State relied upon two statutory aggravating factors to support its request for the death penalty for petitioner: (1) The defendant was previously convicted on one or more felonies, other than the present charge, which statutory elements involve the use of violence to the person; and (2) the murder was committed while Nichols was committing or attempting to commit rape. Nichols

---

[27] Petitioner has recently notified the Court that since the Dr. Blake reported to the state trial court conducting the post-conviction DNA proceedings that new scientific testing reveals that petitioner is identified as the source of the spermatozoa from the victim's gown, he moves to withdraw his *Schlup* gateway arguments with respect to Claims 20 and 21(g).

pleaded guilty to felony-murder, and the State was permitted to present a substantial amount of proof of the rape and murder during petitioner's sentencing trial.

The jury was instructed on their duty to fix punishment of death or life imprisonment [Court File No. 43, Addendum No. 5, Vol. 24, at 577-592]. The Court instructed the jury that they were limited to considering the two aggravating factors identified above [*Id.* at 579-581]. When asked if there were any requests, defense counsel responded yes, and a bench conference ensued. Afterwards, the state court again instructed the jury about the aggravating and mitigating factors and instructed the jury that it was limited to considering only the two statutory aggravating circumstances when deciding whether the death penalty was the appropriate punishment in this case. Subsequently, two other bench conferences were held whereupon the court further charged the jury again only as to the portion of the charge explaining the weighing process of the aggravating and mitigating circumstances and the procedure for completing the verdict form [*Id.* at 581-592]. The trial court's written charge was given to the jury to use during deliberations [Court File No. 43, Addendum No. 5, Vol.24, at 592].

The jury returned, unanimously finding the following listed non-statutory aggravating circumstances beyond a reasonable doubt:

(1)    First degree murder of Karen E. Pulley,

(2)    The unfeeling brutality of the first degree murder of Karen E. Pulley,

(3)    The lack of remorse; and

(4)    The lack of respect of human rights.

109

[Court File No. 43, Addendum No. 5, Vol. 24, at 599-600]. The jury unanimously found that the punishment for petitioner shall be death. The jury did not list any statutory aggravating circumstances.

Whereupon, trial counsel moved for a mistrial [*Id*. at 600]. The trial court determined the jury had a right to rectify their verdict and recharged them only as to the circumstances under which the death penalty shall be imposed and reiterated the two statutory aggravating circumstances they could consider [*Id*. at 600-606]. After stating the statutory aggravating circumstances, the court further instructed the jury:

> Members of the jury, the Court has read to you the aggravating circumstances which the law requires you to consider if you find beyond a reasonable doubt that the evidence was established. You shall not take account of any other facts or circumstances as the bases for deciding whether the death penalty would be appropriate punishment in this case.

[Court File No. 43, Addendum No. 5, Vol. 25, at 606]. Then the court explained the form for Punishment of Death. The trial court refused to re-charge on the mitigating circumstances telling trial counsel, "[n]o, they have found that he is guilty so you can note an exception." *Id.* at 607. The jury returned approximately fifteen minutes later with the original Punishment of Death verdict form. The jury had marked out the four non-statutory aggravating factors and written in the two statutory aggravating factors which the State had relied upon when seeking the death penalty.

### b.    **Failure to Declare Mistrial (Claim 15)**

First, petitioner challenges the trial court's decision not to declare a mistrial after the jury returned with a verdict of death based on four non-statutory aggravating circumstances (**Claim 15**).

This issue was addressed by the Supreme Court of Tennessee on direct appeal. The

110

Tennessee Supreme Court made the following observations about the trial court's polling of the jury after it returned the second verdict:

> The trial court then determined that the jury originally had not listed [the] two [statutory aggravating] circumstances because it had assumed it need not copy statutory aggravating circumstances on the form. Each juror answered affirmatively when asked by the court whether, before reporting the verdict the first time, he or she had found (1) that each of the two statutory aggravating circumstances had been proved beyond a reasonable doubt, and (2) that these circumstances outweighed any mitigating circumstances.

*Nichols v. State,* 877 S.W.2d at 730.

The Tennessee Supreme Court concluded that, "[w]hen the jury reports an incorrect or imperfect verdict, the trial court has the power and the duty to redirect the jury's attention to the law and return them to the jury room with directions to reconsider their verdict." *State v. Nichols*, 877 S.W.2d 722, 730-31 (Tenn. 1994). The state supreme court concluded the trial court was entitled to exercise this power and perform this duty, and by doing so, the trial court did not abuse its discretion in denying a mistrial.

Furthermore, the court concluded that the jury's consideration of the factors it originally listed on the verdict form did not render the verdict invalid or unreliable under the Eighth and Fourteenth Amendments. *Id.* at 731. The Tennessee Supreme Court determined the record clearly reflected that the jury had found that the defendant met the statutory criteria for capital punishment:

> The trial judge ascertained that, prior to the return of the initial verdict, each juror had found the existence beyond a reasonable doubt of the two statutory aggravating circumstances upon which the State sought the death penalty. Each juror also confirmed that he or she had previously found that these two aggravating circumstances outweighed any mitigating circumstances. The jury verdict itself reported that the jury found the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

*Id.* at 731.

111

Citing to United States Supreme Court precedent, the Supreme Court of Tennessee concluded that "once a capital sentencing jury finds a defendant falls within the legislatively-defined category of persons eligible for the death penalty, a jury is free to consider a myriad of factors to determine whether death is the punishment appropriate to the offense and the individual defendant." *Id., citing California v. Ramos*, 463 U.S. 992, 1008 (1983); *Barclay v. Florida*, 463 U.S. 939, 950 (1983) ("Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment."); *Zant v. Stephens*, 462 U.S. 862, 878-79 (1983) ("[S]tatutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death. What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.") (emphasis in original).

In the instant case, the Tennessee Supreme Court concluded the record clearly reflected that the jury had initially found Nichols met the statutory criteria for capital punishment. Additionally, the Supreme Court of Tennessee stated that the factors originally listed by the jury as bases for the sentence concerning the circumstances of the crime and character of Nichols are factors the jury can consider under Tenn. Code Ann. § 39-13-204(c),[28] and consideration of the factors initially listed

---

[28]    The statute in effect at the time of petitioner's sentencing was Tenn. Code Ann. § 39-13-203(c) which provided:

In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the

112

by the jury did not render the verdict invalid or unreliable under the Eighth and Fourteenth Amendments.

When a court is faced with an ambiguous verdict, it may ask the jury to clarify its meaning. *See Unit Drilling Co. v. Enron Oil & Gas Co.*, 108 F.3d 1186, 1191 (10th Cir. 1997). A judge may also encourage a jury having difficulty reaching a verdict to deliberate longer and give due consideration and respect to the views of their peers, *Allen v. United States*, 164 U.S. 492 (1896), "[h]owever, a judge errs in instructing the jury to deliberate further if the jury has reached a final verdict, which has been announced and recorded[.]" *United States v. Straach*, 987 F.2d 232, 242 (5th Cir. 1993), *citing United States v. Taylor*, 507 F.2d 166, 168 (5th Cir. 1975).   A jury reaches a valid verdict when the deliberations are over, the result is announced in open court, and no dissent by a juror is registered.  *United States v. McFerren*, 907 F.Supp. 266, 269 (W.D.Tenn. 1995) *citing United States v. Love*, 597 F.2d 81, 85 (6th Cir. 1979).  However, the practice of permitting a jury to correct a mistake in its announced verdict before it has been accepted and the jury discharged has been approved in numerous cases.  *United States v. Love*, 597 F.2d at 85; *also see McHugh v. Olympia Entertainment*, *Inc.,* 37 Fed. Appx. 730 (6th Cir. 2002), (unpublished table decision), *available in* 2002 WL 1065948 (district judge resubmitted original questions and verdict form, and re-instructed the jury and submitted clarifying questions, because the court did not "redetermine"

---

nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors.  Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted . . . .

the findings made by the jury, no error was found in obtaining clarification of jury's original verdict). It is the judge's job to clear up any confusion with concrete accuracy. *See Bollenbach v. United States*, 326 U.S. 607, 613 (1946).

This is a case with an ambiguous verdict. The verdict reflects the jury initially listed non-statutory aggravating circumstances rather than statutory aggravating circumstances as instructed by the court. However, the printed portion of the verdict reflects they unanimously found the punishment should be death; the listed statutory aggravating circumstances beyond a reasonable doubt; the State had proven beyond a reasonable doubt the statutory aggravating circumstances outweighed beyond a reasonable doubt the mitigating circumstances; and they unanimously found that death should be the punishment for petitioner [Court File No. 37, Addendum No. 5, Vol. 1, at 562]. Petitioner has not demonstrated that the trial court's actions of redirecting the jury's attention to the law and returning them to the jury room with directions to reconsider their verdict were unconstitutional. Tennessee law provides that a trial court has both the power and duty to return the jury to deliberate with directions to reconsider their verdict when a jury reports an incorrect or imperfect verdict. *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993)(verdict where 12 jurors voted to impose fine but only 8 voted to find defendant guilty, trial court should have instructed the jury to reconsider their verdict and sent them back to deliberate). "Great caution must be exercised when declaring a mistrial based on necessity because, 'where the ruling is mistaken or abused, the defendant may not be reprosecuted.'" *State v. Skelton*, 77 S.W.3rd 791, 798-99 (Tenn.Crim.App. 2001). A mistrial may be declared only in cases of manifest necessity. An example of "manifest necessity" recognized as a sufficient reason for declaring a mistrial is the inability of the jury to reach a unanimous verdict. *Id.* at 799. Under Tennessee law, a manifest necessity is shown only

114

when there is no feasible and just alternative to halting the proceedings. *Id.* Because manifest

necessity was not proven in this case, declaring a mistrial would have been improper. A court may

obtain clarification from a still-empaneled jury of the meaning of its answers and verdict. Therefore,

the Court had the power and authority to permit the jury to correct its mistake in the verdict.

Petitioner has not directed this district court to any United States Supreme Court case, nor

has the Court found such case, that demonstrates the trial court's decision to send the jury back to

correct their verdict was contrary to, or an unreasonable application of, federal law. Nor has

petitioner demonstrated the state court decision was based upon an unreasonable determination of

the facts. Consequently, petitioner is not entitled to any relief on this claim. The respondent's

motion to dismiss on this claim will be **GRANTED**.

**c.      Court Erroneously Refused to
Re-charge Jury on Mitigating
Circumstances (Claim 21(g))**

When the trial court recharged the jury and sent it back for further deliberations, the court

refused to recharge the jury on mitigating factors. The trial court specifically refused to recharge

on mitigating circumstances stating, "[n]o, they have found that he is guilty . . ." [Court File No. 43,

Addendum No. 5, Vol. 24, at 607]. The jury retired for further deliberations and returned with the

original verdict form which reflected they had marked through their original non-statutory

aggravators and written the two statutory aggravating circumstances, *i.e.*, finding Nichols was

previously convicted of one or more felonies, other than the present charge, whose statutory

elements involve the use of violence to the person; and the murder was committed while Nichols

was engaged in committing, or was attempting to commit, or was fleeing after committing or

attempting to commit rape. The jury unanimously determined that death was petitioner's

115

punishment. Petitioner contends his capital sentencing proceeding violated the Eighth Amendment when the trial court re-instructed the jury to correct an invalid verdict without re-instructing the jury on mitigating factors.

"The United States Supreme Court has stated that the capital sentencer must make a reasoned moral and individualized determination based on the defendant's background, character and crime that death is the appropriate punishment." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989). The Eighth Amendment mandates the jury must have been able to consider and give effect to all relevant mitigating evidence offered by petitioner. *See Lockett v. Ohio*, 438 U.S. 586 (1978). In *Boyde v. California*, 494 U.S. 370 (1990), the Supreme Court of the United States provided the standard for determining whether a jury instruction that is claimed to be ambiguous, and therefore subject to an erroneous interpretation, requires reversal of the conviction. The proper inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. *Id*. at 380. The petitioner contends the trial court's failure to include the mitigating circumstances instruction when re-instructing the jury and considering the part of the re-instruction that advised the jury they were not to take account of any other facts or circumstances as the bases for deciding whether the death penalty would be appropriate punishment in this case results in a reasonable likelihood that the jury failed to consider mitigating evidence when rendering the second verdict. At first glance, it appears that petitioner makes a legitimate claim. However, the subsequent polling of the jury reveals the initial verdict was a constitutional verdict even though the jury wrote non-statutory aggravating circumstances on the verdict form. Therefore, petitioner suffered no prejudice as a result of the trial court's failure to also re-instruct on mitigating circumstances.

116

Here, the sworn jury was initially properly and fully instructed on mitigating factors and weighing aggravating and mitigating factors. The jury was initially given the requested mitigating instructions and the written instructions were in the jury room during deliberation. This is not a case where the jury was not instructed or not properly instructed on fixing punishment, at least initially after several corrected instructions. The polling of the jury reveals petitioner did not suffer any prejudice due to the trial court's failure to re-instruct on the mitigating circumstances.[29]

Significantly, the trial court sent the written instructions to the jury during its initial deliberations, and nothing in the record reveals that the jury did not have them when it returned for further deliberations. Petitioner's trial attorneys argued the mitigating evidence and asked the jury to sentence him to life based on that evidence. Moreover, the State presented strong aggravating evidence, as shown by the relatively short period of deliberation. Petitioner raped and murdered the victim; after committing that crime, petitioner violently raped several other women; and petitioner admitted he was guilty of the felony-murder and of several other rapes.

Here, the jury was required to decide whether to sentence petitioner to life imprisonment or death. Evaluating the jury instructions as a whole, it is clear the jury was initially fully and properly instructed on mitigating evidence and how to weigh it against the aggravating circumstances. There

_____

[29] After returning with a corrected verdict the trial judge ask the forelady several questions and her answers reflected that they had initially found the two statutory aggravating factors but had not written them in because they were the two listed [presumably in the jury instructions because they are not written on the death verdict] and the other four circumstances they wrote in were a word of explanation [Court File No. 43, Addendum No. 5, Vol. 25, at 610-14]. The jury was polled and each juror stated that before reporting the verdict the first time, he or she had found each of the two statutory aggravating circumstances had been proven beyond a reasonable doubt and the two statutory aggravating circumstances outweighed any mitigating circumstances and that was their verdict prior to the time they first attempted to report [Court File No. 43, Addendum No. 5, Vol. 25, at 608-617].

was no evidence of jury confusion in relation to mitigating evidence and the weight to accord it but rather, the confusion was on what aggravating circumstances to list on the death verdict.[30]

In the present case, the trial judge resubmitted the original verdict form and re-instructed the jury only as to the aggravating circumstances to correct the jury's ambiguous original death penalty verdict. The trial judge did not return the jury to the jury room to deliberate further but rather, sent the jury back only to correct the death verdict. This claim was raised on direct appeal on constitutional grounds. The Supreme Court of Tennessee observed that the trial court ascertained the corrected verdict was the verdict the jury had reached the first time it returned the form. The Supreme Court of Tennessee found there was no reversible error in the failure to re-charge the mitigating circumstances or to include the words "beyond a reasonable doubt" in the questions asked the jurors. The court "concluded the initial verdict was a legal verdict and the jury had a right to correct it under proper instruction." *State v. Nichols*, 877 S.W.2d 722, 735 (Tenn. 1994). The Tennessee Supreme Court found no reversible error in connection with the failure to re-instruct the jury on mitigating factors.

Although this Court believes re-instruction on the mitigating circumstances may have been the better practice, failure to re-instruct on mitigation was not prejudicial where the clarification of the initial jury verdict demonstrates the original verdict was a legal verdict. The jurors clarified their initial verdict when the trial judge conducted the polling of the jury. The polling of the jury revealed that each juror had initially found the existence, beyond a reasonable doubt, of the two statutory aggravating circumstances and found that those circumstances outweighed any mitigating

---

[30]     There is nothing in the record to indicate any confusion on the part of the jury when they returned the death penalty verdict rather than the life sentence verdict.

circumstances [Court File No. 43, Addendum No. 5, Vol. 25, pp. 610-617].[31]  In addition, the court initially gave the jury repeated instructions on mitigating circumstances and considering them in reaching their verdict [Court File No. 43, Addendum No. 5, Vol. 25, pp. 580-591].  Consequently, it was not necessary for the trial court to re-instruct the jury on the mitigating circumstances. Moreover, even if it was error for the court to fail to re-instruct on the mitigating circumstances, petitioner has not demonstrated that the jury instructions, or lack thereof, taken as a whole, were so infirm that they rendered the entire trial fundamentally unfair.  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  There is nothing in the record that indicates the jury failed to understand the function of mitigating circumstances when they decided petitioner's sentence or when they corrected their verdict.

In the instant case, the instructions were initially sent with the jury into deliberations [Court File No. 43, Addendum No. 5, Vol. 24, at 592].  The verdict they initially returned was ambiguous but was ultimately clarified when the court polled the jury.  Viewing the jury instructions in the context of the charge as a whole, rather than in isolation, the failure to re-instruct the jury on mitigating circumstances was not fatal.  The jury was initially properly instructed on mitigating circumstances.  Petitioner has failed to demonstrate that the failure to re-instruct the jury on mitigating circumstances so infected the entire trial that his conviction violated due process.

> The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal.  The question in such a collateral proceeding is "whether the ailing

---

[31]     The death penalty verdict form  originally returned by the jury reflected they unanimously found the aggravating circumstances outweighed, beyond a reasonable doubt, the mitigating circumstances [Court File No. 37, Addendum No. 5, Vol. 1, p. 562].

119

instruction by itself so infected the entire trial that the resulting conviction violates due process[.]"

*Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

Petitioner has not fulfilled his burden of proving that the trial court's failure to re-instruct on mitigating circumstances was so prejudicial that his conviction violates due process. Consequently, he is not entitled to habeas corpus relief on this claim.

The state court judgment must be upheld since petitioner has not demonstrated the state court adjudication resulted in a decision that is contrary to or an unreasonable application of clearly established federal law. Petitioner has not demonstrated the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in state court. Accordingly, respondent's motion to dismiss will be **GRANTED** as to this claim.

### d.       Polling of Jury(Claim 25)

Petitioner maintains that the trial court improperly polled the jury by misstating the applicable requirements of the law in violation of the Sixth, Eighth, and Fourteenth Amendments. The jury was polled by the trial judge after it announced its second verdict. According to petitioner, only one juror was properly polled as to the proper standard for weighing aggravating circumstances against mitigating circumstances. Petitioner contends each juror should have been asked whether he or she found the aggravating factors were proven by the evidence beyond a reasonable doubt, and whether he or she found those two aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt, as required by Tenn. Code Ann. § 39-13-204(f). Petitioner also contends the trial judge failed to poll the forelady of the jury as to the finding on the mitigating factors, but only asked her whether the aggravating factors were weighed against the mitigating factors.

First, the trial judge initially asked the forelady "did the jury find those two aggravating factors had been proven by the evidence *beyond a reasonable doubt* before you came back the first time?" [Court File No. 43, Addendum No. 5, Vol. 25, at 610](emphasis added). Each individual juror, including the forelady, was then polled as to whether he or she had found the State had proven the two statutory aggravating circumstances beyond a reasonable doubt, and each juror responded "Yes" [*Id.* at 610-617].

Next petitioner contends that each juror should have been polled as to whether he or she found that those two aggravating circumstances outweighed any mitigating circumstance beyond a reasonable doubt. The trial judge failed to ask all the jurors this question. The Tennessee statute requires that once the jury unanimously determined at least one statutory aggravating circumstance had been proven beyond a reasonable doubt *and* that such aggravating circumstance had been proven by the State to outweigh any mitigating circumstances *beyond a reasonable doubt*, the sentence shall be death. Tenn. Code Ann. §§ 39-13-204(g)(1)(A) and (B).

The Tennessee Supreme Court found that the challenge was essentially a challenge of the verdict's reliability. The state court observed the jurors were instructed that they must find the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt and that the verdict form itself states that the jury unanimously found that the statutory aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt [Court File No. 37, Addendum No. 5, Vol. 1, p. 562]. The state court found the trial judge was only ascertaining that this was the jurors' verdict and its omission of the phrase "beyond a reasonable doubt" did not invalidate an otherwise valid verdict.

The state court relied upon a poll that cured the alleged error with the verdict. The initial verdict reflected the jury relied upon four non-statutory aggravating factors to impose the death sentence. The polling revealed each juror initially considered only the two statutory aggravating factors when determining whether petitioner was death-eligible and that each juror found the statutory aggravating circumstances outweighed any mitigating circumstance.

Petitioner cites *Brasfield v. United States*, 272 U.S. 448 (1926), and *Lowenfield v. Phelps*, 484 U.S. 231, 240 (1988), for the proposition that polling of the jurors by a trial judge should be undertaken with caution. However, the Court is unpersuaded by petitioner's argument that these two jury-polling cases are on-point Supreme Court precedent supporting his claim. In *Lowenfield*, the Court upheld a trial court's decision to ask jurors whether further deliberation would help them reach a verdict and the trial court's subsequent supplemental instruction, finding there was no coercion. 484 U.S. at 240. Nothing that the trial judge did in petitioner's case was coercive or denied petitioner a constitutional right. Thus, *Lowenfield* does not support petitioner's claim. In *Brasfield* the trial court asked the jury how it was divided numerically. That did not happen in the instant case. These cases cited by petitioner do not indicate that petitioner's trial judge improperly polled or coerced the jury.

The trial court questioned the foreperson, asking whether the jury found the two statutory aggravating factors beyond a reasonable doubt before they returned to the court the first time, and the foreperson responded they had. In addition, the trial judge ask the foreperson if the jury assumed that they did not have to write those two findings on the verdict form, to which she responded "yes"[Court File No. 43, Addendum No. 5, Vol. 25, at 610]. The trial judge then stated, "[s]o you thought that since you found those two, and those are the only two listed, that you did not have to

122

actually copy those in there?"  The jury forelady responded "yes" [*Id.*].  The trial court polled the

jury and each individual juror confirmed the finding of the two aggravating factors beyond a

reasonable doubt, that the two aggravating factors had outweighed any mitigating factors, and that

the verdict was reached before they reported the first time [*Id.* at 610-617].  Considering the

complete facts and circumstances of this case, the combination of the jury's initial jury verdict, the

polling of the jury, and the re-instruction, petitioner has not demonstrated that the state court

decision was based on an unreasonable determination of the facts in light of the evidence, or that the

state court decision was contrary to, or an unreasonable application of, federal law.

"The purpose of polling is to ascertain that each juror approves of the verdict and has not

been coerced or induced to concur in a verdict to which he or she does not fully assent.  Polling

gives effect to each juror's right to change his or her mind about the verdict agreed to in the jury

room even though the likelihood of such change is remote.  If the trial court decides to poll the jury

at all, it had substantial discretion in determining the manner of polling."  *Dunaway v. Moore*, 78

F.3d 584 (6th Cir. 1996) (unpublished table decision), *available in* 1996 WL 102425, at *7 (citations

omitted).

The jurors answered in the affirmative when asked by the court whether they found the two

aggravating circumstances outweighed any mitigating circumstance before they reported their first

verdict.  The polling of the jury made critical inquiries and provided adequate support for the

conclusion that the initial verdict was valid.  Other than the initial written verdict, which the jury

polling revealed was valid, petitioner has not provided any evidence that the initial verdict was

invalid.  Petitioner has not demonstrated that the state court's determination was based on an

unreasonable determination of the facts nor has he demonstrated that the decision was contrary to,

123

or an unreasonable application of, clearly established federal law. Accordingly, petitioner is not entitled to any habeas relief on this claim.

### e. *Middlebrooks'* Error (Claim 20)

Petitioner contends he was sentenced on an unconstitutional felony-murder aggravating circumstance and any "weighing calculus" undertaken by the jury occurred with undue consideration given to this unconstitutional aggravating circumstance. Sometime after petitioner's trial, the Tennessee Supreme Court concluded in *State v. Middlebrooks,* 840 S.W. 2d 317 (Tenn. 1992), that when a defendant is convicted of felony murder, the state's use of felony murder as an aggravating circumstance at the sentencing hearing violates the state and federal constitutions because the aggravating circumstance is a duplication of the crime itself and fails to narrow the class of death-eligible defendants. The Tennessee Supreme Court determined the sentencing jury's consideration of the invalid felony-murder aggravating circumstance was state constitutional error.

The Tennessee Supreme Court applied the harmless error test as set forth in *Chapman v. California*, 386 U.S. 18 (1967), and *State v. Howell*, 868 S.W.2d 238 (Tenn. 1993), holding that an error is harmless beyond a reasonable doubt if an appellate court can conclude the sentence would have been the same had the sentencing authority given no weight to the invalid aggravating circumstance. *Nichols v. State,* 877 S.W.2d at 739, *citing Stringer v. Black*, 503 U.S. 222 (1992); *State v. Howell*, 868 S.W.2d at 262. The court observed that in conducting this harmless error inquiry, it must carefully consider all factors that may have influenced the jury when imposing the death sentence, including other aggravating factors and the proof supporting the other circumstances.

124

Performing a harmless error analysis under *Chapman v. California*, 386 U.S. 18 (1967), the state supreme court determined the error was harmless beyond a reasonable doubt because the sentence would have been the same had the sentencing authority given no weight to the invalid aggravating circumstance. Although only one statutory aggravating circumstance remained, the Tennessee Supreme Court determined "the effect and qualitative persuasiveness of the remaining aggravating circumstance on the sentence increases where there is proof of more than one prior violent felony conviction." *State v. Nichols*, 877 S.W.2d 722, 738 (Tenn. 1994). The state supreme court noted that the State offered proof that the defendant had committed five similar aggravated rapes within 90 days of the victim's murder, using weapons in three instances.[32] The court found the evidence of this remaining aggravating circumstance undisputed and overwhelming. The court also observed that no inadmissible or erroneous evidence was introduced to establish the invalid felony-murder aggravating circumstance so eliminating the felony-murder aggravator did not remove any evidence from the jury's consideration.

The court found the defendant's mitigation proof consisted of his childhood environment, his character, and passive nature. The court observed that the State introduced evidence "in rebuttal to show that a few years earlier, he had been convicted and sentenced to the penitentiary for an attempted rape." *Id.* at 739. In addition, the Tennessee Supreme Court observed that the State rebutted Dr. Engum's diagnosis of intermittent explosive disorder by offering proof that Dr. Engum acted in a dual role as a lawyer and member of the defense team searching for a defense, rather than as an objective psychologist.

---

[32]      "The defendant was previously convicted of one (1) or more felonies, other than the present change, whose statutory elements involve the use of violence to the person[.]" Tenn. Code Ann. § 38-13-204(2)(B)(h)(2).

Petitioner argues the state court decision is contrary to, or an unreasonable application of, federal law, and based on an unreasonable determination of facts. Petitioner contends the four reasons asserted by the state court for finding harmless error are not reasonably supported by the record and not sufficient to prove beyond a reasonable doubt that the error did not contribute to the jury's verdict.

Under AEDPA, review by the district court is confined to whether the Tennessee Supreme Court's harmless error analysis was an unreasonable application of clearly established Supreme Court precedent. This Court recognizes that in Tennessee, a state which requires its juries to weigh aggravating and mitigating factors, the invalidation of one of the aggravating circumstances removes a mass from one side of the scale. Under such circumstances, "[t]here is no way to know if the jury's analysis–how the aggravating and mitigating circumstances balanced– would have reached the same result even without the invalid factor." *Coe v. Bell*, 161 F.3d 320, 334 (6th Cir. 1998). However, despite the fact that state appellate courts can never truly know how a jury viewed an improper aggravating factor, the Supreme Court of the United States has repeatedly held that it is appropriate for a state appellate court itself to reweigh the aggravating and mitigating circumstances when determining whether consideration of the invalid aggravating factor by a sentencer was harmless. *Clemons v. Mississippi*, 494 U.S. 738 (1990).

The Tennessee Supreme Court made an individualized determination on the basis of the character of the individual and the circumstances of the crime. *Id.* at 753. In reviewing the Tennessee Supreme Court's analysis, this Court does not reweigh the aggravating and mitigating factors, but instead, is limited to ensuring that the Tennessee Supreme Court's harmless error review was not unreasonable. *Abdus-Samad v. Bell*, 420 F.3d 614, 622 (6th Cir. 2005). To grant petitioner

126

relief on this claim, he must show the state court applied federal law to the facts of his case in an objectively unreasonable manner.

In petitioner's case, the Tennessee Supreme Court reviewed the complete record for the presence of factors which potentially influenced the death sentence. This review included consideration of the strength of the one remaining aggravating factor; the prosecutor's arguments at sentencing; the evidence admitted to establish the invalid aggravating circumstance; and the nature, quality, and strength of the mitigating factors. The court also evaluated the remaining aggravating circumstance and its qualitative nature, its substance and persuasiveness, as well as the quantum of proof supporting it.

First, the Tennessee Supreme Court considered the effect and qualitative persuasiveness of the remaining aggravating circumstance on the sentence, observing that the effect and persuasiveness increases where there is proof of more than one prior violent felony conviction. The court found the remaining valid aggravating circumstance to be undisputed and overwhelming for the following reasons:

> The State, here, offered proof that the defendant had committed five similar aggravated rapes within 90 days of Pulley's murder, and in three instances was armed with weapons including a cord, a pistol, and a knife. The modus operandi of the convictions was similar to the felony resulting in Pulley's murder. The defendant when "energized," went out night after night, roaming the city, selecting vulnerable victims, eventually breaking into their homes and violently committing rape.

*Nichols,* 877 S.W. 2d at 738.

Petitioner, citing *Old Chief v. United States*, 519 U.S. 172, 185 (1997), argues it was improper for the court to consider these facts. *Old Chief* held that a district court abuses its discretion, under Federal Rule of Evidence 403, by admitting the full record of a prior conviction after a defendant offers to concede the fact of the prior conviction. Petitioner has not demonstrated

that he conceded the fact of his prior convictions.  Nevertheless, *Old Chief* was based on federal rules and statutes and not the Constitution, and was decided several years after petitioner's trial and direct appeal and offers Nichols no support for this claim.

Next, petitioner complains about the state court findings that no inadmissible or erroneous evidence was introduced to establish the invalid felony-murder, and the removal of the invalid aggravating circumstance did not remove any evidence from the jury's total consideration. Petitioner complains that the prosecution was not entitled to introduce all the evidence it did under the guise of informing the jury about the circumstances of the case.  Petitioner pleaded guilty to the murder during the guilt phase, thus the trial court permitted the prosecution to present evidence of the nature and circumstances of the crime so as to provide the jury with enough information to make an individualized sentencing determination of the appropriateness of the sentence.  Petitioner has not provided, and the district court's research did not reveal, any federal law demonstrating the introduction of this evidence was error.  Finally, the state court examined petitioner's mitigation proof in analyzing the effect of the invalid aggravating circumstance on the sentence.[33]

---

[33]    Petitioner's reliance on *Brown v. Sanders*, 126 S.Ct. 884 (2006) is unavailing. The United States Supreme Court held:

> An invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighting process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances.

*Brown v. Sanders*, 126 S.Ct. 884, 892 (2006).  The test used in petitioner's case was more strict than the test announced in *Brown*.  In petitioner's case, the mere submission of the invalid aggravating circumstance to the jury amounted to unconstitutional error, an error that was subjected to a harmless error analysis.

128

The Tennessee Supreme Court examined the quality and strength of the defendant's mitigation proof in their analysis to determine the effect of the invalid aggravating circumstance on the sentence.  The state court described the mitigation proof as follows:

> Primarily the defendant's mitigation proof related to his childhood environment, his character, and passive nature.  The State offered evidence in rebuttal to show that a few years earlier, he had been convicted and sentenced to the penitentiary for an attempted rape.  In addition, expert proof from Dr. Engum was offered to show that the defendant was suffering from a rare condition called intermittent explosive disorder.  The State rebutted Dr. Engum's testimony, however, by offering proof that he acted in a dual role as a lawyer and member of the defense team searching for a defense, rather than as an objective psychologist.

*Nichols*, 877 S.W.2d at 738.  The Tennessee court was permitted to consider the strength of the mitigating circumstances and weigh it against the remaining aggravating factor.   In so doing, the court acknowledged that some of the mitigating evidenced had been rebutted by the State.

The Tennessee Supreme Court's finding that the impact of the improper aggravating factor was not significant enough to put the jury's decision in question was not an unreasonable finding.  Given that the improper aggravating factor did not convey new information to the jury[34] and that the remaining aggravating circumstance was quite significant, it was not unreasonable for the Tennessee Supreme Court to determine that the jury's verdict in this case would have been the same had it not considered the felony-murder aggravating factor.   The jury's consideration of the improper aggravating circumstance in this case has not so infected the balancing process such that it is constitutionally impermissible for the Tennessee Supreme Court to affirm the death sentence  Moreover, the Sixth Circuit has determined *Middlebrooks* is a rule of Tennessee constitutional law

---

[34]     Under Tennessee law at the time petitioner committed the crime and at the time of his sentencing, evidence of the nature and circumstances of the crime was permitted to be presented in the sentencing proceeding.  Tenn. Code Ann. § 39-2-203 (1987).

129

and is not cognizable in federal habeas proceedings, despite *Middlebrooks'* discussion of federal

case law. *Coe v. Bell*, 161 F.3d 320, 348 (6th Cir. 1998).

Accordingly, the respondent's motion to dismiss as to the *Middlebrook's* claim will be

**GRANTED**.

### 9. Objection to Evidence (Claim 16)

Petitioner, having pleaded guilty to all charges, avers that the trial court erred when it

permitted the State to put on its entire case-in-chief during the sentencing phase. At the time of

petitioner's sentencing hearing in May 1990, as the Tennessee Supreme Court noted, Tenn. Code

Ann. § 39-13-203(c) permitted the following evidence to be introduced during the sentencing

hearing:

> In the sentencing proceeding, evidence may be presented as to any matter that the
> court deems relevant to the punishment and may include, but not be limited to, the
> nature and circumstances of the crime; the defendant's character, background
> history, and physical condition; any evidence tending to establish or rebut the
> aggravating circumstances enumerated in subsection (I); and any evidence tending
> to establish or rebut any mitigating factors. Any such evidence which the court
> deems to have probative value on the issue of punishment may be received regardless
> of its admissibility under the rules of evidence; provided, that the defendant is
> accorded a fair opportunity to rebut any hearsay statements so admitted. However,
> this subsection shall not be construed to authorize the introduction of any evidence
> secured in violation of the constitution of the United States or of the state of
> Tennessee.

Tenn. Code Ann. § 39-13-203(c) (Effective Nov. 1, 1989); § 39-13-204(c).

The state supreme court found the evidence admissible, citing to the above referenced statute,

and the fact that since petitioner pleaded guilty, the sentencing jury had no information about the

offense other than the evidence petitioner complains should not have been introduced. The court

found the evidence tended to "individualize" the case for the jury and was limited to testimony

relevant to the crime.

130

The Supreme Court of the United States has found that statutory aggravating circumstances play a constitutionally necessary function, *i.e.*, they narrow the class of persons eligible for the death penalty. In addition the Supreme Court has found, "the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death. What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 878-79 (1983) (emphasis in original). Petitioner complains that the Tennessee Supreme Court's reliance on *Zant* was unreasonable.

First, petitioner pleaded guilty to one count of felony-murder. The challenged evidence is relevant to the statutory aggravating circumstance that the murder was committed while committing rape. Realizing that aggravating circumstance has since been deemed unconstitutional by the Tennessee courts, at the time of trial the court's determination that the evidence was relevant to punishment was not incorrect. Tennessee law provided that any matter the court deemed relevant to the punishment, including any evidence to establish or rebut any mitigating factors, could be introduced in the sentencing phase of a first degree murder trial. Petitioner announced, at the beginning of his trial, that he would plead guilty. Therefore, the trial court determined the facts and circumstances surrounding the crime, which would have been presented to the jury had petitioner gone to trial, was relevant to punishment.

Petitioner has not cited to Supreme Court precedent, and the Court does not know of any federal law, which prohibits evidence related to the nature and circumstances of the crime from being introduced during a sentencing hearing following a defendant's guilty plea to the offense. Indeed, any such law would be inconsonant, if not in direct conflict, with the requirements of the

131

Eighth Amendment. *See Clemons v. Mississippi*, 494 U.S. 738, 748 (1990) ("The primary concern in the Eighth Amendment context has been that the sentencing decision be based on the facts and circumstances of the defendant, his background, and his crime."); *Barclay v. Florida*, 463 U.S. 939, 950 (1983) (After a death-qualifying conviction the sentencer then "is free to consider a myriad of factors to determine whether or not death is the appropriate punishment."); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (The sentencer in a capital case may not be prevented from considering "any of the circumstances of the offense that the defendant proffers" to mitigate the punishment.).

The evidence of the circumstances of the crime was necessary because it was relevant to punishment and to counter petitioner's mitigating evidence. More importantly, the evidence was permitted under Tennessee law and petitioner has not sustained his burden of proving the decision of the Tennessee Supreme Court was contrary to, or an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts. Evidence demonstrating the nature and circumstances of the crime was not constitutionally impermissible.

Consequently, petitioner is not entitled to any habeas relief on his claim that it was error for the trial court to permit evidence relevant to the nature and circumstances of the crime during his sentencing hearing. The evidentiary rulings, by the trial judge, in petitioner's sentencing hearing were constitutionally permissible and necessary to ensure a reliable and individualized sentencing decision. Respondent's motion as to this claim will be **GRANTED**.

10.     **Discovery of Expert's Notes and Memorandums (Claim 17)**

132

Petitioner contends the trial court violated his rights under the Sixth, Eighth, and Fourteenth Amendments when it ordered him to release to the State the personal notes and writings made by petitioner's expert psychologist, in violation of Rule 16 of the Tennessee Rules of Criminal Procedure, thus depriving him of effective assistance of counsel. Petitioner has mistakenly asserted that this claim was exhausted on direct appeal. This claim was not raised on direct appeal as asserted by petitioner in this habeas petition. Petitioner's claim on direct appeal was raised as follows:

> THE TRIAL COURT ERRED WHEN IT ORDERED MR. NICHOLS TO RELEASE TO THE STATE THE PERSONAL NOTES AND WRITINGS MADE BY MR. NICHOLS' EXPERT PSYCHOLOGIST, IN VIOLATION OF RULE 16, TENNESSEE RULES OF CRIMINAL PROCEDURE.

[Court File No. 50, Addendum 6, Vol . 1, at 24]. Consequently, petitioner's claim that in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution the release of Dr. Engum's memoranda to the State, in violation of Rule 16 of the Tennessee Rules of Criminal Procedure, deprived him of effective assistance of counsel is procedurally defaulted. Absence a showing of cause and prejudice, this claim will be **DISMISSED**.

In the last paragraph of petitioner's claim in his appellate brief on direct appeal relating to the disclosure of Dr. Engum's memoranda, petitioner claimed the production of the internal notes and memoranda and the use of the same by the State to condemn the defense strategy was a violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The exhaustion doctrine requires the petitioner to present "the same claim under the same theory" to the state courts before raising it on federal habeas review. *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987). When determining whether petitioner "fairly presented" this federal constitutional claim to the state courts, this Court considers whether:

1)       the petitioner phrased the federal claim in terms of the pertinent constitutional law or in terms sufficiently particular to allege a denial of the specific constitutional right in question;

2)       the petitioner relied upon federal cases employing the constitutional analysis in question;

3)       the petitioner relied upon state cases employing the federal constitutional analysis in question; or

4)       the petitioner alleged "facts well within the mainstream of [the pertinent] constitutional law."

*Hicks v. Straub*, 377 F.3d 538, 553 (6th Cir. 2004) (quoting *McMeans v. Brigano*, 2000 WL 1472708 (6th Cir. 2000) (holding that general allegations of the denial of rights to a fair trial and due process fail to fairly present the claims that specific constitutional rights were violated). In the instant case, petitioner's cite to *Hickman v. Taylor,* 329 U.S. 495, 510 (1947), for the proposition that an attorney's work product must remain undiscoverable, did not fairly present the claim that petitioner's constitutional rights were violated. Furthermore, petitioner's claim on direct appeal that "[t]he production of all of Dr. Engum's preliminary internal notes and memoranda, in contravention of Rule 16, Tennessee Rules of Criminal Procedure, and the use by the State of those notes to ridicule defense witnesses and to condemn the defense strategy, was prejudicial error, and a violation of the Defendant's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution," does not constitute a fair presentation of the federal constitutional claim Nichols raises in his habeas petition that the release of Dr. Engum's memoranda to the State deprived him of effective assistance of counsel.

Although petitioner failed to raise this claim as a constitutional issue in the state courts, if this Court were to interpret this convoluted claim as an exhausted constitutional claim, petitioner would not be entitled to any habeas relief. Although the state appellate court did not address the

claim on a constitutional basis, this Court can review the state court decision under ADEPA. This is so, because a state court need not cite to, nor even be aware of, clearly established Supreme Court precedents, "'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (per curiam) (*quoting Early v. Packer*, 537 U.S. 3, 8 (2002). Therefore, this district court will make an independent, but deferential, review of the record and the applicable law to determine whether the state court decision is "contrary to" clearly established Supreme Court precedents in that it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). In addition, this Court will review the state court decision in terms of whether it is based on an unreasonable determination of the facts in light of the evidence presented in state court. *See Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Therefore, out of an abundance of caution, the Court will address this unexhausted claim.

Petitioner argues Dr. Engum's memoranda should have been protected from disclosure by the attorney work-product doctrine. Violation of the attorney work-product doctrine is not cognizable here because the privilege for attorney work-product is not a constitutional privilege under the United States Constitution, nor is the privilege applicable to the states under any federal law or treaty. "[T]he work-product doctrine is firmly established as a common law privilege." *In re Grand Jury Proceedings*, 473 F.2d 840, 845 (8th Cir. 1973). Moreover, the work-product privilege is not absolute. *United States v. Nobles*, 422 U.S. 225, 239 (1975).

Although the work-product doctrine is more frequently asserted as a bar to discovery in civil actions, it also applies to criminal proceedings. *United States v. Nobles*, 422 U.S. 225, 238 (1975).

The work-product doctrine protects against disclosure of materials prepared in anticipation of litigation or prepared for trial by a party, his attorney, or his representative. *See Maine v. United States Dep't of Interior*, 298 F.3d 60, 66 (1st Cir. 2002). Normally, ordinary work product may be discoverable where production "is essential to the preparation of one's case," or where the relevant information would be difficult or impossible to obtain. *See Hickman v. Taylor*, 329 U.S. 495, 511 (1947). However, opinion work product qualifies for greater protection. *See Upjohn Co. v. United States,* 449 U.S. 383, 401-02 (1982)(Before disclosure of attorneys' opinion work-product is ordered a "far stronger showing of necessity and unavailability by other means is required"). The district court's research did not reveal that the United States Supreme Court or the Sixth Circuit Court of Appeals has taken a position regarding the extent of such protections for opinion work product.

Although opinion work-product doctrine protection does not disappear once a trial has begun, and the United States Supreme Court has acknowledged disclosure of an attorney's efforts at trial could disrupt the orderly development and presentation of a case, the Supreme Court declined to delineate the scope of the doctrine at trial in *United States v. Nobles,* 422 U.S. 225, 239 (1975), and this Court's research has not revealed a Supreme Court case delineating the scope of the doctrine at trial.

However, the *Nobles* Court observed that the work-product doctrine is not absolute and may be waived and so found. Work product is a qualified evidentiary privilege rather than an absolute protection. *Westinghouse Elec. Corp. v. Republic of Phillippines*, 951 F.2d 1414, 1417 fn.1 (3rd Cir. 1991). In *Nobles*, the defendant in a criminal case argued that the work-product doctrine exempted the investigator's report from disclosure at trial, but the Supreme Court found its protection was unavailable to Nobles. The *Nobles* Court determined Nobles waived the privilege derived from the

136

work-product doctrine when he sought to present the testimony of the investigator and contrast his recollection of the contested statements with that of the prosecution's witnesses. The Court found that Nobles waived the privilege with respect to matters covered by the investigator's testimony by electing to present the investigator as a witness. The Supreme Court concluded Nobles was not permitted to advance the work-product doctrine to sustain a unilateral testimonial use of work product. *Nobles*, 422 U.S. at 240. The *Nobles* trial court advised it would conduct an *in camera* inspection of the investigator's report and would excise all reference to matters relevant to the precise statement at issue. When defense counsel refused to produce the report, the *Nobles* trial court precluded the investigator from testifying about his interviews with the witnesses.

The *Nobles* Court observed that the recognition of the work-product doctrine by the United States Supreme Court in *Hickman v. Taylor*, 329 U.S. 495 (1947), reflected the strong "public policy underlying the orderly prosecution and defense of legal claims." *United States v. Nobles*, 422 U.S. at 236. Although the Court recognized a qualified privilege for certain materials prepared by an attorney preparing for litigation, it also recognized that the privilege derived from the work-product doctrine is not absolute.

> The privilege derived from the work-product doctrine is not absolute. Like other qualified privileges, it may be waived. Here respondent sought to adduce the testimony of the investigator and contrast his recollection of the contested statements with that of the prosecution's witnesses. Respondent, by electing to present the investigator as a witness, waived the privilege with respect to matters covered in his testimony. Respondent can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination.

137

*United States v. Nobles*, 422 U.S. at 239-240.  The Supreme Court also observed that when counsel attempts to make a testimonial use of work-product materials, "the normal rules of evidence come into play with respect to cross-examination and production of documents."  *Id.* at 240 n. 14.

The Supreme Court found that the district court in *Nobles* properly exercised its discretion because its order only opened "to prosecution scrutiny the portion of the report that related to the testimony the investigator would offer to discredit the witnesses' identification testimony.  The Court further afforded respondent the maximum opportunity to assist in avoiding unwarranted disclosure or to exercise an informed choice to call for the investigator's testimony and thereby open his report to examination."  *Id.* at 240-41.

In finding that the court's preclusion sanction was an entirely proper method of assuring compliance with its order, the Supreme Court observed that,

> The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been half-truth. Deciding, as we do, that it was within the court's discretion to assure that the jury would hear the full testimony of the investigator rather that [sic] a truncated portion favorable to respondent, we think it would be artificial indeed to deprive the court of the power to effectuate that judgement.  Nor do we find constitutional significance in the fact that the court in this instance was able to exclude the testimony in advance rather than receive it in evidence and thereafter charge the jury to disregard it when respondent's counsel refused, as he said he would, to produce the report.

*Id.* at 241.

In the instant case Dr. Engum testified on petitioner's behalf during the sentencing phase. Applying the principles in *Nobles* to the instant case, the state court's conclusion preventing petitioner from arguing the work-product doctrine to sustain a unilateral testimonial use of work product was not contrary to, nor an unreasonable application, of federal law.  Consequently,

138

petitioner's claim that disclosure of Dr. Engum's memoranda violated the attorney work-product doctrine will be **DISMISSED**.

In addition to finding that the release of Dr. Engum's memoranda did not violate the attorney work-product doctrine, the state courts also concluded that under the facts of this case, the memoranda memorializing Dr. Engum's interviews were discoverable. After petitioner filed his motions for discovery, the State filed motions seeking reciprocal discovery, specifically requesting reports of examinations.[35] However, petitioner failed to provide any discovery regarding his psychologist, Dr. Engum. Petitioner's trial counsel hired Dr. Engum. Dr. Engum evaluated and tested petitioner and also interviewed petitioner, his wife, his father, and his minister. After each interview, Dr. Engum, at the request of petitioner's counsel, wrote a memorandum for their use in preparing a defense and preparing to examine witnesses [Court File No. 42, Addendum No. 5, Vol. 22, at 202-03]. During the trial, the prosecutor was notified that petitioner intended to call a psychologist only after the prosecutor asked if Nichols intended to offer any psychiatric or medical proof [Court File No. 42, Addendum No. 5, at 201]. Dr. Engum did not write a summary report until the second day of trial, only after counsel realized the court was inclined to give the State access to

---

[35] The discovery provision relevant to this issue is found in Tenn. R. Crim. P 16(b)(1)(B) which provided for reciprocal discovery under the circumstances of petitioner's case. The State requested reciprocal discovery; thus, petitioner was required to allow the State to inspect and copy any results or reports of the mental examination performed by Dr. Engum. Petitioner was required to allow the State to copy that information which petitioner intended to introduce as evidence in chief at the trial or which were prepared by a witness whom the petitioner intended to call to trial when the results or reports relate to his testimony. However, Tenn. R. Crim. P. 16(b)(2) precludes discovery of "reports, memoranda, or other internal defense documents made by the defendant, or his attorneys, or agents . . . or of statements made by . . . defense witnesses . . . to the defendant, his agents or attorneys."

139

all interview reports, as well as psychological test results, because they were prepared by a prospective witness.

Although Dr. Eric Engum was hired by petitioner's trial counsel to evaluate petitioner, trial counsel failed to have Dr. Engum prepare a report, having him instead prepare written memoranda for use in preparing their defense and examination [Court File No. 42, Addendum No. 5, Vol. 22, at 201-203]. Trial counsel's untimely notification to the State of their intent to present an expert on petitioner's behalf the day before he was to testify resulted in the prosecutor having access to the memoranda prepared by Dr. Engum. The prosecutor had a substantial need for the material because he was prevented from rebutting Dr. Engum's testimony with his own expert. Petitioner's untimely notification deprived the State of its opportunity to retain its own expert to analyze and testify about the tests and diagnosis.

The state trial court possessed the inherent authority to impose a sanction. The trial judge could have precluded Dr. Engum's testimony; but instead it permitted Dr. Engum's testimony and ordered the doctor's memoranda be given to the prosecutor. The state trial court found that the failure of petitioner's trial counsel to request a report from their expert resulted in Nichols having an unfair advantage that the court could not accept, and that the State was entitled to know the content of the psychologist's testimony. At that time, defense counsel offered to make the expert "available for voir dire, a private meeting, or whatever the State" wanted, but the court, finding the offer was untimely, responded that defense counsel's failure to have Dr. Engum prepare a report prevented the State from obtaining a psychologist [Court File No. 42, Addendum No. 5, Vol. 22, at 220-222]. The court determined it could either preclude Dr. Engum from testifying or give the memoranda to the State. The court performed an *in camera* inspection and permitted the State to

read the memoranda. After the court made its ruling, defense counsel notified the court that Dr. Engum had dictated a report and it would be delivered to the court within thirty minutes. In an attempt to convince the trial court not to give the memoranda to the State, trial counsel also argued Dr. Engum did not reach a conclusion until April 23, 1990,[36] and the memoranda included statements made by the petitioner after Dr. Engum assured petitioner that anything he said to Dr. Engum would be confidential. The court determined that, under the circumstances, giving only the report to the State during the trial was not sufficient to place both sides "on a level playing field" [Court File No. 42, Addendum No. 5, Vol 22, at 227-229].

The Tennessee Supreme Court, acknowledging this issue was difficult, concluded that the results and evaluations of the standardized psychological tests contained in Dr. Engum's files were clearly discoverable. The court also concluded that in the absence of any other records of Dr. Engum's evaluation of petitioner, the memoranda of the interviews were discoverable because his memoranda were not the undiscoverable work product of an agent or attorney of the petitioner. The Tennessee Supreme Court found that the memoranda were the only records of interviews conducted as part of an ongoing evaluation of petitioner, and since the final report was not prepared until the second day of the hearing, and only then because it became apparent that the memoranda were admissible, the memoranda of the interviews provided the most complete written psychological evaluation of petitioner and that these memoranda formed the basis for Dr. Engum's testimony.

The problem here is that Dr. Engum, a lawyer and a psychologist, was wearing too many hats in this case. First, he advised petitioner, incorrectly, that anything he said to him would be confidential. Second, it appears from the content of Dr. Engum's memoranda that he was also

---

[36]       This portion of the sentencing hearing occurred on May 10, 1990.

141

working as a member of the defense team, assisting trial counsel in preparing a mitigating defense, rather than evaluating petitioner as a neutral and objective psychologist.

In the instant case, Rule 16 of the Tennessee Rules of Criminal Procedure, required petitioner to "permit the State to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession or control of the defendant which the defendant intends to introduce as evidence in chief at the trial or which were prepared by a witness whom the defendant intends to call at the trial when the results or reports relate to the witness's testimony." The rule also provides that if a party fails to comply with the rule the court may "order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." Tenn. R. Crim. P. 16.

In Tennessee a trial judge has the authority to take appropriate actions, as deemed necessary, to prevent discovery abuse. *Mercer v. Vanderbilt University, Inc.*, 134 S.W.3rd 121, 133 (Tenn. 2004)(The court determined the plaintiff would need an additional three to six weeks to retain additional experts and prepare for these "surprise witnesses" so the court determined witness exclusion was an appropriate sanction for Vanderbilt's failure to supplement its answers to the plaintiff's interrogatories). This discretionary decision will only be set aside when the trial court misconstrues or misapplies the controlling legal principle or has acted inconsistently with the substantial weight of the evidence. *White v. Vanderbilt Univ.*, 21 S.W. 3d 215, 223 (Tenn.Ct.App.1999). Courts may also impose sanctions based on its inherent authority. A court's inherent power "is governed not by rule or statute but by the control necessarily vested in courts to

142

manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.,* 370 U.S. 626, 630-31 (1962). The decision to impose sanctions lies within the sound discretion of the court. Sanctions are "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643 (1976). Under the abuse of discretion standard, the relevant inquiry is whether any reasonable person would agree with the court's decision. *See Morales v. American Honda Motor Co. Inc.,* 151 F.3d 500, 511 (6th Cir. 1998).

Although preclusion of evidence as a sanction unquestionably implicates the Sixth Amendment because it prevents a criminal defendant from presenting relevant evidence and diminishes his ability to present a defense, it is not necessarily unconstitutional. *See Rock v. Arkansas,* 483 U.S. 44, 55 (1987). The Supreme Court of the United States has found that an "accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). "In the exercise of this right [right of an accused to present witnesses in his own defense], the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). "The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth." *United States v. Nobles*, 422 U.S. 225, 241 (1975).

143

This matter arguably involves possible bad faith conduct during the discovery period. Although trial counsel did not admit any bad faith, counsel did admit this situation arose because they failed to have Dr. Engum prepare a report. The State requested discovery and the petitioner was ordered to provide reciprocal discovery. Petitioner's failure to provide discovery prevented the State from determining whether or not they needed to hire their own expert. This placed the trial court in a position of deciding whether to exclude Dr. Engum as a witness, whether to postpone the trial which had already begun, or whether to allow the State access to the internal memoranda.

Unlike *Nobles*, petitioner found himself in this situation because he failed to abide by the court's discovery order. As a sanction permitted by Tenn. R. Crim. P. 16(d)(2) for failing to abide by the trial court's discovery order, the Court permitted the State access to Dr. Engum's memoranda. A review of the record indicates the trial judge required all of the notes and memoranda be given to the State because of the danger that Dr. Engum's testimony and report, alone, may have mislead the jury. Dr. Engum's report reflected that he relied upon interviews with certain witnesses in the course of diagnosis. Therefore, absent any other documentation of the interviews with the witnesses upon which Dr. Engum relied upon to make his diagnosis, the trial court's decision was not unreasonable.

Although the right of a defendant to present evidence is fundamental, it is not absolute. *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). In *Taylor*, the Supreme Court observed that in *Nobles* the Court, "upheld an order excluding the testimony of an expert witness tendered by the defendant because he had refused to permit discovery of a 'highly relevant' report . . . . The court's preclusion sanction was an entirely proper method of assuring compliance with its order. Respondent's argument that this ruling deprived him of the Sixth Amendment rights to compulsory process and

144

cross-examination misconceives the issue." *Nobles*, 422 U.S. at 241. In *Taylor*, defendant's counsel violated a state procedural rule by failing to identify a particular defense witness before trial in response to a pretrial discovery request. *Taylor v. Illinois*, 484 U.S. at 403-05. The Supreme Court upheld the trial court's exclusion of the defense witness from testifying as a sanction for defense counsel's deliberate failure to identify the witness prior to trial.

Although "a trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor[,] . . . the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests. The integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance." *Id.* at 414-15. In *Taylor*, the United State Supreme Court concluded that "[a] trial judge could insist on an explanation for a party's failure to comply with a request to identify his or her witnesses in advance of trial. If that explanation reveals that the omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, it would be entirely consistent with the purposes of the Compulsory Process Clause simply to exclude the witness' testimony." *Id*. at 415.

The Supreme Court reiterated its holding in *Taylor* in *Michigan v. Lucas*, 500 U.S. 145, 152 (1991), stating "that when a discovery violation amounts to willful misconduct and is designed to obtain a tactical advantage, regardless of whether prejudice to the prosecution could have been avoided by a lesser penalty, the severest sanction is appropriate." This Court is guided here by the principles and reasoning of *Nobles*, *Taylor,* and *Lucas*.

Failure of petitioner's counsel to comply with the trial court's order was prejudicial to the State's litigation stance. The trial court was faced with either having to continue the trial or sanction the petitioner for his actions by precluding the petitioner from presenting his psychologist or the lesser sanction, which the trial court imposed, of ordering the petitioner's expert to release his personal notes and writings to the State.

Applying the principles and reasoning of *Nobles, Taylor,* and *Lucas,* by analogy, to the instant case, the failure of counsel to abide by the court's reciprocal discovery order and their explanation for failing to comply with the order, was sufficient to support the trial judge's conclusion that it appeared the omission was willful and motivated to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence. In light of the principles and reasoning of *Nobles, Taylor*, and *Lucas*, and weighing petitioner's Sixth Amendment rights against the countervailing public interests in the integrity of the adversary process, the interest in fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process, the Tennessee Supreme Court's affirmation of the trial judge's order that petitioner had to release his psychologist's personal notes and writing to the prosecution as a sanction for his attorneys' misconduct was not unreasonable.

The Tennessee Supreme Court concluded that when a psychologist or psychiatrist does not prepare a summary report, but instead relies on extensive memoranda to record not only observations and hypotheses but also evaluations, such records are discoverable under Tenn. R. Crim. P. 16(b)(1)(B) because to allow the defendant to evade a reciprocal discovery rule by making no formal report and then claiming that mere "notes" are undiscoverable would effectively nullify the meaning of Rule 16(b)(1)(B).

146

Consequently, the state court's conclusion that under the facts of this case, the memoranda memorializing Dr. Engum's interviews was discoverable, is not contrary to, or an unreasonable application of, federal law, nor is it an unreasonable determination of the facts as they were presented. Accordingly, petitioner's claim relative to the release of his psychologist's memoranda will be **DISMISSED**.

## 11. <u>Prosecutorial Misconduct (Claim 18)</u>

In this claim, petitioner asserts that prosecutorial misconduct violated his Sixth, Eighth, and Fourteenth Amendment rights. According to petitioner, his death sentence is invalid because the prosecutor informed the jury that a life sentence, if given to petitioner, would not in fact be a life sentence. In addition, petitioner claims the prosecutor displayed, in a chopping manner, the alleged murder weapon, a 2 x 4 piece of lumber, during closing argument. To the extent petitioner raised on direct appeal in state court the claim his death sentence is invalid because the prosecutor informed the jury that a life sentence would not in fact be a life sentence, thus properly exhausting his state remedies, this issue is properly before this Court and will be addressed. However, to the extent petitioner did not fairly present displaying the alleged murder weapon claim in state court, this issue is procedurally defaulted, and absent a showing of cause and prejudice it will be dismissed.[37]

_____

[37] Petitioner has recently notified the Court that since Dr. Blake reported to the state trial court conducting the post-conviction DNA proceedings that new scientific testing reveals that petitioner is identified as the source of the spermatozoa from the victim's gown, he moves to withdraw his *Schlup* gateway arguments with respect to Claim 18. Apparently, petitioner is withdrawing his procedurally defaulted claim regarding the displaying of the alleged murder weapon.

On direct appeal petitioner argued that the prosecutor made statements concerning the possibility of petitioner's parole on two occasions. Petitioner claimed the prosecutor first stated:

> But what do you do, what do you do with a man who's perpetrated that kind of crime? What do you do with a man who's committed senseless murder, and after he does it, instead of being remorseful, he rapes other women? What do you do with him? <u>He's been in the penitentiary. He got a five year sentence in '84 and he served eighteen months. What do you do with him? What's left? But I ask you to do this, ladies and gentlemen.</u> And you heard the psychologist say that if he's out he'll do it again. He even admitted, "Mr. Nichols, if you hadn't been arrested January the 5th, 1989, you would still be out there committing rapes," and he said yes.
>
> Ladies and gentlemen, justice is doing what you have to do to make sure that Harold Wayne Nichols never rapes again and that he never murders again, whatever it takes. Thank you.

[Court File No. 43, Addendum No. 5, Vol. 24, at 511-12; Court File No. 50, Addendum No. 6, Vol. 1 at 32]. No objection was made to this argument. Petitioner also complained of the prosecutor's later argument in response to defense counsel's argument that prison was hell and the jury should send petitioner to prison. "[In] '84 they sent him there on a five year sentence and he served eighteen months and got out and raped again. Sure, send him there." [Court File No. 43, Addendum No. 5, Vol. 24, at 567; Court File No. 50, Addendum No. 6, Vol. 1, at 32]. Then the prosecutor argued that one of the purposes of punishment is to remove petitioner from society so that he could not rape or murder another woman. Shortly thereafter, petitioner objected to his argument as implying a life sentence did not actually mean petitioner would be incarcerated for life [Court File No. 43, Addendum No. 5, Vol. 24, at 568-69].

The state court addressed this issue finding that to whatever degree these arguments were improper they did not constitute error which prejudicially affected the jury's sentencing determination. The Court found the challenged arguments hinted "at the idea that a life sentence carries with it the possibility that defendant will rape and murder again . . . [but] it does not clearly

148

mention parole possibilities for defendant in the present proceeding." The state court determined the argument directly raised "the failure of prior incarceration to affect the defendant's behavior and of the defendant's potential for future dangerousness." *State v. Nichols,* 877 S.W.2d 722, 733 (Tenn. 1994). In addition, the state court found the argument was, in part, a response to petitioner's argument that he would be completely harmless upon incarceration.

Improper closing argument during the penalty phase of a capital trial warrants federal habeas corpus relief only when the argument renders the sentencing hearing fundamentally unfair. *See Darden v. Wainsright*, 477 U.S. 168, 181 (1986) (the relevant question is whether the prosecutor's comments infected the trial with unfairness so as to make the resulting conviction a denial of due process); *Donnelly v. DeChristoforo*, 416 U.S. 637, 642-45 (l974) (establishing "fundamental fairness" standard for prosecutorial misconduct during guilt phase); *Buell v. Mitchell*, 274 F.3d 337, 364-65 (6th Cir. 2001) (habeas relief for alleged prosecutorial misconduct during both guilt and sentencing phases required showing that prosecutor's conduct was so egregious as to render the petitioner's trial fundamentally unfair under the totality of the circumstances). Thus, undesirable or universally condemned remarks by the prosecutor will not warrant habeas relief unless the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. at 642-645; *see Darden v. Wainwright*, 477 U.S. at 181.

The Supreme Court "has approved the jury's consideration of future dangerousness during the penalty phase of a capital trial, recognizing that a defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system." *Simmons v. South Carolina*, 512 U.S. 154, 162 (1994), citing *Jurek v. Texas*, 428 U.S. 262, 275 (1976)(joint opinion of Stewart,

149

Powell, and Stevens, JJ.) (noting that "any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose"); *California v. Ramos,* 463 U.S. 992, 1003, n. 17 (1983) (explaining that it is proper for a sentencing jury in a capital case to consider "the defendant's potential for reform and whether his probable future behavior counsels against the desirability of his release into society").

Petitioner's reliance on *Simmons v. South Carolina*, 512 U.S. 154 (1994), is unavailing. The rule created by the *Simmons* case is that where a defendant's future dangerousness is at issue, "the parole-ineligibility instruction is required only when, assuming the jury fixes the sentence at life, the defendant is ineligible for parole under state law." *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000). Although the prosecutor urged a verdict of death because petitioner had previously been incarcerated and when released began raping again and because petitioner would do so again upon release from jail,[38] petitioner would have been eligible for parole after serving a certain number of years if he received a life sentence. Therefore, unlike *Simmons*, petitioner was not ineligible for parole under state law.

Federal courts will generally defer to a state's determination as to what a jury should and should not be told about sentencing. *See California v. Ramos*, 463 U.S. 992 (1983). The Tennessee Supreme Court did not find the arguments improper but found that to whatever extent they were

---

[38]     In addition, when the prosecutor asked petitioner, "[a]nd if you were out in the streets of Hamilton County right now, women of Hamilton County would not be safe from a possible attack by Harold Wayne Nichols, would they?" Petitioner responded, "Not unless I had gotten help" [Court File No. 42, Addendum No. 5, Vol. 23, at 411]. Dr. Engum testified petitioner functioned well in institutional settings and that petitioner had not experienced any incidences of aggressive or violent episodes in institutional settings [Court File No. 42, Addendum No. 5, Vol. 23, at 441]. Dr. Engum also testified petitioner would continue to rape women if released from jail, and Dr. Engum said petitioner should be incarcerated for the rest of his life [Court File No. 43, Addendum No. 5, Vol. 24, at 456].

improper, the arguments did not constitute error which prejudiced the jury's sentencing determination. The relevant question before this Court is whether the Tennessee Supreme Court's decision was an unreasonable application of federal law. The record supports the conclusion that the Tennessee Supreme Court's finding was reasonable. The record before this Court does not support a finding that the prosecution's alleged misconduct affected the fairness of petitioner's trial.

Consequently, the Tennessee Supreme Court's decision to deny petitioner relief on his claim that the prosecutor implied petitioner may be paroled if given a life sentence was neither contrary to, nor an unreasonable application of, federal law; nor has petitioner demonstrated the state court decision was based on an unreasonable determination of the facts before it. Accordingly, petitioner's claim of prosecutorial misconduct on the basis of this argument will be **DISMISSED**.


Now the Court turns to petitioner's claim of prosecutorial misconduct on the theory that the prosecutor brandished the 2 x 4 board claimed to be the murder weapon in this case.

Petitioner inserts a claim that the prosecutor picked up the 2 x 4 that was allegedly used to assault the victim and brandished it in a chopping manner which he claims prejudiced the jury against him. Petitioner has failed to direct the Court's attention to the location in the transcript describing this incident and the Court is unable to find any reference to this incident in the transcript.

The State argues that although the claim was raised on direct appeal, petitioner failed to raise an objection during the State's closing argument, thus it is procedurally defaulted. Furthermore, according to the State, the Tennessee Supreme Court was precluded from considering the issue as a result of the inadequate appellate record.

151

The Court has found nothing in this voluminous record that reflects the prosecutor brandished the alleged weapon used by petitioner to kill the victim during closing argument. However, assuming this incident did happen, petitioner has not demonstrated that the prosecutor's alleged behavior so infected the trial with unfairness as to make the resulting conviction a denial of due process. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). There is no evidence in the record indicating the prosecutor's alleged action of brandishing the alleged murder weapon, taken in the context of the trial as a whole, was sufficiently prejudicial to have deprived petitioner of his right to a fair trial. Accordingly, petitioner is not entitled to any habeas relief on this claim.

12. **Change of Venue (Claim 19)**

Petitioner claims his constitutional rights were violated when the trial court granted his motion for change of venue and ordered a Sumner County jury to hear the case in Hamilton County. Respondent contends this claim is not cognizable in a federal habeas proceeding because the vicinage clause of the Sixth Amendment is not applicable to the State through the Fourteenth Amendment.

The Tennessee Supreme Court determined that when petitioner filed a motion for a change of venue, he waived his rights under Article I, § 9, of the Tennessee Constitution. The state court concluded the change of venue motion constituted a waiver and unless petitioner is prejudiced, the administration of justice harmed, or the trial court abused its discretion, then no reversible error

152

occurred when a trial court judge employs the unorthodox procedure of ordering an out-of-county jury to hear the case in Hamilton County.[39]  In petitioner's case the court found no reversible error.

Assuming petitioner's concluding sentence on direct appeal properly presented this claim as a constitutional claim,[40] he is not entitled to any habeas relief.  This is so because the Sixth Amendment guarantees a defendant the right to a trial by an impartial jury.  U.S. Const. Amend. VI.  This fair-trial right is effectuated by impaneling a jury of impartial, "indifferent" jurors who render a verdict based on evidence adduced at the trial.  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  Petitioner is not claiming that he did not receive an impartial jury but rather, his impartial jury was

---

[39]     The Court explained:

> Here, the trial judge attempted to solve the problem of possible taint to the jury pool from the extensive pretrial publicity that surrounded this case and the other charges against the defendant.  The trial judge was, at the same time, commendably concerned that, if the trial were held in a distant county, the defendant's family and others would be prevented from attending.  The decision to undergo the expense and disruption of moving the jury, rather than local witnesses and other interested persons, was obviously designed to meet the core complaint of the defendant's motion.  There is no showing by the defendant that prejudice resulted from bringing a jury from Sumner County to try a his case in Hamilton County.

> We conclude that in this particular case the procedure used by the trial judge was not reversible error.

*State v. Nichols*, 877 S.W.2d 722, 728-29 (Tenn. 1994).

[40]          "The unprecedented trial method present in this case is not permitted under the Tennessee Constitution, the Tennessee Rules of Criminal Procedure or the case law of Tennessee.  The two changes of venue which occurred here violated the Defendant's rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution . . . ."

[Court File No. 50, Addendum No. 6, Vol. 1, pp. 41-42]

selected from Sumner County and transported to Hamilton County for trial. This is not a claim of constitutional dimensions. The Sixth Circuit has determined that "districts," as used in the Sixth Amendment, refers only to federal judicial districts and has never been defined to apply to states. *See Caudill v. Scott*, 857 F.2d 344 (6th Cir. 1988). "Technically, the Sixth Amendment addresses only 'vicinage' (the place from which jurors are to be selected) rather than venue." *United States v. Wood*, 364 F.3d 704, 721 fn. 2, (6th Cir. 2004). Although the Court observes that the requirement that a jury be chosen from the state and district where the crime was committed normally means that the jury will sit where it is chosen, once petitioner filed a motion for a change of venue, he relinquished any right to be tried by a jury from the district where the crime occurred. There is no provision in the Constitution mandating a trial in the county where the jury is selected. Petitioner has not demonstrated that he was denied a constitutional right when the trial judge granted his motion for a change of venue and ordered a Sumner County jury to try the case in Hamilton County, where the crime was committed.

Accordingly, petitioner has not demonstrated that the state court unreasonably determined the facts or unreasonably applied the governing legal principles of clearly established federal law to the facts of this case. Additionally, petitioner has not shown that the state court acted contrary to clearly established federal law by applying a legal rule that contradicts the Supreme Court's prior holdings or that the state court reached a different result from one of the Supreme Court's cases despite confronting indistinguishable facts. Therefore, petitioner is not entitled to any habeas relief on his change of venue claim.

### 13. Unconstitutional Jury Instructions (Claim 21)

Petitioner contends his death sentence violates his constitutional rights because his jury was provided unconstitutional and statutorily inadequate jury instructions. Petitioner raises several claims which the Court will address individually.

### a.     <u>Reasonable Doubt Jury Instruction (Claim 21.a)</u>

Petitioner asserts that the trial court failed to properly instruct the jury as to the definition of reasonable doubt. Petitioner contends the instruction permitted a reasonable juror to interpret the instruction to permit a finding of guilt based upon a degree of proof below that required by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Petitioner contends the state court equated the requisite degree of proof to such proof as would allow the mind to rest easily upon the certainty of the juror's verdict and to a moral certainty rather than to an evidentiary certainty.

On direct appeal the Tennessee Supreme Court determined that, unlike the unconstitutional instruction in *Cage v. Louisiana*, 498 U.S. 39 (1990), which equated reasonable doubt with "grave uncertainty" or "actual substantial doubt," the instant instruction used the phrase "moral certainty" by itself and was, therefore, insufficient to invalidate an instruction on the meaning of reasonable doubt. The court observed that the *Cage* instruction required the jury to have an extremely high degree of doubt before acquitting a defendant, but the petitioner's instruction did not require "grave uncertainty" to support acquittal. The Tennessee Supreme Court reasoned:

> When considered in conjunction with an instruction that "[r]easonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the investigation, to let the mind rest easily upon the certainty of your verdict," we find that the instruction properly reflects the evidentiary certainty required by the "due process" clause of the federal constitution and the "law of the land" provision in our state constitution. . . . The context in which the instruction was given clearly conveyed the jury's responsibility to decide the verdict based on the facts and the law.

*State v. Nichols*, 877 S.W.2d 722, 734 (1994).

Petitioner's reliance on *Cage* must be viewed in light of subsequent Supreme Court precedent. Specifically, the Supreme Court has disapproved of the standard of review language in *Cage* and has concluded that the correct standard is, "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the constitution.'" *See Estelle v. McGuire,* 502 U.S. 62, 72 (1991) (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)). To obtain habeas relief, petitioner must demonstrate the alleged incorrect jury instruction was more than undesirable, erroneous, or universally condemned, but rather, that taken as a whole, the instruction must be so infirm that it rendered the entire trial fundamentally unfair. *Estelle v. McGuire*, 502 U.S. at 72. Therefore, "only if 'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,'" will petitioner be granted habeas relief. *Baze v. Parker*, 371 F.3d 310, 327 (6th Cir. 2004) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)), *cert. denied*, 125 S.Ct. 1670 (2005).

Petitioner's jury received the following reasonable doubt instruction:

The burden of proof is upon the State to prove any statutory aggravating circumstance or circumstances beyond a reasonable doubt and to a moral certainty.

Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of your verdict. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty is not demanded by the law, but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the verdict. The law makes you, the jury the sole and exclusive judges of the credibility of the witnesses and the weight to be given to the evidence.

Nichols contends that in *Cage v. Louisiana*, 498 U.S. 39, 41 (1990) (per curiam), the United States Supreme Court held that such an instruction was unconstitutional because it allowed the jury to find guilt based on a degree of proof below that required by the Constitution. A "moral certainty"

156

suggested jurors needed an "actual substantial doubt" or a grave uncertainty, instead of "a reasonable doubt" to acquit, rather than a "evidentiary certainty." (*Cf. Austin v. Bell*, 126 F.3d 843, 847 (6th Cir. 1997), *cert. denied*, 523 U.S. 1079(1998)). Petitioner's contention is devoid of merit because the instruction in *Cage* specifically instructed that a reasonable doubt is an actual substantial doubt and the doubt must rise to a grave uncertainty. The instruction in *Cage* was substantially different from the petitioner's claim before this Court. The United States Supreme Court explained,

> The instruction equated a reasonable doubt with a "grave uncertainty" and an "actual substantial doubt," and stated that what was required was a "moral certainty" that the defendant was guilty. It is plain to us that the words "substantial" and "grave," as they are commonly understood, suggest a higher degree of doubt that is required for acquittal under the reasonable-doubt standard. When those statements are then considered with the reference to "moral certainty," rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.

*Cage v. Louisiana*, 498 U.S. at 40-41.

Petitioner asserts Tennessee's reasonable doubt instruction given in this case has been held to be constitutionally defective under *Cage v. Louisiana*, 498 U.S. 39 (1990) and *Victor v. Nebraska*, 511 U.S. 1 (1994). Petitioner relies upon the case of *Rickman v. Dutton*, 864 F. Supp. 686, 708-10 (M.D. Tenn. 1994), wherein District Judge Nixon determined "the 'moral certainty' language in conjunction with the 'mind rest easily' language suggests to a reasonable juror a lower burden of proof than what is constitutionally required." *Rickman v. Dutton*, 864 F.Supp. at 710. Although *Rickman* was affirmed on appeal, the Court of Appeals for the Sixth Circuit observed that both parties advanced numerous issues on appeal but concluded only one issue was necessary to resolve the appeal. The Sixth Circuit determined only that the district court correctly found Rickman to

have been unconstitutionally denied effective assistance of counsel under the Sixth Amendment. *See Rickman v. Bell*, 131 F.3d 1150, 1152 (6th Cir. 1997), *cert. denied,* 523 U.S. 1133 (1998).

Petitioner's reliance on *Rickman* is, therefore, misplaced as it is not clearly established Supreme Court jurisprudence. This Court must only look to holdings of the United States Supreme Court when determining whether a state court decision is contrary to or an unreasonable application of Supreme Court law. The *Rickman* case is not clearly established Supreme Court precedent; thus, it does not provide grounds to grant habeas relief. In addition, there are Sixth Circuit cases decided after *Rickman* finding Tennessee's reasonable doubt instruction acceptable.

The constitutionality of Tennessee's reasonable doubt instruction has been approved by *Austin v. Bell*, 126 F.3d 843, 847 (6th Cir. 1997), *cert. denied*, 118 S.Ct. 1526 (1998). Although *Austin* was applying the prior version of 28 U.S.C. § 2254, rather than the "contrary to or unreasonable application" standards, its analysis is valid.

*Austin* reviewed a habeas petition where the trial court instructed the jury as follows:

Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability after such investigation to let the mind rest easily upon the certainty of guilt. Reasonable doubt does not mean a doubt that my arise from possibility. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the offense.

*Austin v. Bell*, 126 F.3d at 846. This instruction is almost identical to the instruction issued in petitioner's case. *Austin* upheld the instruction, citing *Victor v. Nebraska*, 511 U.S. 1 (1994).

In *Victor v. Nebraska*, the Supreme Court held that use of the term "moral certainty" does not, of itself, render a "reasonable doubt" instruction unconstitutional. The phrase "moral certainty" is constitutionally permissible where the rest of the instruction "lends content to the phrase," and

158

indicates the government's proper burden of proof. *Austin v. Bell*, 126 F.3d at 847 (citations omitted). In particular, the court held that:

> The reasonable doubt instruction in this case is more like the acceptable language in *Victor* than the unacceptable language in *Cage*. The language of an "inability to let the mind rest easily" lends content to the phrase "moral certainty" similar to the "abiding conviction" language in *Victor*, increasing, if anything, the prosecutor's burden of proof. It also does not create a reasonable likelihood that the jury applied the instruction in a way that would lower the state's burden of proof because it does not increase the measure of doubt beyond a "reasonable doubt."

*Id.* Since *Austin,* the Sixth Circuit has upheld virtually identical instructions for both the guilt and sentencing phases in other Tennessee death penalty cases. *See Workman v. Bell*, 178 F.3d 759, 776-777 (6th Cir. 1998), *cert. denied*, 1999 WL 624390 (Oct. 4, 1999); *Coe v. Bell*, 161 F.3d 320, 329, *cert. denied*, 1999 WL 373745 (Oct. 4, 1999); *Cone v. Bell*, 243 F.3d 961, 971-72 (6th Cir. 2001); *also see King v. Bell,* 392 F.Supp.2d 964 (M.D. Tenn. 2005).

In evaluating the instant reasonable doubt jury instruction, this Court observes that the Due Process Clause requires that the instruction not lead a jury to convict on a lesser showing than "reasonable doubt" and, that when taken as a whole, the instruction must adequately convey the concept of reasonable doubt. The jury in the instant case was instructed that the State must prove any statutory aggravating circumstance(s) beyond a reasonable doubt and to a moral certainty. Taken as a whole, the instruction informed the jury that it could convict only if the prosecution established any statutory aggravating circumstances beyond a reasonable doubt and that decision had to be based on a careful examination of all the proof. The instruction explained the term "moral certainty," and the language of "an inability, after such investigation, to let the mind rest easily," lends content to the "moral certainty" praise, thus, indicating the State's proper burden of proof. *See Workman v. Bell*, 178 F.3d at 776-666. The instruction does not create a reasonable likelihood that

159

the jury applied the challenged instruction in a way that would lower the State's burden of proof.

Accordingly, the state court's decision approving this instruction is not contrary to, nor an unreasonable application of, clearly established Supreme Court jurisprudence under *Cage, Estelle,* or *Victor*, and is without merit. Petitioner's claim that the reasonable doubt jury instruction was unconstitutional will be **DISMISSED**.

### b.  Presumption of No Aggravating Circumstance ( Claim 21.b)

Petitioner complains the trial court failed to instruct the jury that it must presume there are no aggravating circumstances. The Tennessee Supreme Court observed that the trial court instructed the jury it must determine the existence of any aggravating circumstance beyond a reasonable doubt, and that this instruction clearly implied no aggravating circumstance could be presumed.

This Court has not been made aware of any authority that there is a constitutional requirement for a "no aggravating circumstances" presumption. Petitioner has not demonstrated that the Tennessee Supreme Court's decision was contrary to, or involved an unreasonable application of, clearly established federal law. Accordingly, petitioner is entitled to no relief on his claim that the trial court failed to instruct the jury as to a presumption that there are no aggravating circumstances. This claim will be **DISMISSED**.

### c.  Non-Statutory Mitigating Factors (Claim 21.c)

Petitioner asserts he was denied his Eighth Amendment right to an individualized sentencing by the trial court's failure to instruct the jury on non-statutory mitigating factors. The Tennessee Supreme Court determined that the trial court's mitigating instructions were constitutional. The trial court instructed the jury on three statutory mitigating factors and instructed the jury to consider

160

"[a]ny other mitigating factor which is raised by the evidence produced by either the prosecution or defense" [Court File No. 43, Addendum No. 5, Vol. 24, at 579-80].

On direct appeal, petitioner asserted the trial court instructed the jury on three statutory mitigating factors, leaving the other mitigating factors to the jury's recollection, in violation of *Lockett v. Ohio*, 438 U.S. 586 (1978). In *Lockett*, the death penalty statute mandated death unless at least one of three statutory mitigating factors was found to exist. The United States Supreme Court held that "[t]o meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors." *Id.* at 608. Unlike the situation in *Lockett*, the trial court instructed petitioner's jury on three specific statutory mitigating factors and directed them to consider "[a]ny other mitigating factor which is raised by the evidence . . . ." [Court File No. 43, Addendum No. 5, Vol. 24, at 580].

The Tennessee Supreme Court observed that petitioner, although given the opportunity to offer specific jury instructions, did not submit any specific mitigating circumstances to be charged to the jury. Thus, the state court concluded the trial court's instruction to consider any other mitigating evidence in the record complied with *Lockett*. The state court's conclusion is not opposite to *Lockett* nor did the state court unreasonably apply the *Lockett* principles to the facts of petitioner's case. Accordingly, petitioner's claim that the trial court failed to instruct the jury on non-statutory mitigating circumstances will be **DISMISSED**.

### d. Unanimous Finding of Mitigating Circumstances (Claim 21.d)

Petitioner presents a confusing claim regarding jury instructions on mitigating circumstances. First, petitioner contends "[t]he trial court failed to properly instruct the jury as to the unanimity required as to mitigating factors." Then, petitioner claims that a reasonable interpretation of the

161

instructions provided to the jury by the trial court is that the jurors would have to reach a unanimous verdict on mitigating circumstance(s) before such circumstance(s) could be weighed against any aggravating circumstance(s) found by the jury. On direct appeal the Tennessee Supreme Court summarily found "[t]his contention without merit." *State v. Nichols*, 877 S.W.2d at 735.

Sentencing instructions which create a substantial likelihood that reasonable jurors might think they are precluded from considering any mitigating evidence unless all jurors agreed on the existence of a particular mitigating circumstance are constitutionally invalid. *Mills v. Maryland*, 486 U.S. 367, 384 (1988). In *McKoy v. North Carolina*, 494 U.S. 433 (1990), the Supreme Court found that the instructions and verdict form which expressly limited the jury's consideration to mitigating circumstances unanimously found, impermissibly limited the jurors' consideration of mitigating evidence.

Contrary to petitioner's assertion, the trial court's instructions did not lead the jury to believe they were precluded from considering any mitigating evidence in the absence of unanimity [Court File No. 43, Addendum No. 5, Vol. 24, Jury Charge at 570-592]. Under the instructions, petitioner's jury was instructed to first determine the aggravating circumstances beyond a reasonable doubt and upon a unanimous finding of the existence of one or more statutory aggravating circumstances to consider any relevant mitigating circumstances. The jury was then instructed that if they unanimously determined that at least one or more statutory aggravating circumstances have been proven by the State, beyond a reasonable doubt, and said circumstance(s) outweighed any mitigating circumstance(s), the sentence shall be death [Court File No. 43, Addendum No. 5, Vol. 24, at 583-587; 589-591]. In the present case, unlike the jury instructions in *Mills* where the jury was instructed they were required to impose the death sentence if they unanimously found a aggravating

162

circumstance but could not agree unanimously as to the existence of any particular mitigating circumstance, or *McKoy*, where the jury was limited to considering only mitigating circumstances unanimously found, there was no instruction that petitioner's jury must agree upon the existence of mitigating circumstances.

The instant instructions required unanimity as it related to aggravating circumstances, but did not require unanimity as it related to mitigating circumstances. Therefore, the "only reasonable reading of the instructions is that, by omission, unanimity is not required" as to the mitigating factors and the instruction is, therefore, constitutional. *Coe v. Bell*, 161 F.3d 320, 338 (6th Cir. 1998), *cert. denied*, 528 U.S. 842 (1999). The unanimity in petitioner's jury instructions refers to the finding of the statutory aggravating circumstance, weighing process, and a unanimous verdict but only if the jurors unanimously agree on a verdict. The instructions direct unanimity as to the results of weighing, but not unanimity as to the finding of a mitigating circumstance. The instructions required the jury to unanimously find the statutory aggravating circumstance(s) outweighed the mitigating circumstance(s) to sentence petitioner to death, or to unanimously find the statutory aggravating circumstance(s), if so found, did not outweigh the mitigating circumstance(s) to sentence petitioner to life [Court File No. 43, Addendum No. 5, Vol. 24, at 586-587; 589-591]. A unanimity instruction that refers to the process of weighing aggravating circumstances against mitigating factors – as opposed to a unanimity instruction referring to the process of finding or considering a mitigating factor – is acceptable. *Coe v. Bell*, 161 F.3d at 338; *see also Williams v. Coyle*, 260 F.3d 684, 702 (6th Cir. 2001) (jury instruction that did not require unanimity as to the existence of a mitigating circumstance(s) but only required unanimity as to the question of whether the aggravating circumstances as a whole outweighed the mitigating circumstances as a whole does

not violate clearly established federal law). The jury instructions given in petitioner's case did not require unanimity as to the presence of a mitigating factor.

Petitioner has neither demonstrated that the state court decision was contrary to, or an unreasonable application of, federal law, nor an unreasonable determination of the facts. Thus, petitioner's claim that the jury was instructed that unanimity was required to find a mitigating circumstance will be **DISMISSED**.

e. <u>Elements of Underlying Felony Aggravating Circumstance (Claim 21.e)</u>[41]

Petitioner presents another claim regarding jury instructions. In this claim, petitioner contends the trial court failed to charge the jury as to the elements of the crime of rape, but rather charged the jury as to the elements of aggravated rape – which did not contain a definition of rape – and the elements of burglary. Petitioner maintains that the offenses of aggravated rape and burglary did not relate to the statutory aggravating circumstances which were charged by the State, and that the trial court's instructions to the jury respecting these two crimes would only serve to confuse the jury and lead them to believe that they could consider aggravating circumstances which the State had not charged.

---

[41] Petitioner has recently notified the Court that since Dr. Blake reported to the state trial court conducting the post-conviction DNA proceedings that new scientific testing reveals that petitioner is identified as the source of the spermatozoa from the victim's gown, he moves to withdraw his *Schlup* gateway arguments with respect to Claim 21(e).

164

To clarify petitioner's claim, the Court observes the State relied upon the aggravating circumstance that the murder was committed while petitioner was committing a rape. Although the trial court failed to instruct the jury on the statutory definition of rape, it did instruct the jury on the elements of aggravated rape in connection with its instruction on felony murder.

The Tennessee Supreme Court observed that it is generally harmless error for the court to simply fail to repeat a definition already given and the court determined "that to be the case here." *State v. Nichols*, 877 S.W.2d at 735.

The first degree murder instruction identified the essential elements of the offense and instructed the jury that the petitioner unlawfully killed the victim during the perpetration of or attempt to perpetrate rape and petitioner intended to commit rape. Next, the trial judge instructed the jury on the elements of aggravated rape and first degree burglary. The aggravated rape instruction included the element of rape when it instructed that one of the essential elements of the offense was that petitioner had unlawful sexual penetration of the alleged victim and the instruction included a definition of sexual penetration [Court File No. 43, Addendum No.5, Vol. 24, at 575-76]. In addition, petitioner pleaded guilty to the aggravated rape of the victim which necessarily means he pleaded guilty to raping the victim [Court File No. 41, Addendum No. 5, Vol. 21, at 14-15].

The Eighth Amendment does not require the trial court to restate the elements of any underlying felonies advanced as aggravating circumstances at the sentencing phase where the same jury remains impaneled during the guilt and the sentencing phase and the sentencing phase closely follows the guilt phase. *See Carter v. Bell*, 218 F.3d 581, 604 (6th Cir. 2000). The fact that petitioner pleaded guilty to the underlying felony of aggravated rape appears to resolve this controversy. However, the fact that the Tennessee Supreme Court found the use of this aggravating

165

circumstance unconstitutional but found the death sentence was supported by the petitioner's previous convictions for more than one felony involving violence does in fact, resolve this claim. Accordingly, petitioner is not entitled to any habeas relief on his claim that the trial judge failed to instruct the jury on the elements of rape and this claim will be **DISMISSED**.

### f. Failure of Trial Court to Instruct the Jury of its Role as Both Trier of Fact and Law (Claim 21.f)[42]

Petitioner contends the trial court failed to instruct the jury of its role as both trier of fact and law. Petitioner complains that the trial judge instructed the jury that the court was the proper source from which they were to receive the law. This was inadequate, according to petitioner, because it failed to advise the jury that the judge was merely a witness to the jury as to what the law is and that if the jury differed with the court as to the law, the jury had a right to disregard the court's instruction on the law.

Petitioner raised this claim on direct appeal on the basis of state law and as a state constitutional violation. However, assuming without deciding that petitioner has not procedurally defaulted this claim, or if he has, that he can show cause and prejudice, the claim is without merit because the judge gave the following instruction:

> The jury are the sole judges of the facts, and of the law as it applies to the facts in the case. In making up your verdict, you are to consider the law in connection with the facts; but the Court is the proper source from which you are to get the law. In other words, you are the judges of the law as well as the facts under the direction of the court.

[Court File No. 43, Addendum No. 5, Vol. 24, at 577-578].

---

[42] Petitioner has recently notified the Court that since Dr. Blake reported to the state trial court conducting the post-conviction DNA proceedings that new scientific testing reveals that petitioner is identified as the source of the spermatozoa from the victim's gown, he moves to withdraw his *Schlup* gateway arguments with respect to Claim 21(f).

In addition to being incorrect that the trial court failed to instruct the jury on its role as the judge of the law and facts, petitioner has failed to demonstrate, much less allege, that the state court decision was contrary to, or based on an unreasonable application of, federal law. Consequently, this claim is procedurally defaulted and absent a showing of cause and prejudice it will be **DISMISSED**. As a alternative, the claim is **DISMISSED** because the state court gave the instruction and the decision of the state court was not contrary to, nor an unreasonable application of, federal law.

### g.    Failure to Re-instruct Jury on Mitigating Circumstances (Claim 21.g)

This claim was addressed previously in this memorandum opinion under section 8 *supra*, at 107-110.

### h.    Cumulative Error (Claim 21.h)

Petitioner claims that the cumulative error of all the alleged erroneous jury instructions render petitioner's sentencing hearing fundamentally unfair in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Contrary to petitioner's claim that he raised this claim on direct appeal and it was denied on the merits, the Court finds that the cumulative error claim was neither raised nor denied on the merits. The sentence that "[i]ndividually and combined, these errors not only warrant but require reversal of the sentence in this case[,]" in the body of the claim that the jury instructions were unconstitutional, arguably does not constitute full exhaustion.[43]    Indeed, the Supreme Court of Tennessee did not determine that the sentence

---

[43]    It appears that petitioner concedes his procedural default of this claim as he has notified the Court that since Dr. Blake reported to the state trial court conducting the post-conviction DNA proceedings that new scientific testing reveals that petitioner is identified as the source of the spermatozoa from the victim's gown, he moves to withdraw his *Schlup* gateway arguments with respect to this claim.

constituted a cumulative error claim, and they did not address such a claim. Nevertheless, the Tennessee Supreme Court summarized its findings in relation to all the challenged jury instructions by finding no reversible error. This Court concludes that the state court's finding of no reversible error as to any of the challenged jury instructions was not contrary to, nor an unreasonable application of, federal law, and necessarily results in this claim being **DISMISSED**.

### 14. Videotaped Confession Evidence (Claim 22)

Next petitioner presents a claim alleging his constitutional rights were violated when the trial court admitted into evidence his videotaped confession. According to petitioner, the statement was taken after he was refused counsel and under coercive circumstances, rendering the confession untrustworthy. Petitioner also argues the statement was irrelevant as to the issues before the jury during the penalty phase.

The Tennessee Supreme Court observed that Tenn. Code Ann. § 39-13-204(c) permits, at a sentencing hearing, "evidence . . . as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances . . . and any evidence tending to establish or rebut any mitigating factors." The court concluded that a description of the crime and its circumstances was admissible and since the petitioner pleaded guilty, the sentencing jury lacked any information about the offense absent the videotaped confession which the court determined was admissible. Relying upon *Zant v. Stephens*, 462 U.S. 862, 879 (1983), for the proposition that an individualized sentencing determination based on the defendant's character and the circumstances of the crime is constitutionally required, the Tennessee Supreme Court found the trial court permitted the

168

introduction of evidence tending to individualize the case for the jury and limited the evidence to testimony relevant to the crime; thus, there was no error.

In addition, the state court found Nichols' confession was not obtained in violation of his Fifth Amendment right not to incriminate himself because there was ample evidence to support the trial court's finding that the confession was voluntary. The Supreme Court of Tennessee found that the arresting officers read *Miranda* warnings to petitioner who signed a written waiver of those rights. The officers disputed petitioner's claim that he requested an attorney and that they coerced him into making a statement, and the record supported the trial judge's decision crediting the testimony of the officers. The videotaped confession revealed the interrogating officer read petitioner his *Miranda* warnings and petitioner waived those rights; therefore, the court found that the record supported the court's finding that the confession was voluntary, and therefore, admissible. The Supreme Court of Tennessee also concluded the videotaped confession was properly admitted because it was relevant to sentencing since it included a full description of the nature and circumstances of the crime. *State v. Nichols*, 877 S.W.2d at 731-32.

Petitioner was taken into custody by officers of the East Ridge Police Department during the evening of January 5, 1989. Petitioner was placed in a room at the East Ridge Police Station with numerous law enforcement officers from several police jurisdictions. It was during that questioning that petitioner allegedly requested an attorney. The questioning at that time did not pertain to the instant crimes. On January 6, 1989, at approximately 8:00 p.m. petitioner agreed to speak with Detective Richard Heck and was taken to the Chattanooga Police Department where he eventually gave a videotaped statement concerning the instant crime. There is no allegation that petitioner invoked his right to counsel while speaking with Detective Heck, consequently, there is no evidence

169

that the videotaped confession was taken after he invoked his right to counsel to Detective Heck or under coercive circumstances.

The transcript from the suppression hearing in petitioner's other rape cases along with his taped confession in this case does not demonstrate his statement is untrustworthy, unconstitutional, or taken under coercive circumstances. A review of the record in this case demonstrates the trial judge's decision to deny the motion to suppress the confession was based on sufficient evidence. Petitioner confessed to the police that he committed the instant crimes after he had been arrested on other charges. The police officers testified they did not hear petitioner request an attorney in their presence.

At the hearing on the motion to suppress, the trial court heard two different accounts of what transpired after defendant's arrest [Court File No. 48, Addendum No. 5, Vol. 9, at 1-150; Court File No. 49, Addendum No. 5, Vol. 10, at 151-57]. Petitioner testified he told Officer Holland and Officer Turner of the East Ridge Police Department that he wanted to stop the interview until he spoke with an attorney. Their alleged response was that if they had to wait for an attorney they would have to get search warrants; to get search warrants they would have to wake a judge who would not be too happy being woken up in the middle of the night; and it would just be easier to cooperate with them. At that time, the questioning continued [Court File No. 38, Addendum No. 5, Vol. 9, at 11-12]. On cross-examination, petitioner confirmed that at 11:23 p.m., while at the East Ridge Police Department, he signed the waiver form waiving his constitutional rights and agreeing to give a statement, but petitioner testified he did so only after he was denied counsel [*Id.* at 31]. The next day at approximately 8:00 or 8:30, petitioner signed a rights waiver for Detective Heck, the detective investigating the instant case. Petitioner initialed next to each right to

170

acknowledge he understood each right he was waiving [*Id*. at 42-44]. Petitioner signed six separate rights forms waiving his rights after he allegedly requested counsel [*Id*. at 47]. In addition, he agreed to go to Erlanger Hospital and provide blood and hair samples; he agreed to ride around and look at the places where the rape victims lived; and petitioner signed a consent for law enforcement to search his residence and car [*Id.* at 47-54].

Detective Sergeant Dyer of the Red Bank Police Department testified he was present the night of petitioner's arrest where the *Miranda* warnings were orally given to petitioner while he was standing in front of a tree being handcuffed. Detective Sergeant Dyer also observed petitioner signing the rights waiver at the police department [Court File No. 38, Addendum No. 5, Vol. 9, at 63-64]. Detective Sergeant Dyer had no knowledge of petitioner asking for an attorney [*Id*., at 67].

Detective Captain Holland testified they left headquarters at 11:00 p.m. in route to petitioner's residence [*Id*. at 97]. According to Detective Captain Holland, at no time did petitioner request counsel in Detective Captain Holland's presence [Court File No. 38, Addendum No. 5, Vol. 9, at 100-101]. After petitioner signed his rights waiver at 11:23 p.m., Detective Captain Holland talked to petitioner about the East Ridge rape cases, and at 12:47 a.m. on January 6th he turned the tape recorder on, introduced other law enforcement officials who subsequently left, leaving petitioner in the room with Detective Captain Holland and Detective Heck, the detective in charge of the instant case [*Id*. at 106-107].

The trial judge concluded petitioner was not telling the truth and that he in fact, did not ask for an attorney and his confession was not coerced. The trial judge denied the motion to suppress in an oral opinion that is free of constitutional error on this issue [Court File No. 39, Addendum 5, Vol. 10, at 151-53]. The trial judge's credibility findings are supported by the record. Petitioner

signed numerous waivers which included waiving his right to counsel and the trial judge believed

the testimony of the police officers over that of petitioner. The record supports the trial judge's

denial of petitioner's motion to suppress his videotaped confession. The state court's decision was

not contrary to, or an unreasonable application of, clearly established Supreme Court law; nor was

it based on an unreasonable determination of the facts presented in state court.

As to the claim that the videotaped confession was irrelevant to the issues before the jury

during the penalty phase, petitioner is simply incorrect. The state code provided that,

> In the sentencing proceeding, evidence may be presented as to any matter that the
> court deems relevant to the punishment and may include, but not be limited to, the
> nature and circumstances of the crime; the defendant's character, background
> history, and physical condition; any evidence tending to establish or rebut the
> aggravating circumstances . . .; and any evidence tending to establish or rebut any
> mitigating factors. Any such evidence which the court deems to have probative
> value on the issue of punishment may be received regardless of its admissibility
> under the rules of evidence; provided, that the defendant is accorded a fair
> opportunity to rebut any hearsay statements so admitted. . . .

Tenn. Code Ann. § 39-2-203(c) (1988); Tenn. Code Ann. § 39-13-203 (c) [Effective November 1,

1989].

Therefore, the state court's decision that the petitioner's videotaped confession was relevant

to sentencing because it established the nature and circumstances of the offense and that petitioner's

confession was knowingly and voluntarily given after the defendant was advised of, and waived his

constitutional rights, was not based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceeding. In addition, the adjudication of the claim did not

result in a decision that was contrary to, or involved an unreasonable application of, clearly

established federal law.

172

Accordingly, petitioner is not entitled to any habeas relief on his claim that the trial court erred when it admitted, into evidence, petitioner's videotaped confession which will result in this claim being **DISMISSED**.

15. **Chronological Order of Trials (Claim 23) and Prior Convictions (Claim28)**

Petitioner has raised two somewhat related claims which the Court will address in this section. First, petitioner challenges the order of his trials (Claim 23). Second, petitioner challenges the use of the prior convictions as an aggravating circumstance claiming they were not final convictions because final judgments had not been entered (Claim 28). The Court will address these claims separately in this section.

a. **Chronological Order (Claim 23)**

Petitioner alleges his Equal Protection and Due Process Rights were violated when his murder trial was conducted out of chronological order. The murder of the victim in the instant case occurred on September 29, 1988, sometime prior to the other felonies which were used as aggravating circumstances in this case. Petitioner contends the trial court erred when it denied his motion to try the cases in chronological order (based on the time they were committed ), and instead, scheduled petitioner's trials out of chronological order in order to provide the prosecutor with the evidence of additional aggravating circumstances in the death penalty trial. Petitioner maintains the prosecutor was permitted to create an additional aggravating circumstance to support his request for the death penalty, and the prosecutor's discretion was exercised in a way which led to an arbitrary and capricious imposition of the death penalty.

173

This claim was exhausted in the Tennessee Supreme Court on direct appeal as a violation of *Furman v. Georgia*, 408 U.S. 238 (1972). The Tennessee Supreme Court summarized the facts surrounding this claim as follows:

> As a result of the serial rapes, the defendant faced forty charges growing out of some fourteen incidents. The murder of Karen Pulley occurred during the first such incident. The trial court denied defendant's motion to have the cases tried in chronological order. The defendant alleges that the prosecutor deliberately set out to try the cases out of chronological order solely to create an additional aggravating circumstance. The district attorney admitted that this was one reason for the order in which the cases were scheduled to be tried. The defendant contends that allowing a prosecutor the discretion "to orchestrate a series of trial" in this fashion constitutes cruel and unusual punishment and violates due process and equal protection.

*State v. Nichols*, 877 S.W. 2d at 735-36.

The court determined that for purposes of the aggravating circumstance, the order in which the crimes were actually committed is irrelevant so long as the convictions have been entered before the sentencing hearing at which they were introduced. The Tennessee Supreme Court supported its conclusion with two state cases, *State v. Caldwell*, 671 S.W.2d 459, 464-465 (Tenn. 1984); *cf. State v. Teague*, 680 S.W. 2d 785, 790 (Tenn. 1984) (conviction occurring after first capital sentencing hearing but before sentencing hearing on remand could be used to establish the prior violent felony conviction aggravating circumstance). The state court found that prosecutorial discretion of this nature and under these circumstances did not offend the Eighth Amendment under *Furman* which held:

> [I]n order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the criminal.

*State v. Nichols*, 877 S.W. 2d at 736 (quoting *Gregg v. Georgia*, 428 U.S. 153, 199 (1976), *citing Furman v. Georgia*, 408 U.S. 238 (1972)). The Tennessee Supreme Court also noted that where this

174

discretion is involved what is unexplained will not be found to be invidious and an abuse of discretion unless the proof is exceptionally clear that abuse occurred. *Id.*, *citing McCleskey v. Kemp*, 481 U.S. 279, 299, 309 (1987). The Tennessee Supreme Court concluded no such showing was made and that the record did not reflect that the prosecutor's decision to try the crimes out of chronological order violated equal protection or due process.

Under Tennessee law, the language in the statute, "previously convicted," has been defined as clearly indicating that the date of conviction, not the date of the commission of the crime, is the important factor. "The order in which the crimes were actually committed is irrelevant, as long as the convictions have been entered before the sentencing hearing at which they are introduced." *State v. Copeland*, 2005 WL 2008177, *23 (Tenn.Crim.App. 2005), *citing State v. Caldwell*, 671 S.W. 2d 459, 465 (Tenn.), *cert. denied*, 469 U.S. 873 (1984). Tennessee law requires that the State prove prior criminal convictions, not prior criminal activity.

Although petitioner claims the prosecutor's decision to try the cases out of chronological order was done so as to create an aggravating circumstance of prior violent felony convictions, violating his right to equal protection and due process, petitioner has not pointed to a United States Supreme Court case which holds that it is unconstitutional for a prosecutor to try cases out of chronological order for the purpose of obtaining evidence for the prior felony aggravating circumstance for a death penalty trial. In *Tuilaepa v. California*, 512 U.S. 967 (1994), the Supreme Court did find that states are permitted to focus the jury's attention on a capital defendant's prior criminal record. The issue in *Tuilaepa* was the constitutionality of an aggravating circumstance which permitted the sentencer to consider the defendant's prior criminal activity. Although the challenge was based on the allegation that the circumstance was unconstitutionally vague, the

175

Supreme Court explained that the circumstance rested in part on a determination whether certain events occurred, thus requiring the jury to consider matters of historical fact. The *Tuilaepa* Court pointed out that "[b]oth a backward-looking and a forward-looking inquiry are a permissible part of the sentencing process" and states have considerable latitude in determining how to guide the sentencer's decision in this respect. *Id*. at 976-77. Petitioner's jury was permitted to conduct a backward-looking and forward-looking inquiry when looking at the prior convictions for crimes committed after the murder; and petitioner has not directed the Court's attention to any United States Supreme Court law prohibiting this.

Moreover, the state court cases which have addressed the issue of whether it is proper to permit a subsequent crime for which there is a conviction at the time of sentencing to be considered for enhancement purposes hold that prior convictions for crimes committed after the crime upon which a defendant is being sentenced are sufficient to establish a statutory aggravating circumstance. *Knight v.* State, 770 So.2d 663, 670 (Fla. 2000), *cert. denied*, 532 U.S. 1011 (2001) (determining it was proper to consider a subsequent crime as a prior violent felony since the statute referred to previous convictions and not previous crimes); *King v. State*, 390 So.2d 315, 320 (Fla. 1980), *cert. denied*, 450 U.S. 989 (1981) ("The legislative intent is clear that any violent crime for which there was a conviction at the time of sentencing should be considered as an aggravating circumstance."); *Daugherty v. State*, 419 So.2d 1067 (Fla. 1982) (finding prior conviction for subsequent crime qualified as previous conviction); *State v. Steelman*, 612 P.2d 475 (Ariz. 1980) (rejecting a claim that out-of-state murder and robbery convictions should not have been considered as an aggravating circumstance since they were committed after the murders for which the defendant was sentenced to death). *See also People v. Hendricks*, 737 P.2d 1350 (Cal. 1987) (holding that the order of the

commission of the homicides was immaterial for implementation of a prior murder convictions special circumstance statute). Furthermore, state courts have found that the term "previously convicted," which is used in state statutes to establish prior violent felony convictions as an aggravating circumstance, refers to a time prior to the sentence, as opposed to prior to the date of the commission of the capital offense. *Ex Parte Coulter*, 438 So.2d 352 (Ala. 1983); *see also Coulter v. State*, 438 So. 2d 336 (Ala.Cr.App. 1982).

While it is not difficult to appreciate the logic of petitioner's argument that the prosecutor was able to engineer the order of the trials to the State's advantage at sentencing — in fact, the prosecutor actually related on the record that "[w]e never anticipated trying the homicide case until we were in a position where we felt comfortable about the number of aggravating circumstances" [Court File No. 39, Addendum No. 5, Vol. 12, at 3-4], nevertheless, it remains that petitioner has not directed this district court to any Supreme Court precedent finding such actions to be unconstitutional.

Because this claim does not entitle the petitioner to relief unless adjudication of the claim resulted in a decision that was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, *see* 28 U.S.C. § 2254(d), and because the state court's resolution of the claim (*i.e.*, that trying Nichols' cases out of chronological order did not violate his constitutional rights) was neither of these things, his claim will be **DISMISSED**.

### b.    Prior Convictions (Claim 28)

Petitioner also challenges the use of prior convictions as an aggravating circumstance, without asserting a constitutional violation, claiming they were not final convictions because final

judgments had not been entered.  Judgments had not been entered in these cases because the trial

court delayed sentencing at the request of Nichols.  *See State v. Nichols*, 877 S.W.2d at 737.

   This claim was raised in state court only as a matter of state law.  The Tennessee Supreme

Court concluded that Tenn. Code Ann. § 39-13-204(i)(2)[44] requires only a previous conviction and

not a final judgment, and the indictment and minutes of the trial court offered to prove these

convictions were admissible under the Tennessee Rules of Evidence.

   Petitioner failed to raise this claim in his habeas petition or in state court on constitutional

grounds.  Petitioner raised this claim on direct appeal under "the procedures set out in Tennessee

Rule of Criminal Procedure 32(e) and Tennessee Rule of Evidence 803(22)" [Court File No. 50,

Addendum 6, Vol. 1, at 79-80].  "[T]he habeas petitioner must present his claim to the state courts

as a federal constitutional issue – not merely as an issue arising under state law."  *Koontz v. Glossa*,

731 F.2d 365, 368 (6th Cir. 1984).  Although petitioner stated, in his state appellate brief, "[t]o allow

the use of these cases as 'final convictions' was error and violated Mr. Nichol's rights under the

Fourth, Fifth, Sixth, and Eighth Amendments to the United States Constitution . . and a new

sentencing hearing should be granted" [*Id.*], these general allegations of denial of these broad

constitutional rights does not constitute a fair presentation of the claim that specific constitutional

rights were violated.  *See McMean v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  The factual and

legal basis for a constitutional claim must be presented to the state courts.  Without specifying which

particular right identified under each amendment was violated, petitioner failed to fairly present this

claim as a constitutional violation in the Tennessee courts.  On direct appeal petitioner did not rely

---

[44]     This aggravating circumstance provides:  "The defendant was previously
*convicted* of one (1) or more felonies . . . ."

178

upon any federal cases employing constitutional analysis; upon any state cases employing federal constitutional analysis; phrase the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or allege facts were within the mainstream of constitutional law. *See Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987).

Consequently, petitioner has procedurally defaulted his claim that the trial court erred when it allowed the prosecution to use his prior convictions as aggravating circumstances to support the death penalty. Petitioner's failure to exhaust state remedies on federal constitutional grounds has resulted in a procedural default of this claim. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Petitioner did not present the claim in state court as a matter of federal law and absent a showing of cause and prejudice or miscarriage of justice, the claim is not reviewable in this habeas proceeding. Petitioner has offered nothing to demonstrate cause and prejudice. Moreover, petitioner has failed to allege a violation of any constitutional right in this habeas petition.

Assuming for the sake of argument that this claim was exhausted, petitioner would not be entitled to any habeas relief because he has not demonstrated that the state court decision was contrary to, or an unreasonable application of, federal law. Thus habeas review of this claim is barred by petitioner's state procedural default and it will be **DISMISSED**.

### 16. <u>1984 Convictions (Claim 24)</u>

Challenging the constitutionality of his 1984 convictions being admitted into evidence, petitioner asserts the notice provisions of the Tennessee Rules of Evidence were not followed; an evidentiary hearing was not held; and the convictions were inadmissible under Rule 609 or Rule 404(b) of the Tennessee Rules of Evidence. The Tennessee Supreme Court concluded the trial court admitted the evidence, not for impeachment purposes, but rather to allow the State to rebut Nichols'

argument that the 1988 and 1989 crimes were sudden deviations from his normally placid behavior. Finding that petitioner had clearly indicated the murder and rape in the instant case were the result of a sudden feeling that overcame him, and that defense counsel had attempted to show the crime was inconsistent with defendant's otherwise passive nature, the Tennessee Supreme Court concluded the trial court admitted the conviction to rebut evidence that petitioner was a docile person. Finding that the admission of this probative evidence outweighed the danger of unfair prejudice with proper limiting instructions, the court concluded the evidence could be considered by the jury.

Petitioner raised this claim in state court, citing to the Tennessee Rules of Evidence, though he did make a passing reference to certain constitutional amendments of the United States Constitution.[45] "Fair presentation of a federal constitutional issue to a state court requires that the issue be raised by direct citation to federal cases employing constitutional analysis or to state cases relying on constitutional analysis with similar fact patterns." *Dietz v. Money*, 391 F.3d 804, 808 (6th Cir. 2004). This claim was exhausted in the Tennessee Supreme Court on direct appeal as an error of state law and federal habeas corpus relief does not lie for errors of state law. The failure to fairly present this as a constitutional claim in state court has resulted in the procedural default of any claim of federal constitutional error. No cause and prejudice or miscarriage of justice proof has been

---

[45]     The last sentence in Nichols' brief on direct appeal claiming that the admission of the 1984 conviction denied his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution does not fulfill petitioner's obligation to first fairly present all constitutional claims to state courts [Court File No. 50, Addendum No. 6, Vol. 1, p. 37-38].

offered. Petitioner has procedurally defaulted his claim that the trial court erred by admitting evidence of his 1984 conviction resulting in the **DISMISSAL** of this claim.[46]

### 17. <u>Polling the Jury (Claim 25)</u>

The Court resolved this issue above in section 8.d *supra*, at 120-123.

### 18. <u>Unconstitutionality of Tennessee's Death Penalty Statute (Claim 26)</u>

Petitioner contends the Tennessee death penalty statute violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution for nine different reasons. On direct appeal petitioner challenged the constitutionality of the Tennessee death penalty statute on the ground that it creates a mandatory death penalty, and on the ground that it is cruel and unusual punishment. Neither of these grounds are raised in the habeas petition. On post-conviction appeal petitioner did not raise this claim.

Petitioner has procedurally defaulted claim twenty-six in its entirety because he failed to present this claim to the state court. Absent a showing of cause and prejudice petitioner is not entitled to any habeas relief on this claim.[47]      Hence, petitioner's claim attacking the

---

[46]      Assuming purely for argument's sake, that petitioner exhausted his state remedies, respondent's motion to dismiss this claim would be granted because petitioner has not demonstrated that the state court decision was based on an unreasonable determination of the facts, unreasonable application of federal law, or was contrary to federal law.

[47]      The Court observes that the Sixth Circuit has held that Tennessee's death penalty statute, enacted in 1977, is constitutional. *Workman v. Bell*, 178 F.3d 759, 778 (6th Cir. 1998). Assuming *arguendo* that this claim is properly before the Court, petitioner would not be entitled to habeas relief. This is so, because he has failed to demonstrate the Tennessee Supreme Court's denial of his claim, on direct appeal, attacking Tennessee's capital sentencing scheme as cruel and unusual punishment was contrary to or an unreasonable application of federal law.

constitutionality of Tennessee's death penalty statute will be **DISMISSED** as procedurally defaulted.

### 19.     Notice of Prior Conviction in Case 175433 As Aggravating Circumstance (Claim 27)

According to petitioner, his Sixth, Eighth, and Fourteenth Amendment rights were violated when the trial court permitted the prosecutor to rely upon his conviction for aggravated rape in case number 175433 as an aggravating circumstance.

Prior to trial, the State filed its notice of aggravating circumstances and the notice included a prior conviction of Aggravated Rape case number 175487 on October 24, 1989, in Division I of Hamilton County Criminal Court. On the day of his guilty plea and sentencing hearing in the instant case, petitioner objected to the use of case number 175487 as an aggravating circumstance because the State had dismissed that case. The prosecutor indicated that case number 175433 was dismissed but upon review of his file the prosecutor determined that case number 175433, charging aggravated rape by anal intercourse, was in fact the indictment to which petitioner pleaded guilty; and petitioner's case number 175487 charging aggravated rape by vaginal intercourse of the same victim had in fact been dismissed. The prosecutor argued the notice which provided the correct charge of aggravated rape, the correct date upon which he pleaded guilty, and the correct court in which Nichols entered the guilty plea was sufficient notice of the prior felony conviction since petitioner knew the crime to which he pleaded guilty  [Court File No. 41, Addendum No. 5, Vol. 21, at 47-52]. The trial court, denying petitioner's challenge, observed that petitioner and counsel knew which case he pleaded guilty to on that date and the incorrect docket number did not deny him proper notice of the prior conviction to be used as an aggravating circumstance [*Id*. at 53].

The Tennessee Supreme Court determined petitioner was aware that he had pleaded guilty to aggravated rape on October 24, 1989, and was not misled or prejudiced by the State's error. There is nothing in the record to indicate petitioner was not aware that the State intended to use his October 24, 1989 aggravated rape conviction as an aggravating circumstance. Petitioner has not directed the district court to any United States Supreme Court case which provides that notice of a prior felony conviction is insufficient when the defendant is notified of the correct charge of aggravated rape, the correct date of the guilty plea, and the correct court in which a guilty plea was entered, but where there is an incorrect case/indictment number.[48] The Tennessee Supreme Court's decision that the petitioner was neither mislead nor prejudiced by the State's notice of aggravating circumstances is neither contrary to, nor an unreasonable application of, any clearly established federal law.

Petitioner's claim that he had no prior notice of a conviction used as an aggravating circumstance will be **DISMISSED**.

20.    <u>**Newly Discovered Evidence (Claim 29)**</u>

Petitioner's allegation that the trial court erred in denying his motion for new trial is without merit. After trial, petitioner's counsel received allegedly new information from an anonymous male

---

[48]    Petitioner knew the case number to which the notice referred had been dismissed and that the crime to which the notice referred was actually case number175433. Petitioner has not demonstrated that he was not on notice of the prior conviction that the state intended to use to as an aggravating circumstance. Petitioner cites *Jones v. United States*, 526 U.S. 227, 249 (1999), and *Hamling v. United States*, 418 U.S. 87, 116-18 (1974), for the proposition that he has a right to fair notice of the crime to which the State intends to use as an aggravating factor. Petitioner has not demonstrated that he was denied fair notice when the State mistakenly typed in the number of a case which was actually dismissed but provided the correct charge of aggravated rape, the correct date upon which he entered his guilty plea, and the correct court in which he entered his guilty plea. Petitioner knew the case number to which the notice referred had been dismissed.

source relating to abuse of the defendant by his father, which allegations have been kept confidential [Court File No. 43, Addendum No. 5, Vol. 27, at Exhibit D (after page 32)].

The Tennessee Supreme Court determined that petitioner would not be entitled to a new trial unless he could establish reasonable diligence in seeking the newly discovered evidence, materiality of the evidence, and that the evidence would likely change the result of the trial. The court observed that the trial court found the first prong–reasonable diligence in seeking the newly discovered evidence–had been met, but found the other two were not established. The Tennessee Supreme Court agreed the alleged evidence, if it could be produced as represented, would not change the results of the trial. Observing that proof had already been introduced in the record that Nichols' father was abusive, the court agreed with the trial court's judgment denying a new trial.

Because of the interest in preserving the finality of judgments, however, motions for a new trial based upon newly discovered evidence are "granted with caution." *United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991). "A trial judge's order denying a motion for new trial on an appraisal of newly discovered evidence should remain undisturbed 'except for most extraordinary circumstances.'" *Wolcher v. United States*, 76 S.Ct. 254, 255 (1955) (quoting *United States v. Johnson*, 327 U.S. 106,111 (1946). To obtain a new trial in Tennessee on the basis of newly discovered evidence, the defendant must establish the following: (1) reasonable diligence in seeking the newly discovered evidence; (2) materiality of the evidence; and (3) that the evidence will likely change the result of the trial. *State v. Goswick*, 656 S.W.2d 355, 358-360 (Tenn. 1983).

The Court has reviewed the alleged new evidence and finds the state court decision, that the evidence would likely not change the results of the trial, is based on a reasonable determination of the facts in light of the evidence in the state court record, and is not contrary to, or an unreasonable

184

application of, clearly established federal law as established by the United States Supreme Court. The information provided by the anonymous male source is subject to exclusion under the hearsay rules. There is no evidence that this person actually witnessed the alleged act. No credible or reliable evidence was submitted to the trial court; the caller was anonymous. Moreover, there is no indication the witness could be contacted and subpoenaed to court to testify. Additionally, trial counsel's affidavit reflects that petitioner has no recollection of the alleged incident [Court File No. 43, Addendum No. 5, Vol. 27, Exhibit D]. In sum, there is no proof that the newly discovered evidence is admissible and credible and that it would have produced a different result if presented before the original judgment. Accordingly, petitioner's claim that the trial court erred when it denied his motion for new trial on the basis of newly discovered evidence will be **DISMISSED** as it was not based on an unreasonable determination of the facts, nor was it contrary to, or an unreasonable application of Supreme Court precedent.

### 21.    Caldwell Error (Claim 30)

Petitioner alleges that in violation of his rights under the Eighth Amendment to the United States Constitution, the imposition of his death sentence is error because the prosecutor presented arguments that implied the decision was not final, minimized the jury's role in sentencing, and diminished the collective sense of responsibility, in violation of United States Supreme Court precedent. Specifically, petitioner contends the prosecutor minimized the jury's role in the case by referring to himself as the "bad guy" who sought the punishment of death against petitioner, implying that it was the State of Tennessee which chose the penalty.

On direct appeal petitioner claimed the statement by the prosecutor that it was the people of Tennessee who asked that punishment be the death penalty minimized the jury's role in this case.

Petitioner also claimed the statement implied that because the State of Tennessee chose to pursue the death penalty, the death penalty should be applied in this case, thus, diminishing the responsibility of the jury. The Tennessee Supreme Court interpreted petitioner's claim as attacking the prosecutor's argument that "the people of the State of Tennessee, speaking through their legislators, have asked that the death penalty be a punishment" and claiming that it diminished the jury's responsibility in making the sentencing decision in this case had violated *Caldwell v. Mississippi*, 472 U.S. 320 (1985). The court determined,

> This statement was a reply to the defendant's argument that the only reason the death penalty was being sought was because "the prosecution wants Harold Wayne Nichols to die" and was meant to point out that the people of Tennessee through their elected representatives, not the prosecution, had determined that death was a possible punishment in such cases. The defendant made no contemporaneous objection to this argument. In its opening argument, the State emphasized that it was the jury's duty to make the sentencing decision in this case. Taken in context, the prosecution's argument did not lead the jury to believe that the responsibility for determining the appropriateness of defendant's sentence lay elsewhere.

*State v. Nichols*, 877 S.W. 2d at 733.

The only claim fairly presented to the state court on this subject is petitioner's attack on the prosecutor's statement telling the jury that it was the people of Tennessee who asked that the death penalty be the punishment in Tennessee, and that such statement minimized the jury's role and diminished its collective sense of responsibility in violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985). This is the only statement petitioner challenged on direct appeal and, therefore, is the only claim that is not procedurally defaulted and properly before this Court.

In *Caldwell*, the prosecutor told the jury that any decision it made would automatically be reviewed by the state supreme court and that its decision would not be final. *Caldwell*, 472 U.S. at 324-26. This is not what happened in the instant case.

186

First, the prosecutor argued,

> Ladies and gentlemen, it's not like the State is heartless. It's not like the State wants you to do this, but it's a question, ladies and gentlemen, of just getting down to basic what's right, what's fair, and what is just. It's not a matter of wants or not wants. It's not a matter of what the family wants. It's not a matter of what the State wants. It's not a matter of what people in Hamilton County want. Want is not the issue. But what do you do, what do you do with a man who's perpetrated that kind of crime?

[Court File No. 43, Addendum No. 5, Vol. 24, at 511]. The defense counsel argued,

> The prosecution in this case, from the testimony of our expert in his cross examination, and some other things that were said during the evidence in this case, may want you to kill Wayne Nichols because his lawyers put together a defense for him, not a defense to his killing Karen Pulley, but a defense to their killing him. . .
>
> . . . .
>
> But don't kill - - -or don't let Wayne Nichols be killed because we asked Eric Engum to look at various ways of presenting our evidence to you because we asked him what might be wrong with Wayne Nichols.
>
> Don't kill him because we used the ministers in his life, . . . Don't kill him because we applied to your human quality. Don't kill him because we appealed to your religion. . . . Don't kill Wayne Nichols because Eric Engum wrote a report.

[*Id*. at 512-15]. At this point the prosecutor objected to defense counsel "referring to the jury killing Wayne Nichols." [*Id*. at 515]. Defense counsel later argued,

> But we're here because the prosecution wants Harold Wayne Nichols to die. Now Mr. Bevil told you it's not about the State wanting Harold Wayne Nichols to die. If it's not, then why are we here? They want him to die, and we've tried to give you reasons he can live, not reasons to let him off. No one wants Wayne Nichols on the streets again, including Wayne. You heard Wayne testify, and the prosecutor pointed it out to you, that if he were on the streets today, he doesn't know, he might've done it again. He doesn't want to be on the streets and he's not asking you to put him on 'em. We just gave you reasons, or tried to give you reasons why he can live, why you can sentence him to life in prison.

[*Id.* at 523-24]. Defense counsel closed arguing,

> The prosecution in this case would like for you to go back into the jury room and to decide that if you exercise mercy and compassion, and that if you sentence Wayne

Nichols to life in prison, in some way the State has lost the case. Now the State is you and me and everybody out here, Judge Meyer, Ms. Rogers. Everybody here is the State. We're the State. Think about this. You know, the State, that's us, we never lose, we never lose when justice is done. If you believe that justice allows you to sentence Wayne Nichols to a life term in prison, then the State has won. Remember he's already been convicted of five rapes, each of which carries a maximum life term. When justice is done the State always wins. We're always better when justice is done. Despite what the State might tell you, you have a choice. You have a personal, individual, moral choice that you can take into your heart. It's your duty to be fair. And you told us that you would be fair. . . .

[*Id.* at 555]. The prosecutor responded

Members of the jury, I know you've heard a lot of talking and you probably don't want to hear any more, and I don't blame you. It's late and I know you're tired. But I would ask that you bear with me and give me a chance to just respond because, you know, I sort of feel like I'm on trial here. I've heard the prosecutor, the prosecutor, the prosecutor so many times that I feel like, you know, maybe I'm in the wrong. Maybe I ought to just go over and lay down in the floor and say, "There's no sense in prosecuting this case. Let's don't get the death penalty. Let's don't even ask the jury to consider it. It doesn't matter that the people of the State of Tennessee, speaking through their legislators, have asked that the death penalty be a punishment. But why do you want to be the bad guy, Steve? Why do you want to be the prosecutor? . . .

[*Id.* at 555-56].

The statements made by the prosecutor informed the jury that "the people of the State of Tennessee, speaking through their legislators, have asked that the death penalty be *a* punishment" [*Id*. at 556] (emphasis added). Defense counsel did not object to this argument at the time. This argument did not lead the jury to believe the responsibility for determining the appropriateness of the defendant's death rests elsewhere as prohibited by *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985). The prosecutor did not tell the jury that the people of the State of Tennessee, speaking through their legislators, have determined that petitioner should receive the death penalty but only that the death penalty could be asked for in this situation.

188

In *Caldwell*, the condemned comments told the jury that the defense "would have you believe that you're going to kill this man and they know- - they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable." *Caldwell v. Mississippi*, 472 U.S. at 325. The Supreme Court has subsequently explained that *Caldwell* is relevant only to comments that "mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Darden v. Wainwright,* 477 U.S. 168, 184, n. 15 (1986). The statement in the instant case did not mislead the jury as to its role, it only explained why the State was asking for the death penalty — they were asking for the death penalty because the law allowed it. Nothing in *Caldwell* prohibits the State from telling the jury the law permits the State to ask for the death penalty under certain circumstances.

In order to establish a *Caldwell* violation, a defendant must show the remarks made to the jury "improperly described the role assigned to the jury by local law," minimizing their sense of true responsibility. *Dugger v. Adams*, 489 U.S. 401, 407 (1989). In the instant case, the prosecutor's argument did not improperly describe the role assigned to the jury by local law. In light of the facts before the Court, the state post-conviction court's adjudication of this claim was neither contrary to, nor an unreasonable application of, existing Supreme Court precedent, *i.e.,* *Caldwell v. Mississippi*.

Accordingly, petitioner's *Caldwell* claim will be **DISMISSED**.

## 22. Cumulative Error (Claim 31)

Petitioner presents a claim of cumulative error. Petitioner claims "[t]he accumulation of errors which occurred before, during, and after Mr. Nichols' state capital proceedings constitute a fundamental denial of due process of law" [Court File No. 82, at, 48].

189

On post-conviction review, the Tennessee Supreme Court found that petitioner's contention that the trial court's findings were clearly erroneous and that the cumulative effect of all the errors in the record amounted to reversible error were without merit. *Nichols v. State*, 90 S.W.3d 576, 607 (Tenn. 2002).

"Errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone . . . may cumulatively produce a trial setting that is fundamentally unfair." *United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000) (*citing Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983)) (internal quotation marks omitted). However, the standard the Supreme Court has directed federal courts to use on collateral review is whether the trial error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (*quoting Kotteakos v. United States*, 328 U.S. 750, 776 (1946). To obtain relief, therefore, petitioner must present an accumulation of non-reversible errors that must lead this district court to the firm belief that an injustice has been done resulting in a "fundamentally unfair" proceeding. However, the mere addition of numerous insubstantial complaints will not lead to a successful "cumulative error" argument. *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000) (defendant cannot simply add individual meritless claims to show cumulative error).

In analyzing the case for cumulative error, the Court evaluates the effect of matters determined to be error, not the cumulative effect of non-errors. *Lundy v. Campbell*, 888 F.2d 467, 481 (6th Cir. 1989), *cert. denied*, 495 U.S. 950 (1990). In addition the Court may only consider the errors committed in the state trial court, and only errors that have not been procedurally barred from habeas corpus review. *Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) (*en banc*), *cert. denied*, 508 U.S. 960 (1993).

To the extent this claim was initially raised in state court, the Supreme Court of Tennessee determined that any errors were harmless beyond a reasonable doubt. The accumulation of these alleged non-reversible errors do not lead this federal district court to the firm belief that an injustice has been done resulting in a "fundamentally unfair" proceeding. Petitioner has failed to demonstrate that, based upon alleged cumulative error, that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair or his sentence and conviction unreliable. The Court concludes that petitioner has not demonstrated that any errors made by the state courts deprived him of due process. There is no cumulative error made out by a combination of the various unavailing arguments raised in this case.

Petitioner has failed to demonstrate that the state court's decision was contrary to, or involved an unreasonable application of, established federal law as determined by the United States Supreme Court, or involved an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, the Court will **GRANT** respondent's motion to dismiss on this cumulative error claim and petitioner's cumulative error claim will be **DISMISSED**.

### 23. <u>Actual Innocent Claim (Claim 32)</u>

Petitioner has filed a motion to dismiss certain claims, specifically requesting to withdraw his actual innocence claim [Court File No. 243]. While this habeas proceeding was pending, petitioner pursued DNA testing in state court. The test results have been filed with the court and indicate the spermatozoa from the Karen Pulley gown was petitioner's [Court file No. 243]. The motion to dismiss certain claims including petitioner's actual innocent claim is **GRANTED** [Court File No. 243].

## V.
## CONCLUSION

Respondent's motion for summary judgment will be **GRANTED** as to all claims.  Petitioner is not entitled to an evidentiary hearing, and his petition filed pursuant to 28 U.S.C. § 2254 will be **DISMISSED**.

A judgment will enter.

ENTER this the 25th day of July, 2006.

_____/s/ R. Allan Edgar_____
R. ALLAN EDGAR
UNITED STATES DISTRICT JUDGE

192